STORCH AMINI & MUNVES PC
Russell D. Munves
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, NY 10017
(212) 490-4100

BERGER & MONTAGUE, P.C.
Todd S. Collins (Admitted *Pro Hac Vice*)
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
*Attorneys for Plaintiff Advanced Analytics, Inc.*

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ADVANCED ANALYTICS, INC.,                    :

    Plaintiff and Counterclaim-Defendant,  :     No. 04 Civ. 3531 (LTS)(HBP)

    v.                                   :

CITIGROUP GLOBAL MARKETS, INC.,              :
SALOMON SMITH BARNEY, INC., and
THE YIELD BOOK INC., f/k/a SALOMON           :
ANALYTICS, INC.,
                                             :
    Defendants and Counterclaim-Plaintiffs.

-----------------------------------------------------------x

**PLAINTIFF'S OBJECTION TO THE MAGISTRATE JUDGE'S ORDER OF
SEPTEMBER 5, 2012 GRANTING DEFENDANTS' MOTION TO STRIKE THE
NOTICE OF EXPERT TESTIMONY OF JIANQING FAN, DATED JULY 17, 2012**

## TABLE OF CONTENTS

I. Background ............................................................................................................. 2

II. The Fan Notice was a Reply Expert Report ......................................................... 4

    A. Because Dr. Johannes "Opened the Door" with New Matter and New Methodology, Dr. Fan was Refuting the Johannes Expert Notice ............................................. 4

    B. The Fan Expert Notice Directly Refuted Other Assertions of Defendants' Experts 7

    C. The Fan Notice was a Timely Reply to Defendants' Expert Report .................. 9

III. The Fan Expert Notice Should Be Permitted Because Preclusion of Expert Testimony is a Drastic Remedy, and Defendants Suffer No Prejudice from The Fan Notice ...................... 10

IV. Conclusion ........................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.*,
  11 CV 1299 (HB), 2012 U.S. Dist. LEXIS 70750 (S.D.N.Y. May 21, 2012) ........................... 1

*Lidle v. Cirrus Design Corp.*,
  2009 U.S. Dist. LEXIS 118850 (S.D.N.Y. Dec. 18, 2009) ....................................................... 10

*Lore v. City of Syracuse*,
  2005 U.S. Dist. LEXIS 30328 (N.D.N.Y. Nov. 17, 2005) ................................................... 3, 12

*Manoma Realty Mgmt., LLC v. Fed. Pac. Elec. Co.*,
  2007 U.S. Dist. LEXIS 54887 (S.D.N.Y. July 27, 2007) ..................................................... 3, 11

*Papyrus Tech. Corp. v. NYSE, LLC*,
  257 F.R.D. 39 (S.D.N.Y. 2009) ........................................................................................ 10, 11, 12

Dr. Fan's July 17, 2012 Notice of Expert Testimony ("Fan Expert Notice") (attached as Exhibit viii(cc) to the Declaration of Todd S. Collins of September 28, 2012, submitted simultaneously herewith) ("Collins Dec.") is proper. Respectfully, the Magistrate Judge's Order of September 5, 2012, granting Defendants' motion to strike, is clearly erroneous and should be modified or set aside.[1]

The Fan Expert Notice responds directly to new assertions advanced by Defendants' experts. Significantly, the analysis of one of Defendants' experts, Dr. Michael Johannes, with respect to particular test data from Defendants' tests of the ACE sequences led Dr. Fan to make a critical discovery: the test data, which came from documents produced in discovery in 2005, had been falsified by Defendants. This falsification resulted in Dr. Johannes rendering an erroneous finding regarding a key issue -- the accuracy of the ACE sequences. Plainly, the Magistrate Judge did not appreciate the import of the Fan Expert Notice -- uncovering evidence of the falsification of evidence -- in granting the motion to strike it. Moreover, Defendants demonstrated absolutely no legally cognizable damage or prejudice resulting from permitting Plaintiff to rely upon the Fan Expert Notice. The Fan Expert Notice requires no new testing to be conducted; it simply relies on Defendants' own test data show and shows that Dr. Johannes' opinions based on that falsified test data are erroneous. Discovery is not even complete, as the

---

[1] The Magistrate Judge's ruling on Defendants' Motion to Strike is contained at pages 3-5 of the Transcript of Civil Cause for Motions Conference before the Honorable Henry Pitman, United States Magistrate Judge (the "Transcript" or "Tr.") (Collins Dec., Exhibit i(a)).

With respect to a nondispositive matter, Rule 72(a) provides, *inter alia*: "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *See Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 11 CV 1299 (HB), 2012 U.S. Dist. LEXIS 70750 (S.D.N.Y. May 21, 2012) ("A finding is 'clearly erroneous' when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'") (*quoting from United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004)) (quotation and citation omitted by the *Genon* Court).

Magistrate Judge stayed discovery into profits damages to give Defendants another shot at summary judgment on liability.

I. **Background**

Pursuant to a January 19, 2012 Order of the Magistrate Judge (docket no. 143), Plaintiff was to disclose any additional expert disclosures by May 17, 2012, and Defendants were to disclose any additional expert disclosures by June 18, 2012. Both Plaintiff and Defendants did so by the dates specified. The January 19, 2012 Order made no reference to a reply expert report to be submitted by Plaintiff with respect to Defendants' additional expert disclosures.

Upon review and analysis of Defendants' additional expert disclosures, Plaintiff determined that it was necessary to refute new material contained in those disclosures, particularly the Notice of Expert Testimony of Michael Johannes, Ph.D. ("Johannes Expert Notice") (Collins Dec., Exhibit viii(dd)). In response to the Johannes Expert Notice and others of Defendants' June 2012 expert disclosures, Plaintiff timely submitted the Fan Expert Notice thirty (30) days later, on July 18, 2012.

In granting Defendants' motion to strike, the Magistrate Judge noted that his January 17, 2012 Order "contemplated only two rounds of expert discovery." Tr. 3:23-24 (Collins Dec., Exhibit i(a)). The Magistrate Judge ruled that a "reply to defendants' expert report would be appropriate only if defendants' expert report raised new matter or new methodology that was not addressed in [Dr.] Fan's opening report." The Magistrate Judge added: "the purpose of a reply expert report is to address the new matter raised by defendant, if defendant raises new matter in their expert report. It's not an opportunity to simply repeat or buttress what the expert says in his or her opening report." Tr. 4:1-4, 4:18-22 (Collins Dec., Exhibit i(a)).

2

Plaintiff respectfully submits that the Magistrate Judge's ruling is clearly erroneous because, as a reply expert report necessitated by Defendants' new matter, the Fan Notice was timely served, and Defendants suffer no prejudice from the Fan Expert Notice.

As an initial matter, the Fan Expert Notice does exactly what the Magistrate Judge ruled that a reply expert report is supposed to do. The Fan Expert Notice is appropriate because "defendants' expert report raised new matter or new methodology that was not addressed in [Dr.] Fan's opening report." It is precisely "the new matter raised by defendant, if defendant raises new matter in their expert report", that the Fan Expert Notice addresses. As such it is a reply report, and it was timely served within the thirty day window.[2]

Second, Courts in this District look at four factors in deciding whether to preclude an expert report: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's [scheduling] order." *Manoma Realty Mgmt., LLC v. Fed. Pac. Elec.* Co., 2007 U.S. Dist. LEXIS 54887 at *16 (S.D.N.Y. July 27, 2007) (internal citations omitted). Of all these factors, "[t]he touchstone for determining whether to exclude an untimely expert report is whether the party opposing its admission is prejudiced." *Lore v. City of Syracuse*, 2005 U.S. Dist. Lexis 30328 at *10 (N.D.N.Y. Nov. 17, 2005). The Magistrate Judge made no finding that, if the Fan Expert Notice were to be allowed, Defendants would suffer prejudice. This reflects the fact that Defendants themselves failed to show any possible prejudice.

---

[2] The Federal Rules of Civil Procedure give a party thirty days to serve a rebuttal report. *See* Fed. R. Civ. P. 26(a)(2).

3

## II. The Fan Notice was a Reply Expert Report and was Timely

### A. Because Dr. Johannes "Opened the Door" with New Matter and New Methodology, Dr. Fan was Refuting the Johannes Expert Notice

Dr. Johannes addressed in the Johannes Expert Notice an entirely new subject -- his (thoroughly mistaken) analysis of Redacted Redacted Dr. Fan, obviously, did not address Dr. Johannes' mistaken analysis in his earlier expert report for the simple reason that, at the time of that earlier report by Dr. Fan, Dr. Johannes' analysis had not yet been disclosed to Plaintiff.

According to the Johannes Expert Notice:

Redacted

Paragraph 9, p. 5 (emphasis in original). *See also* Johannes Expert Notice, paragraphs 67-73, pp. 26-27.

This is the first time that an expert of Defendants has weighed in on the issue of the superiority of ACE to Defendants' sequences, concluding, after a detailed weighing of the evidence, that ACE is no more accurate in valuing securities and perhaps in some instances less so. Dr. Johannes specifically analyzed (or, rather, misanalyzed) the ACE test results. In response, Dr. Fan appropriately addresses the errors in the Johannes Expert Notice and, in addition, Defendants' falsification of the test results. This falsification became known only upon Dr. Fan's analysis of the Johannes Expert Notice. In refuting Dr. Johannes, Dr. Fan sets forth

4

the facts concerning Defendants' manipulation of the test results to make Defendants' sequences look better and ACE look worse.

Dr. Fan's analysis begins with a discussion of Dr. Johannes' errors concerning the accuracy and superiority of ACE *even assuming* that Defendants had *not* manipulated the test results. *See* Fan Expert Notice, paragraphs 5-11, pp. 7-10. Dr. Fan then moves on to a detailed discussion of precisely how Defendants manipulated the ACE tests results to attempt to minimize its superiority. *See id.*, paragraph 16-18, pp. 11-12. Dr. Fan next assesses the ACE test results after correcting for Defendants' manipulation of the test data, demonstrating that ACE64 is more accurate than Defendants' single seed 200 path production sequence ("Production200") Redacted *Id.* at paragraph 20, p. 13; *see generally id.*, at paragraphs 19-30, pp. 12-15.

All of the foregoing analysis was prepared and presented in direct refutation of the specific findings of the Johannes Expert Notice. And this analysis could not have been undertaken or presented to the Court at any earlier date, because Dr. Johannes' contentions about what the data showed were not known. Moreover, the tampering with test results was difficult to uncover. As Dr. Fan explains, because Defendants have never produced ACE test systems. "This made the discovery of tampering [with] the ACE test results by Defendants unduly difficult. If ACE test systems were produced, I would be able to perform the tests done by Mr. Russell and Dr. Teytel and reproduce all the true ACE test results." Fan Expert Notice, paragraph 41, pp. 17-18.

The ACE testing documents are voluminous, involving thousands of test results. Tampering is easy to do. Uncovering tampering with respect to this mass of test results would have posed an extraordinary challenge. Not only did Defendants withhold the ACE test systems,

5

as described above, but also they withheld a complete set of code sufficient to allow Plaintiff to compile and build The Yield Book system. *See id.*, paragraph 42, p. 18.

The break – the tipoff of widespread tampering – did not come until the submission of the Johannes Expert Notice. Defendants had provided Dr. Johannes the tampered-with test results. Dr. Johannes' emphasis on a         Redacted

Redacted                                       appeared unusual in light of

ACE's clear superiority. Dr. Fan investigated. He first observed that, for the         Redacted

Redacted

Redacted This is impossible. Price moves inversely to rates, which means that if the OAS increases, the total yield spread increases and the price goes down. As Dr. Fan explains, "This clearly indicates that the results have been tampered with by Defendants." *Id.*, paragraph 6, p.8.

Dr. Fan continued to investigate. He found that purported errors of ACE64 unmistakably showed         Redacted                                       In other words, as a result of tampering, the test results appeared to indicate that ACE was inferior in accuracy. In fact, it was Defendants' sequence, and not ACE, that was inferior.         Redacted

Redacted

Redacted                                       *Id.*, paragraph 26, p. 14.

Within a month after the Johannes Expert Notice, Dr. Fan promptly reported his findings in the Fan Expert Notice.

To disallow the introduction of evidence of tampering with the ACE test results would reward Defendants for their improper actions. Allowing the introduction of this evidence works no legally cognizable prejudice.

6

### B. The Fan Expert Notice Directly Refuted Other Assertions of Defendants' Experts

In addition to challenging Dr. Johannes' assertions in the June 2012 Johannes Expert Notice with respect to the relative accuracy of Defendants' alleged sequences and the ACE sequences, the Fan Expert Notice also properly addressed other opinions that Defendants' experts put forward in their June 2012 Expert Notices. Again, Defendants suffer no prejudice.

The Johannes Expert Notice "Summary of Opinions" section is contained in six bullet points (paragraph 9, pp. 5-6). The third bullet point, discussed above, concerns Dr. Johannes' mistaken opinion with respect to the accuracy of Defendants' purported sequences against that of the ACE sequences. The first two bullet points, and the last three, address Dr. Johannes' views -- not previously shared with Plaintiff -- on alleged limitations with respect to "model-based" valuations for MBS.

The first Johannes bullet point claims that these alleged limitations include the fact that "[a]t any point in time, an MBS will have at least two market prices" and, as a result of a multitude of models and parameters used, "typically a wide range of resulting valuations". Dr. Fan addresses this point directly, pointing out that what Dr. Johannes "confusingly called 'market prices', are not determined by some divine methods . . . but by what he dismissively called 'model-based' valuations". Fan Expert Notice, paragraph 1(a), p. 5.

The second Johannes bullet derides the valuation models' alleged "well-known, serious defects". Dr. Fan disagrees, pointing out that "it is these very same models that market makers like Defendants use to determine fair values [for] Level 2 instruments. . . . His opinion is contradicted by all the major market participants . . . ." *Id.*, paragraph 1(b), p. 5.

The fourth Johannes bullet point asserts that there is an "insignificant" "magnitude of any accuracy gain" arising from the use of a more accurate sequence. That is incorrect. As Dr. Fan

7

counters: "Defendants can thrive with models made far more accurate by ACE. . . . The analogy is that all the other traders were using muskets, but, with ACE, Defendants' traders were armed with automatic rifles." *Id.*, paragraph 1(c), p. 5.

The fifth Johannes bullet point claims that it is not possible to use any such "accuracy gains . . . for arbitrage trading". This is not the case, according to Dr. Fan: "[A]rbitrage opportunities exist exactly because of the wide bid-and-ask spreads. . . . Further, hedging Level 2 instruments with Level 1 instruments can be an effective arbitrage . . . . " *Id.*, paragraph 1(d), p. 6.

The sixth Johannes bullet point would have it that "[a]ny alleged improvements in accuracy" resulting from use of a superior sequence, such as ACE, "would not be meaningful, given the nature of the MBS market, MBS valuation models, and the market making business". This just isn't so, as Dr. Fan explains: "[I]f the sequence is inaccurate, the interest rate paths are inaccurate, and adjusting other parameters or components does not matter; the errors will propagate throughout the prepayment model and discount valuation[,] greatly impacting the end results." *Id.*, paragraph 1(f), p. 7.

After discussing Dr. Johannes' errors with respect to the ACE test results, the remainder of the Fan Expert Notice, pages 16-19, describes other relevant evidence of tampering by Defendants. Paragraphs 31-35, page 16, address massive tampering with the Sequence Development File and Testing File Production. The Second Expert Report of Nathaniel Polish, Ph.D., dated June 18, 2012, dealt with this Production at length, thus "opening the door", and the Fan Expert Notice responded. In connection with all of Defendants' other manipulation and alteration of the evidence, the Fan Expert Notice also referenced Defendants' production of phony sequences. Fan Expert Notice, paragraphs 36-40, p. 17.

8

This is hardly, however, to minimize the importance of Dr. Fan's findings regarding Defendants' systematic tampering with the Sequence Development Files and Testing Files Production, *see* Fan Expert Notice, paragraphs 31-35, p. 16, and Defendants' production of phony sequences. *See id.* at paragraphs 36-40, p. 17. Plaintiff was diligent in bringing forward the matters that Dr. Fan addresses in these paragraphs. The Sequence Development Files and Testing Files Production occurred only in 2011, and it took months of analysis, particularly as a result of Defendants' manipulation of the documents, as well as the volume of the documents, to decipher them. Moreover, it was not until this Production, as deficient and misleading as it was, that Dr. Fan was able to discover additional bases for his conclusion that the sequences that Defendants produced were phony.[3]

### C. The Fan Notice was a Timely Reply to Defendants' Expert Report

For the above reasons the June 2012 Expert Notices of Defendants' experts, including particularly the Johannes Expert Notice, "opened the door" to a range of subjects that Dr. Fan properly replied to in the Fan Expert Notice. The Magistrate Judge ruled that a "reply to defendants' expert report would be appropriate only if defendants' expert report raised new matter or new methodology that was not addressed in [Dr.] Fan's opening report." Tr. 4:1-4, 4:18-22. As shown above, the Defendants' expert raised new matters and Dr. Fan was merely entering a newly opened door. Thus, the Fan Expert Report was timely.

The Magistrate Judge's ruling in this case finds no support even under the Magistrate Judge's own ruling in *Lidle v. Cirrus Design Corp.*, 2009 U.S. Dist. LEXIS 118850 (S.D.N.Y.

---

[3] For example, as the Court is aware, Defendants admit that they would never use a sequence for production purposes without proper testing. However, as Dr. Fan states: "The Sequence Development and Testing File Production contains no development file and no testing files for either of the two purported 1000 path sequences." Fan Expert Notice, paragraph 39, p. 17.

9

Dec. 18, 2009). In *Lidle*, the Court struck a reply expert report because the discovery order did not provide for a reply and, importantly, because new matters were not addressed. In an airplane crash case, plaintiff wanted to submit a reply report based on a particular test of the crash evidence, but defendant's expert reports had not performed any similar test. Here, by contrast, all the test results being analyzed are Defendants' *own* test results.

Particularly relevant for purposes of the present case, this Court in *Lidle* would have permitted a reply report to the extent that the defendant's expert report to which it responded employed a new methodology (namely, a finite element analysis, which uses computer simulation to model the real-world behavior of physical structures). According to the Court, the "door for a reply report was opened, but only with respect to the finite element analysis itself." *Lidle* 2009 U.S. Dist. LEXIS 118850 at *16. Applying *Lidle* to the present case, Dr. Johannes' detailed analysis of the ACE test results was new -- and the tip-off that he provided as to the falsification of evidence was startling -- and, thus, the "door for a reply report was opened." The Fan Expert Notice properly countered Dr. Johannes' test analysis with an analysis of Defendants' own data.

### III. The Fan Expert Notice Should Be Permitted Because Preclusion of Expert Testimony is a Drastic Remedy, and Defendants Suffer No Prejudice from The Fan Notice

"In general the trial judge has broad discretion in the matter of exclusion of expert testimony." *Papyrus Tech. Corp. v. NYSE, LLC*, 257 F.R.D. 39, 41 (S.D.NY. 2009). Within this discretion, "[e]xclusion of an expert report has been termed a drastic remedy." *Manoma Realty Mgmt., LLC v. Fed. Pac. Elec. Co.*, 2007 U.S. Dist. LEXIS 54887 at *15 (S.D.N.Y. July 27, 2007) (*citing RMED Int'l, Inc. v. Sloan's Supermarkets*, Inc., 2002 U.S. Dist. LEXIS 23829, at *11-12) (S.D.N.Y. Dec. 11, 2002)).

10

Application of the four factors used by this District Court in *Manoma*, (*supra*, p. 3) in evaluating the possibility of excluding an expert report, allow for the Fan Expert Notice because: 1) no prejudice is imposed on Defendants, as they implicitly admitted by their virtual silence on the issue of prejudice; 2) any potential prejudice could easily be cured by allowing a response or a further expert report; 3) the trial will not be disrupted; and 4) there was no bad faith by Plaintiff, as Dr. Fan could not have addressed an opinion not previously advanced, which was based on test data not previously known to have been tampered with. Obviously, it was no simple task to uncover this manipulation of the evidence, since Defendants' own expert, Dr. Johannes, relied on the tampered-with data.

Apart from the *Manoma* test applied by this Court, other Courts in this District have used a similar test that relies on factors used by the Court of Appeals in determining if the District Court abused its discretion: "1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Papyrus Tech. Corp.* 257 F.R.D. at 41 (quoting *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)).

These factors also weigh in favor of the admission of the Fan Expert Notice because: 1) the Fan Expert Notice was necessitated by new matters raised in the Joahnnes Expert Notice; 2) the testimony is very important to Plaintiff in proving its case and refuting Defendants' defenses; 3) no prejudice is imposed on Defendants; and 4) there exists the possibility of a continuance, if needed.

As the Court noted in *Lore,* what is central to the consideration of whether to exclude an expert report is the utter lack of any prejudice to Defendants. *See Lore v. City of Syracuse*, 2005 U.S. Dist. Lexis 30328 at *10. Here, the Magistrate Judge found no prejudice, yet struck the report. In their papers in support of the motion to strike, Defendants barely addressed the possibility of prejudice. Yet prejudice is the key, and the fact that it does not exist here is, by itself, sufficient grounds to determine that the Magistrate Judge's ruling should be modified or set aside. Significantly, in their motion papers before the Magistrate Judge, Defendants asked, as an alternative form of relief, leave to submit an expert report rebutting (or attempting to rebut) the findings of the Fan Expert Notice. *See* Defendants' memorandum at 11 n.19. (Collins Dec., Exhibit ii(c) and iv(k)). This constitutes a tacit admission that, as to Defendants, there is no prejudice and, in any event, if there were prejudice, leave to file a rebuttal expert report would have cured that prejudice.

On top of these four factors, the Court in *Papyrus* noted that other factors can be considered. It noted that, "most importantly", harm to the client, if the expert report were to be struck, should be considered. *Papyrus Tech Corp.* 257 F.R.D at 45. Here, because the Fan Expert Notice is needed for Plaintiff's case and harm would result to Plaintiff if it were excluded, it should be admitted.

Evidence of Defendants' tampering with the ACE test results to make their own sequences look better goes to the heart of this case -- Defendants' motivation for stealing and using ACE. It answers any possible question concerning why Defendants have produced no evidence of independent development of three out of four sequences that they allegedly developed after the last test of ACE, and, with respect to the fourth sequence, why the files produced were modified just prior to production to Plaintiff, covering up any evidence of

tampering. This evidence indicates why, in the face of substantial evidence that one of the 1000 path sequences produced (the alleged Russell 1000 Path Sequence) could not be generated by The Yield Book production code and was ginned up expressly for purposes of this litigation, Defendants produced no sequences actually generated by the unmodified The Yield Book code. Instead, they created custom code and used it to generate the sequences produced to Plaintiff, the Radak Sequences, which were supposed to be the sequences that Defendants actually used in production but, in fact, clearly did not. This evidence answers any possible question concerning why Defendants have refused to produce a complete set of The Yield Book code files to Plaintiff that would allow Plaintiff to verify the source code used and then to verify the test results produced by the tampered-with development and testing files produced by Defendants.

Here, the Fan Expert Notice was necessitated by new matters raised particularly in the Johannes Expert Notice, and it is highly important to Plaintiff in proving its case and refuting Defendants' defenses. Critically, the Fan Expert Notice imposes no prejudice on Defendants, as they implicitly admit by their virtual silence on the issue of any possible prejudice. Refusal to allow the Fan Expert Notice would allow Defendants to obtain the benefit of tampered-with evidence.

13

IV. **Conclusion**

For the foregoing reasons, Plaintiff respectfully asks the Court to modify or set aside the Magistrate Judge's ruling in favor of Defendants' motion to strike.

Dated: New York, New York
September 28, 2012

                         STORCH AMINI & MUNVES PC

By _____
Russell D. Munves
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, NY 10017
(212) 490-4100

and

BERGER & MONTAGUE, P.C.

By _____
Todd S. Collins
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

*Attorneys for Plaintiff*

14

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2012 I served a true and correct copy of the foregoing **PLAINTIFF'S OBJECTION TO THE MAGISTRATE JUDGE'S ORDER OF SEPTEMBER 5, 2012 GRANTING DEFENDANTS' MOTION TO STRIKE THE NOTICE OF EXPERT TESTIMONY OF JIANQING FAN, DATED JULY 17, 2012** by hand delivering it to:

> Christopher Moore, Esq.
> Jennifer Kennedy Park, Esq.
> Cleary, Gottlieb, Steen & Hamilton, LLP
> One Liberty Plaza
> New York, New York 10006

STORCH AMINI & MUNVES PC

_____
Melquiades Fernandez