**LAW OFFICE OF PETER J. TOREN**
Peter J. Toren
3028 Newark Street NW
Washington, D.C. 20008
(646) 623-4654
ptoren@petertoren.com

Attorneys for Plaintiff and Counterclaim-Defendant
Advanced Analytics, Inc.


# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------------------x<br>:<br>ADVANCED ANALYTICS, INC.       :<br>        :<br>    Plaintiff and Counterclaim-Defendant,  :<br>        :<br>       v.        :<br>        :<br>CITIGROUP GLOBAL MARKETS, INC. f/k/a<br>SALOMON SMITH BARNEY, INC., and<br>THE YIELD BOOK INC, f/k/a<br>        :<br>SALOMON ANALYTICS, INC.,       :<br>        :<br>    Defendants and Counterclaim-Plaintiff.  :<br>------------------------------------------------------x | **Case No. 04 Civ. 3531 (LTS) (SLC)**<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF MAGISTRATE JUDGE'S ORDER GRANTING DEFENDANTS' MOTION TO STRIKE AND FOR INJUNCTION AND ORDERS OF FEE SANCTIONS; MEMORANDUM OF LAW** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iv

I.      INTRODUCTION ......................................................................................................1

II.     FACTUAL BACKGROUND .....................................................................................8

        A.     Relying on Three Prong Scheme and Collusion with Collins, Defendants Procured and Then Sustained the September 5, 2012 Order .................................................... 9

        B.     Defendants Revealed New Evidence that Defendants and Collins in Collusion Sabotaged Plaintiff's Spoliation Motion to Sanction Defendants Under FRCP37(b) and Court's Inherent Powers, and Procured the Contempt Order .......................... 11

        C.     Defendants Mischaracterized the March 26, 2014 Order to Mislead this Court. The Order Held that Fourth Fan Declaration is Admissible in Support of Motions for All Non-merits Purposes, Including 37(b) Spoliation Motion ................................ 14

        D.     Magistrate Judge Pitman Denied All Defendants' Motions to Strike and Motions For Sanctions/Injunction in Response 56(d) Motion, 56(h) Motion Supported by the Admissible Fan 4th Decl and the Wang 6th Decl. .................................................... 17

        E.     Defendants Failed to Disclose to the Court that They Made Approximately 12 Attempts Before MJ Pitman to Obtain the Order Regarding the Fee Applications But Failed Each Time. .................................................................................................... 18

        F.     Defendants Did Not Disclose to this Court that the Nov 11 Mot is a Untimely Request for Reconsideration of Prior Failed Motions to Strike and for Injunction 19

III.    ARGUMENT .............................................................................................................19

        A.     Plaintiff Alleged That Defendants' 3 Prong Scheme and Collusion Procured these 4 Orders from 2012 to 2014.  Defendants Could Not Rebut Any of the Allegations but Cited These Orders as Defense ...................................................................... 20

        B.     Defendants' Motions to Strike and for Injunction is Intended to Circumvent the Law to Silence Plaintiff ............................................................................................ 21

        C.     Defendants Motion to Strike and for Injunction was Intended to Prevent the Court from Investigation of Defendants' Misconduct. This is Again an Improper Purpose. ................................................................................................................ 23

        D.     The Court Should Vacate its Injunction Order of November 12, 2019 Striking Plaintiff's Motion to Defer and Granting Defendants' Motion to Strike on the Grounds that Defendants Failed to Disclose that the Motion to Strike and for Injunctive Relief is Untimely Reconsideration of Defendants Prior Motions. ....... 24

ii

E.     The Court Should Vacate Its Orders of November 12 and Fee Sanction on the Ground that They Were the Result of Misrepresentations in Defendants' Nov 11 Mot. ...................................................................................................... 24

F.     The Court Should Investigate the New Evidence of Defendants 3-Prong Scheme and Collusion with Collins and Vacate Fee Sanction or Stay It Until Judge Swain Has Ruled on Plaintiff's Objection ....................................................................... 25

IV.    CONCLUSION..................................................................................................25

Glossary     27

Appendix     32

# TABLE OF AUTHORITIES

Page(s)

**Laws and Rules**

28 U.S.C §1651 ........................................................................................................ 22, 24

28 U.S.C §636(b) ..................................................................................................... 22, 24

Fed R Civ P. 65(d)(1) .................................................................................................... 22

Fed. R. Civ. P. 54(b) ....................................................................................................... 1

Fed. R. Civ. P. 65(d) ..................................................................................................... 24

Local Rule 6.3 .................................................................................................................. 1

**Cases**

*Cleary Gottlieb Steen & Hamilton LLP v. Kensington Intern. Ltd.,* 284 Fed.Appx. 826 (CA2,

2008) .......................................................................................................................... 25

*DiLaura v. Power Auth. of State of N.Y.,* 982 F.2d 73, 76–77 (2d Cir. 1992) ............................. 25

*Kensington Intern. Ltd. v. Republic of Congo*, 03 Civ. 4578 (LAP), 2007 WL 2456993 at *10

(S.D.N.Y. 2007) ......................................................................................................... 25

*Virgin Atl. Airways,* 956 F.2d at 1255 .......................................................................... 25

# NOTICE OF MOTION

PLEASE TAKE NOTICE that pursuant to Fed R. Civ. P. 54(b) and Local Rule 6.3, and based on the accompanying Memorandum of Law, and the pleadings and prior proceedings in this matter, Plaintiff Advanced Analytics, Inc. ("Plaintiff," or "AAI"), respectfully moves this Court to reconsider the following orders:

(1) The portion of November 12, 2019 Order (ECF 375) (the "Injunction Order"); (a) denying Plaintiff's Motion to Defer Fee Application for Inquiry Regarding Defendants and Plaintiff's Former Counsel's Potential Collusion ("Motion to Defer") (ECF 366), and (b) granting Defendants' "Motion to (i) Strike Motion to Defer Fee Application for Inquiry Regarding Defendants and Plaintiff's Former Counsel's Potential Collusion; and (ii) To Require the Court's Preauthorization for Any Future Filings by Plaintiff" of November 11, 2019 ("Motion to Strike and For Injunction," "Motion to Strike" "Motion for Injunction", or "Defs Nov 11 Mot") (ECF 370); and

(2) The December 5, 2019 Order (ECF389) as amended on January 8, 2020 (ECF 409 and ECF410), (the "Fee Sanction Orders," "Fee Orders", including  ECF375 the "Injunction and Fee Sanction Orders" or the "Orders") granting in part and denying in part the fee application ("Fee Application") (ECF 242) of Defendants Citigroup Global Markets, Inc. *f/k/a* Salomon Smith Barney, Inc., and The Yield Book Inc. *f/k/a* Salomon Analytics, Inc., (collectively "Defendants," "Defs"), and counsel for Defendants Cleary Gottlieb Steen & Hamilton LLP ("Cleary").

Defendants' Fee Application is based on Magistrate Judge Pitman's order of March 26, 2014 (ECF 235) (the "March 26 Order," or the "Contempt Order") that is the subject of *Plaintiff's Objection to Magistrate Judge Pitman' s Opinion and Order of September 4, 2019 Denying Rule 56(h) Motion* (the "Objection", ECF361) and currently pending before the Honorable Judge Swain.

Plaintiff respectfully requests that the Court also order an investigation regarding the collusion between Defendants and Plaintiff's former counsel, Mr. Todd S. Collins ("Collins"), which, among other things resulted in the entry of the Contempt Order against Plaintiff. The evidence of such collusion includes but is not limited to Collins in collusion with Defendants misrepresentation that the Fourth Declaration of Dr. Jianjinq Fan ("4th Fan Decl.") was drafted in support of the summary judgement motion ("MSJ 2013") without the justification, over the express and explicit objections of Plaintiff. Collins concealed in six sets of court papers filed with  the Court that the 4th Fan Decl. was actually drafted and filed in support of *Plaintiff's letter-motion to sanction Defendants for their spoliation and violations of existing court's discovery orders pursuant to Fed. R. Civ. P. 37(b) and the courts inherent powers* ("Rule 37(b) Sanction Motion"). The recent evidence also revealed that Collins secretly withdrew Plaintiff's Rule 37(b) Sanction Motion behind Plaintiff's back in collusion with Defendants.

Accordingly, Plaintiff respectfully requests that: (a) the Court vacate the Injunction Order, unseal the Motion to Defer and grant the Motion to Defer as unopposed; and (b) the Court vacate Fee Sanction Orders after investigation of the new evidence,.

In the alternative, Plaintiff respectfully requests that the Court modify the Orders or stay the Sanction Order (ECF 409 and ECF410) until Judge Swain has had the opportunity to rule on Plaintiff's 56(h) Objection (ECF361). Plaintiff also respectfully request any other relief that the Court deems appropriate and just.

In support of this Motion, Plaintiff relies on the evidence presented in the Declaration of Peter J. Toren ("Toren Decl"), the Fourth Declaration of Dr. Jianqing Fan, of June 4, 2013 ("Fan Decl" Exh. 8), the Sixth Declaration of Dr. Xiaolu Wang, of November 12, 2018 ("Wang 6th Decl" Exh. 9), submitted in support of *Plaintiff's Motion for Sanctions Pursuant to Fed. R. Civ. P. 56(h) and the Court's Inherent Power Against Defendants and Defense Counsel Cleary Gottlieb Steen & Hamilton LLP Under Fed R. Civ. P. 56(h)* (the "Rule 56(h) Motion", ECF 313), the *Objection, Dr. James Li's letter motion of January 6, 2020 to Judge Laura T. Swain* (ECF 407) and other such evidence before the Court.

(The remaining part of the page is intentionally left blank.)

# MEMORANDUM OF LAW

Pursuant to Fed R. Civ. P. 54(b) and Local Rule 6.3, Advanced Analytics, Inc. (the "Plaintiff'," or "AAI") respectfully submits this Memorandum of Law in support of its motion for reconsideration of the Court's Injunction Order granting Defendants' "Motion to (i) Strike Motion to Defer Fee Application for Inquiry Regarding Defendants and Plaintiff's Former Counsel's Potential Collusion And (ii) To Require the Court's Preauthorization for Any Future Filings by Plaintiff", and the Court's Fee Sanction Orders.

## I.    INTRODUCTION[1]

The ACE Use Code that was installed immediately by Defendants after they stole ACE (using the Theft Code during the last ACE test) reveals that The Yield Book ("TYB," "YB") offline systems surreptitiously read the verbatim ACE sequences to generate ACE interest rate scenarios, which are then installed into the Yield Book online systems for the exclusive use of Defendants' own traders' for pricing, trading and arbitrage. This is *Plaintiff's ACE Verbatim Use Claim,* and is now undisputed and is confirmed as shown by the parties' pleadings in connection with Plaintiff's 56(d), 56(h) motions and Objections to MJ Pitman's Rulings on Sep. 5, 2019.

From the very beginning, Defendants have mischaracterized Plaintiff's ACE Verbatim Use Claim as "Yield Book sequences incorporated ACE sequences." To support the Mischaracterization, Defendants played a semantic trick involving the "Yield Book sequences," by using the false or misleading declarations of Branislav Radak and Nathaniel Polish. All of the Radak and Polish declarations omitted addressing the sequences used by TYB,  but instead defined two distinct types of phony "Yield Book sequences" Indeed, both declarants could not have discussed the sequences used by YB, because both of them testified that they have no personal knowledge of this subject. Then using this semantic trick, Defendants relied on the Radak and Polish Declarations to misrepresent and purportedly authenticate the phony "Yield Book sequences" as the sequences used by YB.

---

[1] Capitalized terms used but not defined in this Memorandum have the same definitions as in the Objection, (ECF361, at 3-5), and the Rule 56(h) Motion (ECF 229, at 2-3). For the Court's convenience, they are collected in the Glossary attached to the end of this Memorandum.

Defendants produced the Radak Decl in 2007, which stated only that Radak created the Monte Carlo code ("Radak Code") that in turn *generated* "what are known as the Yield Book sequences," which Radak circularly defined as the sequences *generated* by the Radak Code and which he produced with his Declaration (which Plaintiff denoted as the "Radak Sequences" or "*Radak Seq II*"). [2] Defendants then misrepresented the "Yield Book Sequences Production" in the Radak Declaration as the "Yield Book Production Sequences" in order to be able to assert that they have produced the sequences *used* by Yield Book, as ordered by the Court.[3] The First Polish Decl defined the "so-called Yield Book sequences" as the sequences generated by the YB Monte Carlo code from the Decoy Seeds in the code files. (Plaintiff denoted them as the *Decoy Sequences* or *Decoy Seq II*  in order to distinguish them from "so-called Yield Book sequences" of Radak). Through the use of this semantic trick, Defendants misrepresented to the Court that Polish's "so-called Yield Book sequences" (i.e., *Decoy Seq II* ) are the sequences used by YB. The 2nd, 3rd, 4th and 5th Polish Decls accepted the Radak Sequences as the "Yield Book sequences."

Defendants have mischaracterized **Plaintiff**'s claims as the "Yield Book sequences incorporating ACE," where the "Yield Book sequences" are defined in either Radak's Decl or Polish's Decls.  Either way, this implies that "Defendants' Monte Carlo code generated ACE sequences"[4] ("**Defendants** False Claim"), which further implies that "ACE is *not* AAI's trade secret" and that "AAI stole ACE from Defendants."[5] Thus, according to Defendants' Mischaracterization, in order for Plaintiff to prevail on its misappropriation claim, Plaintiff must prove that "Defendants' Monte Carlo code generated ACE," *i.e*., *Plaintiff* stole ACE from *Defendants*. This completely mischaracterizes

---

[2] Wang Decl. ¶42, Annex C; Fan Decl, Fig. 4-6 of Ex. SSS.
[3] MJ Pitman mistakenly believed that the 56(h) Motion only "attacked the completeness of defendants ' production of TYB sequences in discovery" (ECF 339 at 2, 10, 13 and 15); and speculated that Radak's testimony of lack of personal knowledge of the sequences used by TYB did not necessarily affect the "completeness" of his "production of TYB sequences. .The Court was apparent misled by Defendants' semantic trick. Radak's testimony actually means that his "TYB sequences" have nothing to do with the sequences used by TYB.
[4]  Wang Decl, ¶46.  See 56(h) Motion at 2, A1-1, 1-3, 1-4.
[5] 56(h) Motion, §IV(C) at 20.

Plaintiff's claims as the exact opposite. Defendants have relied on this Mischaracterization during the entirety of this litigation to in order to resist discovery, and now to seek summary judgement.[6]

After Plaintiff objected to Defendants' semantic trick of the use and meaning of the term "Yield Book sequences," Defendants changed the name of "Yield Book sequences" to "Defendants' sequences." However, continuing to this very day, Defendants still rely on the semantic trick and call their mischaracterizations as the "law of the case." [7] Defendants have also mischaracterized Plaintiff's ACE Verbatim Use Claim as that the "ACE numbers were incorporated or inserted into the Yield Book software product." *See e.g.,* Defs' Nov 11 Mot at 1.[8] This is another of Defendants' false claims, and which can never be true because their code files never contain data files. Defendants have repeatedly conflated source code files with software systems. In order to resist discovery and to support their two motions for summary judgement, Defendants submitted five false Polish declarations. Defendants misrepresented Polish's meaningless "findings" that he could not "find" the "ACE numbers" in "TYB production code files" to mean that "TYB does not use ACE." However, the truth is that ACE sequences are *never* "inserted or "incorporated" into TYB code, but that TYB systems read and use ACE sequences when TYB systems are run. Recently, Defendants were compelled to admit that they withheld the entire TYB-RCS code files relating to  the interest rate path generation.[9]  Defendants have withheld the incriminating part of the offline ACE Use Code that reads ACE. Defendants' Rule 37(c) Motion relied on the same mischaracterizations.[10]  This is the 1st Prong of Defendants' 3 Prong Scheme. Prior to the above, Defendants misrepresented the partial MR-RCS code from the Mortgage Research Dept. as the TYB-RCS production code. After Dr. Fan testified during the September 5, 2012 Hearing that the produced MR-RCS code was missing many key files and and cannot be compiled,

---

[6] 56(h) Motion, §IV(C) at 20.

[7] Defs' Opp to R&R Obj of Dec. 27, 2019 (ECF 392), §I, p.13.

[8] "AAI filed this action claiming that Defendants had stolen …the "ACE Numbers"—in order to insert those numbers in,.., their own product, known as the Yield Book" at 1.

[9] Defendants' 56.1 Reply of February 15, 2015, ¶61,¶20 (See E3-1, Appendix. A of Objection)

[10] "After nine years of litigation, AAI cannot point to any of Defendants' sequences that bear any actionable similarity to the ACE Numbers, let alone any of Defendants' code or sequences that incorporate those numbers," p.2, July 10, 2013 Defendants Rule 37(c) Motion to Strike Fan 4th Decl. ECF231.[11] See *e.g.,* Collins' MSJ Opp Br of May 28, 2014, at 13, "[YB Monte Carlo code] generated ACE64". After Dr. Wang exposed it, Collins wrote to MJ Pitman on December 12, 2016 and to embrace Defs False Claims in three different ways to further mislead the Court. See ¶¶ 176, 206-209, Wang 6th Decl.

during the same hearing Defendants made 14 misrepresentations to the Court that the Radak Code (consisting three code files listed in the Radak Declaration) was the withheld TYB-RCS code (consisting thousands of code files), and that Dr. Fan was mistaken because Radak testified that Radak Code was compilable. Defendants' misrepresentations led the Court to believe that "[Radak Code] compiles and generates interest rate paths"] (C1-2, C2-3, C3-4), Appendix. B. Consequently, "Judge Pitman found that 'there has been sufficient discovery on liability for the matter preceding to summary judgment.'" *See* Nov 11 Mot at 3. However, the Radak Code is capable of generating only phony Radak Sequences and no more.

Defendants then misrepresented that there can be no misappropriation because the Polish Declarations "found" that the "Yield Book sequences" (either Decoy Sequences or Radak Sequences) do not "incorporate ACE numbers." However, Polish testified that he did not actually determine whether that was accurate. However, Polish knew that the Monte Carlo code cannot generate ACE, and he also knew that the "Yield Book sequences incorporated ACE." is Defendants False Claim, and is not Plaintiff's claim. Defendants knew that the "Yield Book sequences" are completely unrelated to the sequences used by TYB.

Throughout this entire case, Defendants' defense has relied entirely on the Mischaracterizations of Plaintiff's claims, and their Misrepresentations regarding their discovery production (the 2nd Prong), which was supported by the seven False Declarations of Polish and Radak (the 3rd Prong), and by relying on their semantic trick. *See* Objection at 1. Plaintiff's Rule 56(h) Motion exposed the forgoing 3-Prong Scheme. Relying on their 3-Prong Scheme and collusion with Collins, Defendants procured the Contempt Order.

The Fee Sanction Orders  accepted Defendants' mischaracterization of Plaintiff's claims as "Defendants misappropriated AAI's sequences of numbers used to aid in pricing mortgage-backed securities and incorporated them into Defendants' software, the Yield Book." (ECF410 at 1). However, a sequence "aids" pricing tools in the same understated way that an engine "aids" transportation tools. Dr. Fan discovered from the data relied upon in Defendants' expert report that Defendants massively tampered with the ACE test results. While Defendants' tampering has

been corrected to recover the true data, Defendants' original ACE test results reveal that the ACE sequences are not just more accurate and faster, but uniformly hundreds of times faster, than Defendants' YB Monte Carlo sequences. See ¶20, Fan July 17, 2012 Declaration. To put this in context, a mode of transportation that is several hundred times faster than a car would be a rocket. "The analogy is that when everyone else was using muskets, but Defendants' traders could use ACE like a machine gun." ¶1(d), *Id.* Defendants have made a meticulous and calculated effort to steal ACE, and then to implement the stolen ACE with an extremely sophisticated ACE Use Code that was installed immediately after the theft and was intended for the exclusive use of Defendants' traders. This demonstrates the almost incalculable value of ACE to Defendants. It is also noteworthy that all of Defendants prior hedging attempts failed. In comparison, after Defendants had installed the stolen ACE, they launched a spectacularly lucrative hedging and arbitrage operation.

Undisputed documentary evidence such as that listed in the Wang 6th Decl reveal that since 2012, Defendants clandestinely flipped Collins. Then he embraced 3 Prong Scheme, and prevented any AAI's expert declarations being filed in support of imposing sanctions on Defendants. Instead Collins intentionally misrepresented such expert declarations as "untimely reports" to frame Plaintiff for violation of a scheduling order. He embraced all of Defendants' False Claims, e.g., "YB Monte Carlo code generated ACE" as "AAI's claims"[11]; Defendants sought MSJ by dismissing "AAI's claims"-- the straw man stood up by Defendants, "through the provision of undisputed evidence and unrebutted legal arguments," as Defendants put it. *See* Defs' Nov. 11 Mot at 12. Defendants' denial of collusion has always confirmed Collins' collusion at work. In all of their responses and subsequent submissions, including the most recent Motion to Strike of Nov. 11, 2019, Defendants failed to address the substance of Plaintiff's allegations and avoid addressing the evidence that revealed the 3 Prong Scheme and

---

[11] See *e.g.,* Collins' MSJ Opp Br of May 28, 2014, at 13, "[YB Monte Carlo code] generated ACE64". After Dr. Wang exposed it, Collins wrote to MJ Pitman on December 12, 2016 and to embrace Defs False Claims in three different ways to further mislead the Court. See ¶¶ 176, 206-209, Wang 6th Decl.

Collins' collusion. Acccordingly, these allegations and supporting evidence are undisputed and should be considered as true. Defendants also relied on the 3-Prong Scheme and collusion with Collins to procure the rulings from latter part of 2012 until 2014. *See* Appendix. These rulings are the subject of Plaintiff's 56(h) Objection that is currently pending before Judge Swain. Defendants have relied entirely on certain dicta in these orders that had been procured by their 3-Prong Scheme and collusion with Collins. The language relied upon by Defendants is the subject of the Objection currently pending before Judge Swain and should be vacated. This is the basis of Plaintiff's Motion to Defer. Therefore, the Court should either consider the evidence of collusion and misconduct, or else should defer ruling until Judge Swain has had the opportunity to rule on Plaintiff's Objection based on the new evidence contained in the Fan 4th and Wang 6th Decls. *Further,* any specific issues Defendants raised in opposition to Plaintiff's 56(d) and 56(h).  motions rely on their collusion and conspiracy with Collins. *See* the Objection 22-25. Defs' Nov 11 Mot has provided new evidence of Collins' collusion with Defendants. For example, on June 18, 2013, immediately after AAI filed its *Letter Motion to Sanction Defendants for Spoliation and Violation of the Court's Express Discovery Orders Pursuant to FRCP 37(b) and Inherent Power* on the night of June 17, 2013 ("Rule 37(b) Spoliation Motion"), supported by the evidence contained in the 4th Fan Decl, Collins and Defendants, intentionally concealed from Dr. Wang and without his knowledge, jointly called MJ Pitman and requested that the Court "defer" the consideration of the Rule 37(b) Spoliation Motion. Collins then concealed the existence of this pending Rule 37(b) Spoliation Motion *from both Judge Pitman and Judge Swain* six times. Instead Collins misrepresented in six court filings that the 4th Fan Decl was drafted to oppose Defendants' MSJ. Based on these false assertions, Defendants and Collins procured the March 2014 Order and July 15, 2014 Order.  Defendants' fee application is based on this Contempt Order, a fruit of the poisonous tree of Defendants' collusion with Collins.

Defendants have opposed any consideration of the allegations and the evidence of their misconduct. They have mischaracterized these that the orders that were procured by their 3-Prong Scheme and collusion, and have misrepresented that these orders "[already] considered the

allegation of Defendants' discovery misconduct and ruled [that they are] without merit[]." In reality, because of Defendants' 3-Prong Scheme and collusion with Collins. the Court has never had the opportunity to actually considered these allegations as supported by the new evidence. Indeed, the new evidence has never yet been properly presented to the District Court until now through the filing of Plaintiff's Objections. Further, MJ's Pitman's rulings are the subject of the Objection and are subject to Judge Swain's rulings. Thus, Defendants' reliance on them should be given no weight by this Court.   Defendants have falsely claimed that MJ Pitman has considered the new evidence and has "rejected" Plaintiff's allegations based on the new evidence. Defendants have argued that the MJ Pitman does not have the authority to overturn a ruling by the District Court (which was issued before the new evidence was available and admissible for District Court's consideration). Consequently, MJ Pitman did not consider the substance of Defendants' misconduct in deciding Plaintiff' Rule 56(d) Motion because he determined that consideration of the new evidence contained in the Fan 4th, would lead to vacating his prior rulings. MJ Pitman denied the 56(d) Motion based on his mistaken belief that motion to reconsider does not allow the review of new evidence and must be raised within 14 days, both of which are contrary to FRCP 54(b).

Defendants also failed to disclose to the Court that MJ Pitman did not rule on or denied twelve previous unsuccessful attempts by Defendants to obtain the attorney's fees after he received the new evidence contained in Ex.1, and Ex2 of the Wang 4th and 5th Decl, (ECF 276). Because AAI is the victim and not the perpetrator an order imposing Attorney's Fees on AAI would be manifestly unjust.Further, in order to protect the integrity of the justice system, and to prevent manifest injustice, Plaintiff respectfully requests that  the Court should order an investigation of Defendants and Collins' collusion and the 3-Prong Scheme that procured and sustained the Contempt Order against Plaintiff. *Finally*, in all of their responses and subsequent submissions, including the most recent Motion to Strike of Nov. 11, 2019, Defendants failed to address the substance of Plaintiff's allegations and failed to address the evidence of Defendants' 3 Prong Scheme, and Collins' collusion. Accordingly, these allegations and supporting evidence

are undisputed and should be considered as true. This is the basis of Plaintiff's Motion to Defer. Therefore, the Court should grant Motion to Defer and consider the evidence of collusion and misconduct. The Court has the exclusive jurisdiction to investigate fraud perpetrated against the Court. Alternatively this Court should defer ruling until Judge Swain has ruled on Plaintiff's Objection based on the new evidence as contained in the Fan 4th and Wang 6th Decls.

## II.    FACTUAL BACKGROUND

Defendants have falsely claimed that "Plaintiff's allegations had been all considered" and "rejected by the Court." Plaintiff's 56(h) Motion presented new evidence before Judge Swain for the first time that reveals that Defendants and Collins' collusion led to procuring and sustaining the Contempt Order. As shown by the 56(h) Ruling, MJ Pitman did not know that Defendants' Theft Code had been analyzed by Dr. Fan and that Defendants had admitted that they withheld TYB-RCS code. Both MJ Pitman and Judge Swain have issued multiple orders between 2007-2010 that admonished Defendants for their discovery misconduct, and granted Plaintiff's motions to compel the sequences used by TYB (ECF 75, ECF 81), and to compel the sequence development files and testing files (ECF 110, ECF124, and ECF138). Plaintiff's 37(b) Spoliation Motion establishes that Defendants are still in violation of these orders. AAI has filed motions under FRCP 56(d) and 56(h), supported by the Fan 4th Decl and the Wang 6th Decl which reveal that Collins' collusion and Defendants 3-Prong Scheme procured the four orders entered by the Court between  2012-2014.[12] Defendants have completely failed to respond to these serious allegations and address the new evidence.

Instead, Defendants have filed baseless motions to strike and motions for sanctions, and argued to  MJ Pitman and this Court that even if the two orders by MJ Pitman should be reversed, this Court is without the authority to do so,  because the orders had been affirmed by the District Court, therefore the Magistrate Judge cannot grant the 56(d) Motion or 56(h) Motion ("as explained in Defendants' motion to strike the Rule 56(h) Motion, it is axiomatic that a

---

[12] The orders of MJ Pitman' September 5, 2012, and March 26, 2014, and then the orders of February 8, 2013 and July 15, 2014 by Judge Swain.

Magistrate Judge cannot vacate an order from a District Court." (Nov 11 Mot at 14).
Accordingly, by his own admission, after 2014,  MJ Pitman did not consider the new evidence
contained in the Fan 4th Decl and the Wang 6th Decl, and  did not address Defendants misconduct
because it would require a reconsideration of these orders "in 2012 and 2013 by both myself and
by Judge Swain." Instead he denied the Rule 56(d) Motion strictly on procedural grounds. *See*
July 11 Mot at 6. MJ Pitman's ruling on Rule 56(h) Motion is based on a misreading of the law
and clear errors of the facts.  He did consider much less "reject" Plaintiff' allegations of
Defendants use of the 3-Prong Scheme and the collusion. Further, he did not even consider
Defendants' Mischaracterizations of Plaintiff's claims and still mistakenly relied on them as the
"law of the case". Objections to both of these ruling are currently pending before Judge Swain.
Defendants continued reliance on the orders procured by the 3-Prong Scheme and their collusion
with Collins have misled the Court into issuing the Fee Sanction Order.

The Nov 11 Mot cited "the prior court determinations" that resulted from Defendants' 3-
Prong Scheme and collusion with Collins. *See* Appendix. Defendants claimed they had
responded to Plaintiff's allegations supported by the new evidence. However, Defendants did not
cite any support for this specious claim.  Indeed, Defendants have never disputed these
allegations and the new evidence because they cannot. Instead, Defendants responded to both the
56(d) Motion and the 56(h) Motion by filing motions to strike and for sanctions/ injunctions,
both of which had already denied by MJ Pitman, which Defendants in their Nov 11 Mot did not
disclose to this Court. Accordingly, Plaintiff's allegations supported by the new evidence are
uncontested, and should be considered as true. The Injunction Order granted the Nov 11 Mot to
strike and for an injunction without allowing Plaintiff the opportunity to respond or even to read.

## A. Relying on Three Prong Scheme and Collusion with Collins, Defendants Procured and Then Sustained the <u>September 5, 2012 Order</u>

Collins' collusion with Defendants resulted in preventing two key witnesses, Russell and
Herman from being deposed. It further caused the Radak and Teytel depositions to be taken at
the end of August 2012, which meant that Dr. Fan could not obtain the transcripts prior to

immediately before the September 5, 2012 Hearing. Collins then prevented the Fan July 18, 2012 Declaration or any other evidence which would have exposed Defendants' fraud from being presented to the Court. Consequently, MJ Pitman's decision on September 5, 2012 was based on "very little, if any evidence" of Defendants discovery fraud. Instead, Collins set it as a target that the Defendants could strike. This is an example of just one act in furtherance of Collins' collusion with Defendants. *See* Wang Decl. §IV. Defendants procured both September 5, 2012 Order and February 8, 2013 Order though Mischaracterizations, Misrepresentations and False Declarations (their "3 Prong Scheme") and Collusion with Collins. See Appendix. During the Court Hearing of September 5, 2012, Defendants relied on their *Mischaracterizations* of Plaintiff's claims as "Defendants' sequences (Radak Sequences I or Decoy Sequences II) incorporated or derived from ACE sequences.". The Court was misled by Defendants' Mischaracterization that Plaintiff's misappropriation claim is a claim of [copyright] infringement by the bogus "Defendants sequences."[13] *See* Appendix.

During the Sep. 5, 2012 hearing, counsel for Defendants made 14 misrepresentations that were intended to mislead the Court that the Radak Code is the TYB-RCS code Defendants withheld, and falsely claimed that this code was "capable of generating interest rate paths," and was only "modified only on two places."[14] Defendants knew that this was false, because at the hearing Defendants' possessed the false *Radak Decl* which listed the entirety of the Radak Code of 2007, which consisted of a grand total of three C-code files, which can only generate the phony Radak Sequence, and not anything else. Defendants also knew that the uncompilable partial RCS code files actually contains more than 1000 code files. See CGM0176.

Further, Defendants' Three Prong Scheme misled the Court at the September 5th Hearing into reaching the wrong decision.[15] Defendants successfully concealed the direct evidence of

---

[13] "You know, whether they have testing files, whether -- you know, the ultimate issue, though, is whether their sequence is misappropriated from your sequence." *Id*. 18:6-9.[14] Wang Decl, ¶94, fn. 63. From only redacted Sep. 5 2012 Hr. Tr., C1-2, Appendix. B, Objection,

[14] Wang Decl, ¶94, fn. 63. From only redacted Sep. 5 2012 Hr. Tr., C1-2, Appendix. B, Objection,

[15] Id. 93:21-94:20 C3-4, *Id.*

their misappropriation in violation of the multiple court orders. Defendants and Collins in

collusion again prevented the Court from considering the evidence of Defendants fraud, such as

the Fan 3rd Decl., and the Wang 3rd Decl, both of September 28, 2012. Defendants relied on

Judge Swain's February 8, 2013 Order,[16] but their cite to the Order's *dicta* confirms that the

Court has been misled by Defendants' fraud by: (1) mischaracterizing AAI's claims as

Defendants' False Claims; (2) misrepresenting that the "YB sequences" defined by Radak and

Polish were the sequences used by TYB; and (3) that the statements in the Radak and Polish's

Declarations about the phony "YB sequences" were true and accurate and concerned the

sequences used by TYB. See (A2-4, A2-5) attached to 56(h) Motion, and Appendix.

### B. Defendants Revealed New Evidence that Defendants and Collins in Collusion Sabotaged Plaintiff's Spoliation Motion to Sanction Defendants Under FRCP37(b) and Court's Inherent Powers, and Procured the Contempt Order

Plaintiff's Motion to Deferpresented undisputed evidence that starting sometime in 2012,

when Defendants' fraud was being exposed, Collins was clandestinely flipped by Defendants.

*See*  Motion to Defer §II(C); Rule 56(h) Motion, §III(D); and Objection §§A-B, K, ppgs 23-25

Then he blocked all Plaintiff's sanctions supported by admissible evidence, but embraced

Defendants' 3-Prong Scheme to cover up Defendants' fraud. The Wang 6th Decl presented over

100 pieces of mostly documentary undisputed evidence of Collins' collusion with Defendants.

*See*  ¶¶95-212, *Id.* Defendants have now confirmed that one of these key pieces of collusion

evidence.[17] They confirmed that Collins was made a secret call jointly with Defense counsel to

MJ Pitman behind Plaintiff' back to request the Court to "withdraw" the Rule 37(b) Spoliation

---

[16] Defendants' **mischaracterization** of AAI claims, in J. Swain' order of Feb 8, 2014 at 1 "[Defendants] incorporated [ACE data] into a software product called the Yield Book"; as "copy-right infringement claim" by "Defendants' sequences" (Decoy Sequences): "Plaintiff has everything it needs to compare Defendants' sequences, analyze the code that Defendants use to generate their sequences to determine whether this process could have been derived from Defendants' alleged exposure to the Plaintiff's product and determine whether the Plaintiff's product played any role in the development of Defendants' sequences";  J Swain did not know Defendants **misrepresented** Radak Code as their withheld TYB-RCS. The Order was based on "The Court also finds, from review of the evidence in front of Judge Pitman and in light of the briefings submitted in connection with this objection". J Swain had no access to the new evidence of Fan 3rd Decl and Wang 3rd Decl, both had been stricken by Defendants and Collins in collusion. Her Honor could only see their briefings based on 3 Prong Scheme.

[17] "The next day, Plaintiff's counsel informed Judge Pitman that Plaintiff was withdrawing the letter. See Joint Status Report, ECF No. 355 (Oct. 17, 2019).", Defs' Nov 11 Mot at 4.

Motion. The secret call was placed the next day after Plaintiff had filed the Motion during the night of June 17, 2013. Records establish that Collins did not inform Dr. Wang of his withdrawal of the Motion, but deceived Dr. Wang into believing that he did not withdraw the Motion from the Court's consideration but actually wanted for the Court to consider it. To cover up their collusion, on July 9, 2013, at Dr. Wang's insistence, Collins filed a Motion for Reconsideration or to Modify the Order of June 19, 2013 which asked Court to consider the Rule 37(b) Motion before considering Defendants' Rule 37(c) Motion (ECF223-225),This confirms that Collins intended to conceal his withdrawal of the Rule 37(b) Motion from Plaintiff.  Collins' Motion to Reconsider was totally frivolous. It consisted of only 6 pages and was drafted to be denied. Indeed, the Court denied it on July 14, for "not cit[ing] any controlling facts or precedent that I overlooked and that are contrary to my June 19 Order." (ECF 226.)

In his Motion and in all the six sets of papers purportedly "opposing" Defendants' 37(c) sanction motion, Collins rejected Dr. Wang's suggestion to include controlling facts and precedents establishing that Plaintiff's submission of 4th Fan Decl. was substantially justified, and therefore sanctioning the Plaintiff was not warranted. Instead Collins insisted what MJ Pitman later called as a "plainly misleading argument" ("all Fan 4th has the same opinions within the 4 corners of Fan 2007 Report").[18] This and other "duplicitous behavior" by Collins led to Plaintiff being held in contempt of court as sought by Defendants' Rule 37(c) motion. *Id* at 37. Defendants have continued to rely on Collins' collusion to dodge the 37(b) Spoliation Motion.[19]

To cover up their collusion and again to block Plaintiff's 37(b) Spoliation Motion, Nov 11 Mot at 8 claimed that "Plaintiff admitted it withdrew the [37 (b) Spoliation Motion]" by misquoting Dr. Li from the May 28, 2019 court hearing. They cut off the critical parts of his statement: "to me, the example of collusion is [Collins'] withdrawal [of the Motion]..," and "Collins withdrew [the 37 (b) Motion from the Court's consideration] **without telling the**

---

[18] The Contempt Order, at 22.

[19] ".. Plaintiff concedes, Plaintiff's prior counsel withdrew the June 2013 Letter soon after it was filed, rendering it moot. See id. at 4; see also May 28, 2019 Hr'g Tr. at 14:21-15:2 (Plaintiff's current counsel admitting that AAI's prior counsel advised Judge Pitman that he "[did not] need to consider" [the "Rule 37(b) Spoliation Motion"]" Nov 11 Mot, at 7.

**client.**" Dr. Li first appeared in the case in July 2017, and could not have been privy to the secret call with the Court and Defense counsel. Dr. Wang could not have personal knowledge of this call. Dr. Wang only knew that Collins had deceived the Court and concealed the existence of the Rule 37(b) Spoliation Motion in the six sets of papers filed purportedly in "opposition" to Defendants' briefs. *See* Wang 6th Decl, ¶¶140-143. Dr. Li did not know this either, but inferred that Collins withdrew the 37(b) Motion in collusion with Defendants without telling Dr. Wang[20]. In contrast, current Defense counsel, including Ms. Jennifer Park, participated with Collins in that secret call. She confirmed[21] that Dr. Li's suspicion was true: Collins was the one who "withdrew" the Rule 37(b) Spoliation Motion behind Plaintiff's back to help Defendants.

There are two reasons that Collins "deferred" the 37(b) Motion, and then concealed this in six sets of papers filed in the Court.  First, to shield Defendants from the 37(b) Spoliation Sanction Motion. Second, to misrepresent that the Fan 4th Decl was not prepared for the 37(b) Spoliation Motion, but for opposing MSJ, to set up Plaintiff for Defendants 37(c) motion. Fan 4th Decl is patently admissible to support the 37(b) Spoliation Motion.  If Collins had disclosed this to the Court, then Defendants would not have had a basis to file their Rule 37(c) Motion. Defendants misstated their admission of withdrawal evidence to Collins' collusion as that "Plaintiff admitted Fan 4th is improper for MSJ."  This is also false. Indeed, properly citing Fan 4th in support of MSJ, especially the factual material, is actually substantial justified. Dr. Wang urged Collins to present at least five basis why the Fan 4th Dec. could have been submitted in support of Plaintiff' opposition to Defendants' MSJ (*See* ¶¶130-137, (a)-(e), Wang 6th Decl.), but Collins deleted all of them clean,[22] from the six sets of papers filed without the knowledge of Plaintiff. Instead he insisted on "plainly misleading argument". *Id,* §IV(C)(f).

In the six sets of papers filed with the Court, Collins also deleted the legitimate grounds for the filing of the Fan July 2012 Decl, in support of a motion to compel and a motion to strike HC

---

[20] Dr. James Li's letter motion of January 6, 2020 to Judge Swain, at 2-3. ECF 407.
[21] Joint Report of October 17, 2019 to Magistrate Judge Cave on status conference, at 3. Nov 11 Mot at 4.
[22] Ex.2, Exhibits of Wang 4rd Decl.

(both of which were also sabotaged by Collins), and for the inclusion in the Fan 4th Decl. in support of 37(b) Spoliation Motion. Collins' "total silence" let MJ Pitman mistakenly thought it as Plaintiff's "duplicitous behavior", to impose contempt sanctions on Plaintiff. Id at 37. The Court was unaware that it was actually Collins' and Defendants' scheme to hold Plaintiff in contempt. Collins also altered the title of the Fan 2012 Decl to a "supplemental reply" Collins admitted in 2012 emails that he knew that submitting the Fan declarations as expert reports without stating the justification would violate the Courts scheduling order. [23] Now Defendants continued to rely on Collins' collusion, including his "withdrawal" of the 37(b) Spoliation Motion behind Plaintiff's back, and still citing Collins' "duplicitous behavior," in order to further mislead the Court to grant *the fee sanction procured by their collusion,* in Defs' July 11 Mot and Nov 11 Mot. *See also* Plaintiff's Motion to Defer §II(A)(B), 2-6.

### C. Defendants Mischaracterized the March 26, 2014 Order to Mislead this Court. The Order Held that Fourth Fan Declaration is Admissible in Support of Motions for All Non-merits Purposes, Including 37(b) Spoliation Motion

Defendants' Statement relied on their Mischaracterizations that are flat-out contradicted by documentary evidence on the record. (ECF 355) *See* Objection, at p18-19, F1-1, F1-2, F2-1. Defendants mischaracterized the Rule 37(b) Spoliation Motion as a "letter" for "untimely" "discovery."  See Mot. To Defer, II(C)(1) and (2). However, the Rule 37(b) Spoliation Motion has nothing to do with a "discovery motion" discussed in the March 26, 2014 Order, and does not request for the reopening of discovery or seeks new documents. To the contrary, it requests that the Court impose sanctions on Defendants for their massive spoliation of development records relating to sequences, for the willful violation of five ***existing*** Court orders and the withholding of evidence. The Motion also seeks an adverse inference that would establish Defendants' liability. The sanctions against Defendants' spoliation and violations of ***existing*** orders under 37(b) and the Court's inherent power, are not limited by discovery schedule, and can be imposed even after the cases have been closed.[24]

---

[23] Excerpts from Wang 3rd Decl. ECF276,  Ex. 2;   Wang 6th Decl. ¶98.
[24] See Rule 56(h) Motion, §IV(C).

The Fee Order relied on Defendants' mischaracterization of the March 26, 2014 Order that "AAI could not use the Fourth Fan Declaration in support of its motion for sanctions (ECF410 at 3, citing March 26, 2014, Order at 32, 34, 36)." Contrary to Defendants' assertion, the Order actually held the opposite:

"2. Use of the Fourth Fan Decl. for Purposes Other than the Merits

To the extent *AAI seeks to use the Fourth Fan Decl.* to respond to Defendants' Rule 702/Daubert motion and *in support of its contemplated motion for sanctions*, I conclude that preclusion as a result of AAI's failure to comply with my scheduling Order or the requirements of Rule 26(a)(2) would lead to unjust results. I do not believe that Rule 26(a)(2)'s requirements should be applied when expert testimony or affidavits are offered for purposes other than the merits of a claim or defense. *Id* at 32

Non-merits-related issues, such as the admissibility of expert testimony or *whether an adversary has engaged in discovery misconduct,* stand on a different footing… *To conclude that expert disclosures used in connection with a Rule 702/Daubert motion or used for other non-merits purposes must comply with Rule 26(a)(2)'s disclosure requirements would create a standard with which compliance is impossible* because the non-merits issues could not be known at the time the Rule 26(a)(2) disclosures are required. *Id.* at 33. (Emphasis added)

*Id* at 34 continues:

The chronology in this case demonstrates the problem. AAI's 26(a)(2) disclosures were due on May 17, 2012. Defendants served [their summary judgment motion] on or about April 5, 2013. AAI could not have foreseen the [summary judgment motion] issues that Defendants would raise 11 months before those issues were first asserted: [if Defendants would rely on the false declarations misrepresenting their discovery production to seek the summary judgment, or if Defendants' witnesses Teytel and Radak would admit massive spoliation of development records several months later and confirm Defendants violation of all existing discovery orders]
Accordingly, I conclude that the requirements of Rule 26(a)(2) do not apply to expert reports or expert testimony or affidavits to the extent such material is used for non-merits purposes, [such as 56(d)/56(h) Motion, or Motion to sanction Defendants for their Spoliation and  violation of all **existing** discovery orders under Rule 37(b)].  Accord Zeola v. Ford Motor Co., 09-40106-FDS, 2013 WL 308968 at *10-*11 (D. Mass. Jan. 24, 2013); Lyman v. St. Jude Med. S.C., Inc., 580 F. Supp. 2d 719, 725 n.3 (E.D. Wis. 2008); see Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169, 190 (S.D.N.Y. 2006) (Francis, M.J.).

(The example in the original, [FRE702 motion], is replaced by the example of sanction motions in the above underline text emphasis between the brackets [], to show MJ's reasoning.)

**applies ot both rulings. Misquoted observation** This should end all inquiry. Contrary to

Defendants' mischaracterization, the March 26 Order correctly held that Fan 4th Decl is admissible to support Plaintiff's FRCP56(d), 56(h) and the 37(b) Spoliation Motions, in consistent with all applicable laws. See also II(C)(3), Mot to Defer. This should end all inquiry. However, Collins blocked the use of the Fan 4th Decl. from all such admissible purposes. In fact, MJ Pitman has denied Defendants motions to strike and never questioned that the Fan 4th Decl is admissible in support of all of Plaintiffs Rule 56(d) or 56(h) or 37(b) Motions. The observation in March 26 Order misquoted by Defendants consisted of two parts: *because* "a [nonexistent] discovery sanction motion" to reopen discovery under Rule 16(b) needs "good cause," and is *therefore* "untimely", therefore it cannot be supported by the Fan 4th Decl. Defendants mischaracterized the observation on "discovery motion" to Fan 4th Decl and falsely claim that the prohibition against using the Fan 4th "applies regardless of what vehicle Plaintiff might choose for such a motion — Rules 37, 56(d), 56(h) or otherwise." July 11 Mot at 21. Defendants' claim is without legal support directly contradicts the March 26 Order, that Fan 4th is admissible for supporting all motions for "non-merits purposes." Id at ,32-34.

Incredibly, Defendants and Collins also falsely represented that the "March 26, 2014 Order has considered and 'disposed' Rule 37(b) Spoliation Motion." Because of the Mischaracterization and concealment by Defendants and Collins of the existence of the Rule 37(b) Spoliation Motion, at the time of the March 26 Order, the Court was unaware of the existence of the Motion and could not have "disposed" it. Indeed, the March 26 Order stated explicitly that *"[d]espite the seriousness of its charges, AAI has not yet sought spoliation sanctions."* *Id.* at 25  In addition, the March 26 Order only cited cases where litigants sought new documents after discovery had closed and/or sought to reopen discovery under Rule 16(b): *Gucci America*, *Shah v. Jefferson*, 35-36, *Id*., and found that the relief sought and as falsely portrayed by Defendants and Collins as "grossly untimely:"[25] "Where a party seeks to make a discovery motion after the close of discovery, that party must show good cause. As explained in Gucci America..: Under Rule 16(b), ... Reopening discovery after the discovery period has

---

[25] Jan. 17, 2012 Ct Hr Tr: 77:12-14 (ECF144) "I'm not going to bifurcate and set one period for testing and development discovery and another period for profits discovery. Just not going --" Defendants stonewalled both discoveries. Profit discovery is still open. Wang Decl. §IV.

closed requires a showing of good cause. .. Though Rule 37 does not establish time limits for such a motion, a party seeking to file a motion to compel after discovery has closed must similarly establish good cause." (Citations are all of Rule 16(b) cases and are omitted)

In other word, the "disposed" "discovery sanction" alleged by Defendants was completely unrelated to the Rule 37(b) Spoliation Motion which is not subject to a time limitation as to when it can be brought. *See* §III(C)(D), 56(h)Motion. Defendants' assertion that the March 26 Order considered and denied the Rule 37(b) Spoliation Motion is "without merits" and is flat-out false. Defendants cited "little if any evidence [of fraud]" from the September 5, 2012 Hearing[26] and instead claimed it to have occurred in 2014 after the evidence of Defendants' fraud have been presented in the Fan 4th Decl.

### D. Magistrate Judge Pitman Denied All Defendants' Motions to Strike and Motions For Sanctions/Injunction in Response 56(d) Motion, 56(h) Motion Supported by the Admissible Fan 4th Decl and the Wang 6th Decl.

Defendants' pleadings, including the Nov 11 Mot, failed to inform the Court that their prior two motions to strike and for sanctions/injunction filed in response to Plaintiff's 56(d) and 56(h) Motions were denied by MJ Pitman and that MJ Pitman denied the 56(d) Motion on only procedural grounds and did not reject any Plaintiff's allegations. *See* Mot to Defer II(C)(4). Defendants further misrepresented that MJ considered and rejected the Spoliation Motion under 37(b) and Inherent Power filed on June 17, 2013. *See* p14-15, the bullet points, Nov 11 Mot. This is totally false. MJ Pitman held "[Defendants] discovery misconduct be good cause to extend the schedule." 26:14-27:6. But then MJ Pitman mistakenly confused a motion for reconsideration under Fed R. Civ P. 54(b) with L.R.6.3. *See* §IV(D), Rule 56(h) Motion.

---

[26] Because Collins withheld Fan 2012 July Decl as evidence to support motion to compel. Wang 6th Decl, ¶111.[27] MJ Pitman's May 31, 2017 order was before he received Dr. Wang's May 31, 2017 letter to MJ Pitman, and also before Plaintiff filed the Wang 6th Decl. on Nov. 11, 2018 and Wang 7th Decl on January 2, 2019, ¶78. Defendants Nov. 11, 2019 misquoted a footnote MJ Pitman's order of May 31, 2017, "I am not aware of any evidence supporting or even suggesting the claims made by plaintiff's principal that counsel have colluded with adverse counsel" Defendants omitted the qualifier "based on what I have been able to observe," from filings by other attorneys at Plaintiff's direction, not by Collins from 2012 to 2017.

**E.  Defendants Failed to Disclose to the Court that They Made Approximately 12 Attempts Before MJ Pitman to Obtain the Order Regarding the Fee Applications But Failed Each Time.**

Between 2015 and 2019, Defendants petitioned this Court more than 12 times for the Court to consider and grant their Fee Application (ECF 240). Each time, however, MJ Pitman rejected or failed to rule on them, apparently after he had reviewed the new evidence showing that AAI was the victim of what he termed "duplicitous" contempt, to prevent manifest injustice. *See* Ex.2. (Wang 4th and 5th Decl). In addition to the eight filings that are publicly available on Court's docketing system, between Novermber 2014 and May 31, 2017,  Defendants' counsel Christopher Moore sent six letters to this Court requesting that Defendants' fee application be granted and this Court failed to grant the requests. Attached as Exhibit 1[27] which are true and correct copies of these letters in chronological order from Chris Moore, from Collins, and Dr. Xiaolu Wang to MJ Pitman from November 2015 to May 31, 2017 ECF276. Because Collins failed to object to Defendants' requests,[28] *Id*,  Dr. Wang had to write directly to MJ Pitman to oppose Defendants' fee application. *Id.*

When Defendants renewed their  fee application before this Court on , Defendants did not disclose MJ Pitman's repeated rejections of Defendants fee applications. In fact, MJ Pitman rejected Defendants' fee application at the May 28, 2019 hearing.[29] Then, during the November 12, 2019 Hearing, Defendants falsely claimed to this Court that MJ Pitman' admonishment of "asking for the fees" was not directed at Defendants, but was directed to both parties because Plaintiff had also rquested in its Rule 56(d) Motion that it be awarded fees, and that the fee application rejected by MJ Pitman involved "cross-requests in connection with Plaintiff's Rule

---

[27] MJ Pitman's May 31, 2017 order was before he received Dr. Wang's May 31, 2017 letter to MJ Pitman, and also before Plaintiff filed the Wang 6th Decl. on Nov. 11, 2018 and Wang 7th Decl on January 2, 2019, ¶78. Defendants Nov. 11, 2019 misquoted a footnote MJ Pitman's order of May 31, 2017, "I am not aware of any evidence supporting or even suggesting the claims made by plaintiff's principal that counsel have colluded with adverse counsel" Defendants omitted the qualifier "based on what I have been able to observe," from filings by other attorneys at Plaintiff's direction, not by Collins from 2012 to 2017.

[28] In 2016 Collins negotiated for Defendants and asked Dr. Wang if he would accept Defendants' offer to drop this litigation in exchange for waiving the fee sanction. Wang 7th Decl, filed January 2019.

[29] May 28, 2019 Court Hr Tr Excerpts, 56:15-57:16, Ex.4.

56(d) Motion and Defendants' Motion to Strike." Nov 11 Mot, n.12 and Hrg Tr. At 9-10.

However, the hearing transcripts established that Defendants raised the Fee Application at the

very end of the hearing, and after this Court had already denied both Parties' motions.

Consequently, the Court was not considering whether to award fees at that time. When MJ

Pitman stated that "there was some fee applications with the flurry of -- the more recent flurry of

letters," he was referring to Defendants' letters to this Court requesting for the Fee Application,

ECF 307 Filed 01/16/19, ECF 311 Filed 04/17/19, and Plaintiff's responses.

### F. Defendants Did Not Disclose to this Court that the Nov 11 Mot is a Untimely Request for Reconsideration of Prior Failed Motions to Strike and for Injunction

Defendants did not and cannot dispute that the Nov 11 Mot is motion to strike and for

injunctive relief.  It specifically requests that this Court "enjoin" the Plaintiff from filing new

motions on the basis that having to respond to Plaintiff's allegations would "strain the resource"

of Defendants Citigroup, despite these serious allegations would "defame" Defendants and their

counsel. In short, the Nov. 11 Mot. did not directly respond to Plaintiff's allegations. Moreover,

it failed to disclose to this Court that the Nov 11 Mot is actually an untimely request for

reconsideration of Defendants' July 11, 2019,  motion to strike and motion for injunction, which

this Court denied on September 5, 2019. (ECF339). In turn, the July 11, 2019 motion to strike

and for an injunction, was essentially a rehash, repackage and untimely reconsideration of

Defendants' unsuccessful December 11, 2018 motion to strike and motion for sanctions which

this Court also denied on May 28, 2019. (ECF312). Defendants did not disclose to this Court that

the Nov 11 Mot is actually a motion for reconsideration that was filed 47 days too late under

Local Rule 6.3. Defendants did not event attempt to justify that the Nov. 11 Mot is permissible

under Rule 54(b). The Injunction Order granted the motion to strike and that "the Court require

pre-authorization for any future filings by Plaintiff."

### III.    ARGUMENT

Based on the above facts and the references cited therein, the Court should order for the

Injunction Order and Fee Sanction Orders be vacated, for the following reasons: (1) Defendants

failed to rebut Plaintiff's allegations that Defendants 3-Prong Scheme and Collusion led to the issuance of the Court's four orders between 2012 and 2014; (2) Defendants motions to strike and for injunctive relief is intended to improperly silence Plaintiff contrary to Second Circuit authorities; (3) Defendants' Motions are intended to prevent the Court from ordering investigation into Defendants' misconduct and collusion with Collins;  and (4) Defendants' Motions are actually untimely motions for reconsideration. Each of these grounds are discussed *in seriatim*.

### A. Plaintiff Alleged That Defendants' 3 Prong Scheme and Collusion Procured these 4 Orders from 2012 to 2014.  Defendants Could Not Rebut Any of the Allegations but Cited These Orders as Defense

The Court should vacate Injunction and Fee Orders because Defs' Nov 11 Mot did not disclose to this Court that Defendants have never responded substantively to Plaintiff's allegations of Defendants' fraud and collusion, as supported by the new evidence. Had Defendants informed the Court of this, this Court would never have granted Nov 11 Mot. Indeed, the Court has previously denied Defendants repeated and previous motions to strike and motions for sanctions. The Nov. 11 Mot. avoided the substance of Plaintiff's allegations but cited these Orders that were procured by their 3-Prong Scheme and collusion, as defense to Plaintiff's allegations. According to Defendants, because they have successfully procured these same Orders, therefore Defendants no longer need to answer the allegations and evidence of 3 Prong Scheme and Collusion. *See* Nov 11 Mot at 2 and Appendix. The Court should not accept this as a defense because each of the 2012-2104 orders cited by Defendants, actually confirmed the existence of the 3-Prong Scheme and Collusion. See Appendix, and Appendix A to Objection. In other words, the Court's perceived basis for the entry Injunction and Fee Orders was misplaced.

The 2012 September 5, 2012 Order relied on the Mischaracterization of AAI's claims, and Defendants' Misrepresentation of Radak Code as TYB-RCS code, and the Polish and Radak declarations to support Defendants 3-Prong Scheme. For example, Judge Swain Feb 8, 2013 Order is about "Defendants' sequences" which have nothing to do with the sequences used by

TYB. It was on the same reasoning of Judge Pitman's understanding of the 3-Prong Scheme and ws based on the same evidence before Judge Pitman, because Collins' collusion with Defendants excluded the **the** Fan 3rd and Wang 3rd Decl**.** In turn, the March 26 and July 15, 2014 Orders also relied on the 3-Prong Scheme. Collins' "withdrew" the Spoliation Motion behind Plaintiff's back and then concealed its existence in the six sets of papers. His "plainly misleading argument" and "duplicitous behavior" framed Plaintiff for contempt. The March 26 Order explicitly stated that "[d]espite the seriousness of its charges, AAI has not yet sought spoliation sanctions." Id, at 25. It held that the Fan 4th is admissible for all motions for non-merits purposes, in particular 37(b) Spoliation Motion. If MJ Pitman had been aware of the 37(b) Spoliation Motion, then at minimum, even if all other misrepresentations of Defendants and Collins were accepted, he would have decided that Defendants should be awarded only one-third, and not "one-half" of the fees.

### B.  Defendants' Motions to Strike and for Injunction is Intended to Circumvent the Law to Silence Plaintiff

As shown by both of their Oppositions of Dec, 27, 2019 and Jan. 7, 2020, Defendants did not and could not dispute that Defs Nov 11 Mot (ECF 369) is a motion to strike and a motion for injunctive relief. The Court's Injunction Order stated : "Defendants' motion to strike ECF No. 366 (ECF No. 369) is GRANTED. Defendants' motion that the Court require pre-authorization for any future filings by Plaintiff (ECF No. 369) is GRANTED IN PART…". ECF375 at 2. This Order is contrary to law. 28 U.S.C. § 636(b)(1)(A) provides that a magistrate judge, has no "jurisdiction and power…to hear and determine… a motion for injunctive relief."[30] Because the procedure of "hearing and determination" is contrary to law and without authority, the result of this process, *i.e.*, the  Injunction Order also is contrary to 28 U.S.C. § 636(b)(1)(A). This should end the inquiry and the court should vacate Injunction Order regardless of Defendants' attempts

---

[30] During the court hearing on January 2, 2020, the Court held that "I am part of the District Court." Plaintiff concurs with this understanding. So that Defendants' argument Nov 11 Mot at 14 has no basis ("it is axiomatic that a Magistrate Judge cannot" reconsider the new evidence that may reverse a prior clearly erroneous order that had been affirmed by District Court.) However, the Court's holding is non-sequitur to its jurisdiction set forth explicitly in 28 U.S.C. § 636(b)(1)(A).

to dress it up as something different. Putting lipstick on a pig does not mean that the animal is no longer a pig. Stating that the Injunction Order was intended "to persuade instead of to prohibit Plaintiff not to file papers" does not mean that it is no longer an injunction order and does not provide the Court with a basis for jurisdiction to enter such an order. Further, the Nov 11 Mot did not allege and the Court did not find that the Mot to Defer was procedurally defective or contrary to the Individual Practices of the Court. Despite this, the Court struck Plaintiff's pleading and failed to give Plaintiff an opportunity to respond as provided by L.R. 6.1. These rulings are consistent with Defendants goal of preventing Plaintiff from presenting its case and are unrelated to the Court's I.P. Both rulings are consistent with Defendants' goal of obtaining an injunction to silence Plaintiff. As further detailed in Plaintiff's letter motion of Dec. 19, 2019, the Injunction Order is also contrary to other applicable laws, including 28 U.S.C. § 1651(a) and Fed. R. Civ. P. 65 (d)(1), and Second Circuit authority. See Id at 2-3. Accordingly, the Injunction Order should be vacated in its entirety.

Defendants knew that their request for injunctive relief is contrary to Second Circuit authority that even an Article III judge is without authority to grant this request. In fact, their Opposition to Plaintiff' Letter Motion, of Dec. 27, 2019, cited *StreetEasy, Inc. v. Chertok*, 730 F. App'x 4, * 6 (2d Cir. 2018) which held that "a court has no power to prevent a party from filing pleadings, motions or appeals." To circumvent the authority, in their motions for injunction, July 11 Mot and Nov 11 Mot, Defendants dressed up their request for injunction against Plaintiff as a request for modification of the magistrate judge's "individual practices.".  Defendants Opp at 2 acknowledged their stylized request for injunction is still illegal: "*Youssef v. Halcrow, Inc*., 2011 WL 2693527, at *1-2 (S.D.N.Y. June 30, 2011) (noting that "[t]he letter and conference requirement does not impermissibly foreclose the filing of a motion which the Federal Rules of Civil Procedure otherwise permits");" See also  *Eisemann*, 204 F.3d at 397. In these two motions for injunction, their request "the Court require pre-authorization for any future filings by Plaintiff" is intended precisely to "foreclose the filing of a motion which the Federal Rules of Civil Procedure otherwise permits". Defendants mischaracterized that "Plaintiff's request for

22

[37(b) Spoliation Sanctions filed for the letter and conference requirement] was disposed of by Judge Pitman's March 26, 2014 Opinion, ECF 235", and vehemently insisted that ECF235 imposed an injunction on Plaintiff's pending 37(b) Spoliation Sanction Motion.  See Joint Report filed Oct. 17, 2019, to MJ Cave ECF355 at 3. So Defendants again confirms that for all intents and purposes, their Nov 11 Mot requested an injunction which they knew was improper.

This was just only one of several improper purposes of Nov 11 Mot. See *infra*.

**C. Defendants Motion to Strike and for Injunction was Intended to Prevent the Court from Investigation of Defendants' Misconduct. This is Again an Improper Purpose.**

In response to every Plaintiff's motions, Defendants have failed to address Plaintiff's allegation and the facts. *See* Appendix A. They avoided the substance and all evidence and asked this Court not to consider the evidence but claimed Plaintiff's uncontested allegations based on the undisputed evidence "defamed" them. Defendants could cite no brief which answered Plaintiff's allegations and evidence. Plaintiff's Motion to Defer should not be considered and should be granted as unopposed. Defendants may not endeavor to strike, delay, hamper a potentially criminal investigation. See 18 U.S.C §1512, Motion to Defer §III(C).  So the purpose of Nov 11 Mot is again improper. See also Plaintiff's Letter Motion of December 19, 2019 and Reply of January 2, 2020. Defendants are improperly seeking to prevent the Court from investigation of Defendants' misconduct including their collusion with Collins, and potentially criminal activities. Because Defendants are seeking an injunction for an improper purpose, Injunction Order should be vacated. If Defendants truly believe they are innocent of Plaintiff's allegations, they have nothing to hide and should welcome an investigation. In contrast, however, Defendants fought tooth and nail to prevent the Court from doing so and have repeatedly requested for the Court to strike the evidence and Plaintiff' motions. It is contrary this Court's and Judge Swains Individual Practices. See I.P. §III(E) I.P. §A(5) respectively. Both motions cited the identical inapposite cases. Defendants asserted that they were "again" forced to respond to the allegations of Plaintiff when in fact they have never answered them, and never

disputed the evidence. Defendants' basis to strike and for injunction that the cost of responding

to Plaintiff' allegations "restrain the resource" is simply not believable.

**D.  The Court Should Vacate its Injunction Order of November 12, 2019 Striking
Plaintiff's Motion to Defer and Granting Defendants' Motion to Strike on the
Grounds that Defendants Failed to Disclose that the Motion to Strike and for
Injunctive Relief is Untimely Reconsideration of Defendants Prior Motions.**

As detailed above, in addition to being contrary to Second Circuit authority, it is also actually

a belated reconsideration of Defendants' failed July 11, 2019 Motion and for that reason alone,

ECF 375 and 386 should be vacated by the Court. See also Plaintiff's Letter Motion of

December 19, 2019 and Reply of January 2, 2020. The Court should vacate its Injunction Order

granting Defendants' Motion to Strike. In Second Circuit, "a court has no power to prevent a

party from filing pleadings, motions or appeals", *supra*. Nov 11 Mot sought to strike Motion to

Defer for the same purpose of Defendants' injunction request. That is, to silent Plaintiff's

allegations that Defendants cannot refute and to prevent Plaintiff's from filing papers. So the

striking Motion to Defer in the Injunction Order should also be vacated. The Order is contrary to

several laws, 28 U.S.C §636(b), 28 U.S.C §1651, Fed R. Civ. P. 65(d) and Second Circuit

authority.  It deprived Plaintiff's right to respond to Defendants' Motion to Strike.  Accordingly,

the Court should vacate its Injunction Order and ECF 410, and grant Plaintiff's Motion to Defer.

**E.  The Court Should Vacate Its Orders of November 12 and Fee Sanction on the
Ground that They Were the Result of Misrepresentations in Defendants' Nov 11
Mot.**

This Court granted Defs' Nov 11 Mot and stricken Mot to Defer, before Plaintiff even had the

opportunity to review Defendants' Motion.[31] . In granting Defendants' fee application, the Court

stated that  "[Cleary] is a reputable law firm."  The Court should be aware that Cleary is not

without some substantial blemishes. In fact, several of Cleary's lawyers [including a managing

partner in its Executive Committee] have been sanctioned for *one failed* attempt to obstruct the

depositon of a witness. [32] See *Kensington Intern. Ltd. v. Republic of Congo*, 03 Civ. 4578 (LAP),

---

[31] Because the Court held "And while I too have not had a chance to check every quote that they cite, I have no
reason to believe that their citations to Judge Pitman's orders and Judge Swain's orders are not correct."

[32] See e.g., the orders of September 5, 2012,  D3-1, and February 8, 2013, A2-2, A2-4, A2-5

2007 WL 2456993 at *10 (S.D.N.Y. 2007) (Preska, D.J.), <u>aff'd sub</u>. <u>nom</u>. *Cleary Gottlieb Steen &*
*Hamilton LLP v. Kensington Intern. Ltd.,* 284 Fed.Appx. 826 (CA2, 2008). *DiLaura v. Power*
*Auth. of State of N.Y.,* 982 F.2d 73, 76–77 (2nd Cir. 1992), the court stated:

> "[t]he major grounds justifying reconsideration are 'an intervening change of controlling
> law, the availability of new evidence, or the need to correct a clear error or prevent
> manifest injustice.' "*Virgin Atl. Airways,* 956 F.2d at 1255 [Quotations omitted].

Mot to Defer alleged far more serious obstruction by Defendants and Cleary. Additional
controlling precedents are set forth in Plaintiff's Rule 56(h) Objection §IV(D). For "the need
to correct clear error" and "to prevent a manifest injustice", the Court should vacate its
Injunction and Fee Orders.

### F.  The Court Should Investigate the New Evidence of Defendants 3-Prong Scheme and Collusion with Collins and Vacate Fee Sanction or Stay It Until Judge Swain Has Ruled on Plaintiff's Objection

The evidence and law cited herein provides the Court with ample reasons to vacate Injunction
and Fee Orders, and for the Court to open an investigation of Defendants' misconduct. Undisputed
new evidence, *supra* II(B),  Fan 4th Decl and Wang 6th Decl, have all revealed that Defendants
relied on their 3 Prong Scheme and Collins' collusion to procure the order of September 5, 2012
and the Contempt Order , which should be vacated pursuant to FRCP54(b), alternatively, Rule
56(h) Motion at 2, and III(D), 23-25.It is manifested injustice to reward the master mind of the co-
conspirators while to punish the victim of their conspiracy and collusion. See Motion to Defer,
§III(B) and *supra*. At minimum, Collins' and his firm should be responsible for the payment of
fees, even if there had been evidence of collusion because Collins was entirely responsible the
alleged violations of the schedule order, by his own admissions on the record, from the
documentary evidence. See Ex.2, the Wang 4th, 5th, 6th Declarations.

## IV. CONCLUSION

For the foregoing reasons, the Court should vacate its Injunction Order of November 12,
2019, vacate its order of January 8, 2020 or stay it until the inquiry on Plaintiff's allegations in
Motion to Defer has been completed and the Objection before Judge Swain has been decided.

Dated: January 17, 2020

Respectfully Submitted,

Peter J. Toren
Attorneys for Plaintiff and Counter-
Claim Defendant Advanced Analytics, Inc.

# Glossary[33]

**RCS, a public domain software tool**[34] to archive a software product such as The Yield Book.

**RCS, the RCS archives of code files** created by the RCS tool. Each RCS archive is separately maintained by the separate department which created the archive:

> **TYB-RCS,** the RCS archive from The Yield Book, Inc. Defendants have misrepresented the partial MR-RCS as TYB-RCS from the beginning of the litigation. During September 5, 2012 Hearing, Defendants intentionally made 14 misrepresentations to the Court that Radak Code produced in 2007 were "the RCS" code generating interest rate paths, the TYB-RCS code or MR-RCS withheld by Defendants sought by Plaintiff. Now Defendants L.R.56.1 Reply of January 15, 2015, ¶61, conceded that *they have withheld the entire TYB-RCS relating to sequences, i.e., relating to interest rate paths*. Wang 6th Decl. ¶¶85-87, 93-94, fn.63, 111, 219-220.

> **MR-RCS,** the RCS archive from the Mortgage Research Department of CGMI, produced by Defendants in 2005 and 23 identical copies in 2011, but all of them missed the many critical files; that made them incompilable.

> **CMO-RCS,** the RCS archive from the CMO Analytics Group of CGMI. Defendants have withheld it in its entirety. Defendants did not even reveal its existence, until July 13, 2012 by Teytel Declaration. Fan 4th Decl, ¶¶ 274, 104.The CMO-RCS "is an integral part of The Yield Book code and purportedly was used by Dr. Teytel with the Mortgage Research RCS code to obtain a complete set of source code to price securities during his development of his LDS sequences." *Id.* ¶ 51.

**Radak Code,** in response to this Court's orders in 2007 compelling production of the sequences used by TYB, Robert Russell, the mastermind of the ACE theft, instructed Branislav Radak in 2007 to concoct a set of *new* Monte Carlo codes consisted of three C-code files ("Radak Code") to generate sequences for production ("Radak Sequences") to purportedly comply with the Court orders, Fan 4th Decl. ¶¶ 34, 56.

**Radak Seq I**[35]**, i.e., Radak Sequences** The sequences generated by Radak Code, with the two sets of decoy mixed seeds in MR-RCS code. Defendants produced the Radak Decl in 2007, which only stated that Radak created the Monte Carlo code ("Radak Code") that in turn generated "what are known as the Yield Book sequences" which he produced with his Declaration (which Plaintiff denoted as "Radak Sequences" or "Radak Seq II"). Defendants misrepresented the "Yield Book Sequences Production" in Radak Declaration as "Yield Book Production Sequences" to claim Defendants have produced the sequences used by Yield Book as ordered by the Court. §B, *Id.*

---

[33] For ease of understanding, the terms are listed in the order of their appearance instead of alphabetically, and are grouped and organized for readability.

[34] https://www.gnu.org/software/rcs/tichy-paper.pdf, at 7, "Every node in a revision tree consists of the following attributes: a revision number, a check-in date and time, the author's identification [log id], a log entry, a state and the actual text [revision of the code]". Wang 6th Decl, ¶160.

[35] Wang 6th Decl, Annex A-C.

27

**Decoy Seq II, *i.e., * Decoy Sequences** The 1st Polish Decl defined "so-called Yield Book sequences" as the sequences generated by the YB Monte Carlo code from the two sets of decoy seeds in MR-RCS code. (Plaintiff denoted them, the two (2) phony sequences as the *Decoy Sequences* or *Decoy Seq II* in order to distinguish them from "so-called Yield Book sequences" of Radak, consisting approximately fifteen (15) Radak Sequences manufactured by Radak Code.) Through the use of the semantic trick, Defendants then misrepresented to the Court that Polish's "so-called Yield Book sequences" (i.e., *Decoy Seq II*) are the sequences used by TYB. The 2nd Polish Decl defines "so-called Yield Book sequences" as *Decoy Seq II* as above, but ***also*** accepted the Radak Sequences as the "Yield Book sequences" despite Radak Sequences are all totally different from Decoy Sequences. In the 3rd, 4th, and 5th Polish Decls, the definitions of "Yield Book sequences" have been switched from that of Decoy Seq II to that of Radak Seq I. §B, *Id.*

**LDS Seq III, i.e. LDS sequences** the three sequences LDS64, LDS100 and LDS200 generated by TYB Monte Carlo code using hidden seeds read in through XXXXX variable. By mathematical analysis, Fan showed that with a ***99.5%*** certainty that the one and only real algorithm used by Teytel to select all LDS sequence was targeting ACE. *Id.* ¶¶ 268, 269; Ex. E & G.

**Defendants' Theft Code** the secret downloading code Dr. Fan discovered from MR-RCS. Fan Decl., ¶ 121. As shown by RCS[36] of the Theft Code, Robert Russell,wrote and installed the first version of the Theft Code on August 1, 1996, the very day before Russell's boss called Dr. Wang to arrange the first test. *Id.* ¶ 139. During the 2-year feigned "testing" period from 1996 to 1998, Russell made at least 13 revisions to the Theft Code (*id.* ¶¶ 127, 150) in "lock steps with the progression of ACE tests" (*id.* ¶ 157). Theft Code was installed in the last ACE test system and saved ACE paths from the hidden files to back out the ***multiple*** ACE sequences. *Id.* ¶ 17, Tab. A The Theft Code was designed to be easily converted to the Use Code after they stole ACE to generate ACE interest rate paths. For example, as shown by Dr. Fan, module a2 of the Theft Code became b2 of the Use Code, again for saving the ACE rate paths in hidden files; module a3 in the Theft Code became b3 in the Use Code, again for retrieving the ACE rate paths from the files. Fan 4th Decl., Table B, ¶17, Fig.2-3; ¶175, §E.

**Defendants' ACE Use Code** Right after Defendants stole the ACE sequences using the Theft Code, they started using the stolen ACE sequences for production by converting the Theft Code to ACE Use Code (or the "Use Code"). *Id.* ¶¶ 178, 181; Summary (b), p. 6. Defendants installed the Use Code on June 16, 1998, immediately after they backed out the ACE sequences from the ACE Interest Rate Paths misappropriated on June 3, 1998. *Id.* ¶ 174. Using all of the stolen ACE sequences, the Use Code generates ACE Interest Rate Paths for the exclusive use of Defendants' internal users including their own traders for arbitrage operation. *Id.* §C and F, ¶¶ 174-5, 194-5, 215-6.

---

[36] The revision history of the RCS code contains the dates and authors of all revisions made to the code, including comments.

**Plaintiff's ACE Verbatim Use Claim** Defendants' ACE Use Code installed immediately after Defendants stole ACE sequences (using Theft Code in the last ACE test) reveals that The Yield Book ("TYB", "YB") offline systems surreptitiously read verbatim ACE sequences to generate ACE interest rate scenarios, which are then installed into the Yield Book online systems for the exclusive use of Defendants' own traders' for pricing, trading and arbitrage. (Appendix A, Objection)

**Plaintiff's ACE Derivative Use Claim** the sequences used by all TYB licensees, the LDS sequences, are selected by the algorithm targeting the stolen ACE sequences, and are all ACE derivative sequences. LDS Seq III are distinct from Radak Seq I and Decoy Seq II. *See* Fan 4th Decl., §§ C, D, F, G.

**"Yield Book sequences",** *a.k.a,* **"YB sequences", "TYB sequences", "Defendants sequences", "YB Numbers", "Yield Book Numbers".** Defendants have used all these terms interchangeably. Using a semantic trick, Defendants misrepresented to the Court that the "Yield Book sequences", the phony sequences generated by YB Monte Carlo code (which Plaintiff called Decoy Sequences) or the sequences generated by Radak Code (which Plaintiff called Radak Sequences) are the sequences used by TYB.

**Defendants False Claim** Defendants have mischaracterized ***Plaintiff****'*s claims as the "Yield Book sequences incorporating ACE," where the "Yield Book sequences" are defined in either Radak's Decl or Polish's Decls.  This implies that "Defendants' Monte Carlo code generated ACE sequences"[37] ("***Defendants*** False Claim"), which further implies that "ACE is *not* AAI's trade secret" and that "AAI stole ACE from Defendants.

**Defendants' 2nd False Claim, and Defendants' 3rd False Claim** Defendants willfully mischaracterized the ACE Derivative Use Claim as the phony "YB numbers were derived from ACE sequences." (A1-2, Appendix. A, Objection) When the "YB numbers" are Radak Seq I, this will be referred to as **Defendants' 2nd False Claim.** When "YB numbers" are Decoy Seq II, this will be referred to as **Defendants' 3rd False Claim.**[38] Defendants' mischaracterizations deceived the Court into believing that Plaintiff must show "actionable similarity" between the phony "YB sequences" with ACE.

**Semantic game or semantic trick of Defendants:**  Defendants' game and trick of confusing the "TYB sequences" defined in Radak and Polish Declarations, i.e. Radak Sequences and Decoy Sequences, with the sequences used by TYB.

**Defendants' defense is based the 3 Prong Scheme[39]**

---

[37]  Wang Decl, ¶46.  See 56(h) Motion at 2, A1-1, 1-3, 1-4.

[38] 56(h) Memo at p. 3: "1st Polish Decl defined the phony sequences generated from the decoy seeds in MR-RCS ("Decoy Sequences II" or "Decoy Seq II") as "YB sequences." The definitions also in (B2-1) and Annex C, ¶42, Wang 6th Decl, several times before FMJ.  Defendants semantic trick confused all the phony sequences with the sequences used by TYB. It is necessary to distinguish them and give them different names.

[39] Plaintiff's Objection to Rule 56(h) Ruling, ECF361, at 4-5

29

***First Prong*** (**Mischaracterizations of Plaintiff's Claims as Defendants' False Claims**).
Defendants' willfully mischaracterized Plaintiff's misappropriation claim that TYB used verbatim stolen ACE sequences as "YB Monte Carlo code generated ACE sequences"[40] ("**Defendants False Claim**"). This implies that "ACE is *not* AAI's trade secret" and that "AAI stole ACE from Defendants."[41]

Defendants willfully mischaracterized the ACE Derivative Use Claim as the phony "YB numbers were derived from ACE sequences." (A1-2) When the "YB numbers" are Radak Seq I, this will be referred to as **Defendants' 2nd False Claim.** When "YB numbers" are Decoy Seq II, this will be referred to as **Defendants' 3rd False Claim**.[42] Defendants' mischaracterizations deceived the Court into believing that Plaintiff must show "actionable similarity" between the various patently garbage "YB sequences" with ACE.

**Defendants' Three Mischaracterizations** turned Plaintiff's trade secret misappropriation claim into Defendants' three False Claims of "copyright" infringement of ACE sequences by the phony "Yield Book sequences"[43]. By Defendants' own definitions these phony sequences are not even "defendants' product", but are product of Defendants' deceit[44]. A2-2. App.A
Defendants MSJ concealed all the material facts, and instead relied on their Mischaracterizations, which means that Plaintiff cannot prevail unless Plaintiff can prove *Defendants*' three False Claims to be true. To prove *Defendants*' False Claim is to prove "YB Monte Carlo code generated ACE", *i.e.*, to prove *Plaintiff* stole ACE from *Defendants*. Defendants mischaracterized Plaintiff 's claims to their exactly opposite.

***Second Prong*** (**Misrepresentations of Defendants' discovery production**) Defendants' misrepresented what they produced in discovery, in order to conceal the direct evidence of misappropriation including by withholding the sequences used by TYB and the entire TYB production code relating to sequences (TYB-RCS), which reads ACE to generate interest rate paths.[45] Defendants  misrepresented "YB sequences" as the sequences used by TYB.[46] Defendants further misrepresented the partial code achieve from their Mortgage Research Dept. ("MR-RCS") as the entire TYB production code TYB-RCS. When Dr. Fan noted that the MR-RCS cannot even be compiled, because of many missing files, Defendants misrepresented to the Court that the Radak Code composed of only 3 code files as the concealed TYB-RCS, which by comparison has over 1000 code files, and asserted that Dr. Fan is mistaken because the Radak Code can be compiled.

---

[40]  Defendants' deceptively phrased their False Claim as "Yield Book sequences incorporated ACE" which implies "YB Monte Carlo code" generated ACE sequences, Wang Decl, ¶46.  See 56(h) Motion at 2, A1-1, 1-3, 1-4.
[41] 56(h) Motion, §IV(C) at 20.
[42] 56(h) Memo at p. 3: "1st Polish Decl defined the phony sequences generated from the decoy seeds in MR-RCS ("Decoy Sequences II" or "Decoy Seq II") as "YB sequences." The definitions also in (B2-1) and Annex C, ¶42, Wang 6th Decl, several times before FMJ.  Defendants semantic trick confused all the phony sequences with the sequences used by TYB. It is necessary to distinguish them and give them different names.
[43] R&R2009 at 19, and R&R 2019 at 2.
[44] Appendix, A2-2.[45] Fan Decl. §H.
[45] Fan Decl. §H.
[46] Fan Decl. §B, p.15. Wang Decl. ¶¶45-54.

Their conspiracy with Collins procured and sustained the MJ' orders of September 5, 2012 and March 26, 2014.[47]

***Third Prong*** ( **the False or Misleading Declarations**) The 3rd Prong consists of Defendants submissions of the seven (7) false/misleading declarations of Radak, Polish and Russell in order to support their first two Prongs: Mischaracterizations and Misrepresentations. Radak Decl did not state that his declaration was based on first-hand knowledge as required by Rule 56(c)(4) and the Court Order ECF81, indeed he testified that he had no personal knowledge regarding the sequences used by TYB. Further, Defendants did not hire him until 2004, Exh.14, and therefore could not have had first-hand knowledge of the sequences used before this date, no matter to which code he had access. Polish relied on the phony Radak Decl in his 2nd-5th declarations and as a basis for his expert reports. The subject in 1st Polish Decl is Decoy Seq II. Yet in all their submissions, Defendants misrepresented these phony "Yield Book sequences" in Radak and Polish declarations (*i.e.,* the Radak Seq I or the Decoy Seq II), as all the sequences used by the Yield Book, misrepresented the circular definitions of the phony "Yield Book sequences" in these declarations as Radak and Polish' personal identification of the sequences used by the Yield Book. (B and C in App.A).

In addition, Defendants also submitted the declaration by Robert A. Russell[48] which falsely claimed that he did not "either save ACE nor interest rate paths generated by ACE." This is directly contradicted by his Theft Code which was designed with functions like "save_seq" and "get_seq" to steal ACE. The Theft Code was installed by Russell during the final ACE test system that stole ACE.  Defendants' first two Prongs and their semantic trick of "YB sequences" is evidence of Defendants' bad faith in submitting the False Decls in support of MSJ's for their corrupt purpose of changing Plaintiff's claims from misappropriation of ACE to copy-right infringement by the patently phony Radak Seq I or Decoy Seq II.

---

[47] 56(h) Motion, §III(D); Fan Decl. §B, and September 5, 2012 Hr Trs cited in Wang 6th Decl, ¶93, n63.

[48] The Op referred to Robert Russell as "Dr.".  This is inaccurate. Russell has a law degree but no advanced degrees beyond a bachelor.  Although he lacked expertise in math relating to sequences development or interest rate modeling, his expertise in programming made him the ideal chief architect of Defendants' Theft Code and ACE Use Code. Wang 6th Decl, ¶13.

# Appendix

**Defendants' 3 Prong Scheme and collusion Misled the Court to Prior Determinations**
(They have been presented in Plaintiff's Rule 56(h) Objection, under Review by District Court)

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| **Background.**<br><br>104. While steadfastly withholding the Evidential Documents, §VI, Defendants anxiously requested the Court ***to foreclose*** liability discovery "very quickly" ***before the start of*** damage discovery, during the **January 17, 2012 Court Hearing,** 74:11-13, Dkt. 146.. Magistrate Judge Pitman correctly denied Defendants' request and ruled that "I'm not going to bifurcate and set one period for testing and development discovery and another period for profits discovery."[49].<br><br>(Here the unspecified Paragraph numbers were from **Wang 6th Decl.,** where the | Defendants stonewalled both liability and damage discovery.<br><br>Defendants steadfastly refused to produce Robert Russell and Stephen Herman to Plaintiff for depositions regarding their Theft Code and ACE Use Code, that would expose the false Russell Declaration.<br><br>106. On July 13, 2012, Mr. Moore submitted a letter to the Court to resist the liability discovery ordered by both Judges. It masqueraded "YB sequences" as the Sequences Used by TYB, misrepresenting that Defendants have "agreed with AAI" regarding Defendants' semantic game, at 7. See ¶45-46. Relying on Defendants Flagrant Deceit, citing a misleading new declaration by Teytel of July 13, 2012. *Id.* Ex. ZZZZ, Moore claimed that Defendants could withhold Sequence Development Files and Testing Files, because "Teytel explained" the withheld code are "unrelated to the code relating to generation of sequences", and the withheld MR-RCS code, such as the 11 head files identified by Fan that are required for compiling | Collins delayed motion to compel, which AAI filed through another attorney on April 30, 2012.<br><br>Wang 6th Decl, ¶¶107-113,§ IV.<br>**Court order ECF 163, 168**.<br><br>107. In July 2012, to support Plaintiff's forthcoming motion to compel, Plaintiff's expert, Prof. Fan submitted a **declaration**, which Collins improperly **renamed** as "Notice of Expert Testimony of Jianqing Fan In Response to Notice of Expert Testimony of Michael Johannes, Ph.D. Anthony B. Sanders, Ph.D. and Nathaniel Polish, Ph.D." ("Fan July 2012 Decl."), Ex., Fan 4th Decl. Fan July 2012 Decl was sent to Defendants *before* the Court Hr of July 18, 2012, following Defendants' submission of Teytel's Decl of July 13, 2012. Fan July 2012 Decl. totally reaffirmed that Plaintiff needs the Evidential Documents withheld by Defendants as listed in Plaintiff's letter of July 5, 2012. After carefully analyzing the test data focused by Johannes' Report of June 17, | |

---

[49] *Id.* 77:12-15 "[the Court:] Just not going -- I think it's going to wind up generating more problems than it's going to solve.".

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| ECF numbers of the Court rulings and other documentary evidence are provided.)<br><br>**In July 18, 2012 hearing** ECF, the Court ordered Defendants to produce the damage documents they withheld, within two weeks.<br><br>Damage discovery certainly cannot be completed and has been extended. Discovery was to be extended | MR-RCS code, are maintained by CMO Analytics group. | 2012, Fan July 2012 Decl mathematically proved all these test data had been massively tampered with by Defendants, and discovered how Defendants did it, §II.D.<br><br>108. In the afternoon of August 17, 2012, Defendants **and Mr. Collins** behind my back **jointly** rushed the Court to change the course of Litigation to abruptly close discovery. Behind my back, Mr. Collins purportedly representing Plaintiff and Defendants **jointly**[50] called Hon. Pitman's Chambers to grant Defendants' request to rush the discovery be completed before September 5, 2012, so Defendants could launch SJ while concealing Evidential Documents. Defendants and Collins kept both Plaintiff and the Court in the dark. Their sneaky maneuver succeeded, Dkts. 163, 168. | |
| **September 5, 2012, Court Hearing.** | 93. In the Court hearing of September. 5, 2012, relying on Defendants' Flagrant Deceit, Defendants argued Evidential Documents are irrelevant to the purported "Plaintiff's allegations" which are really Defendants False Claims, ¶¶46-8. Further Defendants misrepresented that they had produced all The Yield Book production code "that generate sequences" and "that | 111. Disregarding my instruction, Collins **refused** to present Fan July 2012 Decl to the Court as an expert's declaration in support of Plaintiff's motion for relief from Defendants' violation of existing orders and obstruction of discovery. Collins' refusal misled the Court to believe that there was "very little if any | |

[50] "The Court: I believe there was a joined call [to the Chambers]… Ms Park: That's correct, Your Honor." Telephone Conference Hr Tr 2:9-14, of August 17, 2012, filed September 17, 2012, Dkt 168.

33

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | generate interest rate [path] scenarios", and asked "why defendant should have to produce code that generates an interface for interacting with a computer-based web program. It doesn't make any sense."[51]. <br><br> 94. Defendants further misrepresented to the Court approximately fourteen (14) times, that Radak Code *are* The Yield Book production code files sought by Plaintiff "modified only on two lines", and **can** generate interest rate scenarios, in response to Magistrate Judge Pitman's repeated questioning[52], intentionally misled the Court to believe that Fan's finding that none of Defendants' RCS code files are compilable was due to lack of "modification", rather than Defendants' withholding of files. <br><br> 95.Defense counsel, Ms. Jennifer Kennedy Park, misquoted Radak 30(b)(6) Depo of September 28, 2007 and its exhibit "Raddick-3[*sic*]" to deceive the Court, 70:10-13, *Id.*, while concealing from the Court that the exhibit Radak-1 holding in her hands, and in Defendants' computers brought into the Courtroom, is Radak Decl, Ex. O, *id.* which listed the inventory of the grand total three (3) code files consisting of **all** | evidence of Defendants' fraud", in **September 5, 2012 Hearing,** ¶143, ¶155, *infra.* Defendants relied on Defendants' Flagrant Deceit, and also relentlessly misrepresented the 3 files of Radak Code as the thousands of TYB-RCS code they withheld, §III.E.c. Defendants and Mr. Collins' scheme succeeded. | |

---

[51] September 5, 2012, Court Hr Tr. 44: 20-24, and 34:4-11, Dkt. 170.

[52] From **only redacted** Sep. 5 2012 Hr. Tr., Judge Pitman asked the point-blank questions at least fourteen (14) times *e.g.,* 13:3-7, 15:7-19, 54:25-55:11, 55-63:5, 56:24-57:1, 59:4-6, 60:17-22, 61:9-10, 61:22-62:8, 62:10-63:5, 63:17-20, 64:21-65:1, 65:15-17, 67:18-21, 68:3-4, and Defendants misleadingly answered the Court fourteen (14) times,15:7-19, 33:3-7, 41:8- 43:15, 44:13-25, 45-60 especially 58:7-11, 61:11-21, 63:21-64:1, 65:11-14, 65:19-23, 67:18-21, 70:10-13, 70:15:22, 74:11-21, 77:19-22, 78:22-79:6, *id.*

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | Radak Code. "Raddik-3" was one of the three files. Ms. Park also concealed from the Court that contrary to her misrepresentation, Radak *testified* specifically that Radak Code could generate **no interest rate scenarios** but only the sequences (phony Radak Seq I). Defendants' relentless deceits succeeded to mislead the Court, 93:21-94:12, *id.* Plaintiff's request for Evidential Documents was denied.  Dkts. 174; Court Hr. Tr. 170, 175.   Defendants knew very well that whether compilable or not, Radak Code has no evidential value, is irrelevant to the uncompilable cleansed MR-RCS code of several hundred files from Mortgage Research Dept. (CGM0176), and irrelevant to the partial TYB code (CGM0177). | | |
| **February 15, 2013, Ruling by District Court, ECF  214.**<br><br>Defendants' **mischaracterization** of AAI claims, in J. Swain' order of Feb 8, 2014 at 1 "[Defendants] incorporated [ACE data] into a software product called the Yield Book"; as "copy-right infringement claim" by "Defendants' sequences" (Decoy Sequences): "Plaintiff has everything it needs to compare | Judge Swain's Order of February 8, 2013 (based on Defendants' 3 Prong Scheme, presented to the Court in collusion with Collins)<br><br>45. "For substantially the reasons stated by Judge Pitman at the September 5, 2012, hearing, and in light of the evidence proffered by Defendants [misrepresentation of 3 files of Radak Code as thousands of concealed TYB-RCS code] that Plaintiff has everything it needs to compare Defendants' sequences [Decoy Seq II], analyze the code that Defendants use [Radak Code or YB Monte Carlo Code ] to generate their sequences [Radak Seq I or Decoy Seq II] to determine whether this process [Not ACE Use Verbatim Claim, Fig. 3 of Ex. SSS] could have | Judge Swain's Order of February 8, 2013, at 4, Dkt. 214 ("The Court also finds, from review of the evidence in front of Judge Pitman and in light of the briefings submitted…")<br><br>115.     In opposition of Plaintiff's objection, Defendants moved to exclude *Fan 3rd Decl.* and Wang 3rd Decl.  on the base that these documents have not been presented to Magistrate Judge Pitman. I instructed Collins to oppose Defendants' move to exclude, and I provided numerous controlling precedents. Further I pointed out to Collins that closing liability discovery on September 5, 2012 *before* Plaintiff's experts could have received deposition transcripts | |

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Defendants' sequences, analyze the code that Defendants use to generate their sequences to determine whether this process could have been derived from Defendants' alleged exposure to the Plaintiff's product and determine whether the Plaintiff's product played any role in the development of Defendants' sequences"; Judge Swain did not know Defendants **misrepresented** Radak Code as their withheld TYB-RCS. The Order was based on "The Court also finds, from review of the evidence in front of Judge Pitman and in light of the briefings submitted in connection with this objection". Judge Swain had no access to the new evidence of Fan 3rd Decl and Wang 3rd Decl, because both of them had been stricken by Defendants and Collins in collusion. | been derived from Defendants' alleged exposure to the Plaintiff's product and determine whether the Plaintiff's product played any role in the development of Defendants' sequences", *Id.*<br><br>46.The direct evidence to Plaintiff's ACE Verbatim Use Claim and ACE Derivative Use Claim, ¶39-41, is the sequences used by Defendants in TYB in the relevant period of time ("Sequences Used by TYB", Category 1, §VI) and Defendants' Sequences Development Files and Testing Files, which Defendants massively spoliated[53] , and still withheld ("Withheld Sequence Development Files and Testing Files" Categories 2, §VI); Categories 1-2 together will be referred as "Evidential Documents". Throughout this Litigation, Defendants withheld Evidential Documents (i) by **mischaracterizing** Plaintiff's allegations to misdirect, and (ii) by **misrepresenting** what Defendants have produced and what are Plaintiff sought, to mislead.<br><br>47.(i) Defendants **mischaracterized** Plaintiff's allegations as **Defendants' False Claim**: "YB sequences incorporated ACE", where their semantic game misleadingly **defined** "YB sequences" as certain phony sequences **generated** by TYB Monte Carlo code, not Sequences **Used** by | of Radak and Teytel to report to the Court in support of Plaintiff's sanction motion in September 5, by itself, should be a base for the Court to reconsider the new evidence, if not by Judge Swain, then through Her Honor, by Hon. Pitman.<br><br>116.    Collins rejected all of my inputs and instructions. Over my objection, **Mr. Collins concurred with Defendants' motion to strike both Fan 3rd Decl and Wang 3rd Decl**. Defendants and Collins let Hon. Swain no choice but to disregard both Declarations. Collins (at Defendants' direction) rushed a correction for an alleged error in Plaintiff's briefs to Judge Swain, and refused to retract the correction after the records demonstrated that there was no error the next day.   Further over my express objection, Mr. Collins briefs withheld controlling laws and key facts that would have overturned September 5 Order, but embraced Defendants Flagrant Deceit and Defendants' Deceit, ¶46-7, and Defendants' numerous misrepresentations in September 5 Hearings. Consequently, Judge Swain sustained September 5 Order, Dkt. 214 | |

---

[53] §D of Fan Decl.

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Her Honor could only see their briefings which are based on the 3-Prong Scheme. | TYB. So this mischaracterization is the same as "YB code generated ACE sequences" and will be referred as **Defendants' Deceit**. Defendants argued that "YB sequences incorporated ACE" is false because YB Monte Carlo code cannot generate ACE, so their purported "Plaintiff's misappropriation claim"—which is the strawman set up by Defendants----should be dismissed, See Annex A and Annex B.<br><br>48.Defendants further misleadingly named the Decoy **Seq II**[54], or later the Radak **Seq I**[55], as "Yield Book numbers", "Yield Book sequences", and later "Defendants' sequences" after Plaintiff exposed their semantic game[56]. Defendants masqueraded <u>these phony "Yield Book sequences" as the only sequences _used by_ The Yield Book</u>, and then misrepresented **_Defendants'_** masquerade as **_Plaintiff_**'s allegations to the Court ("**Defendants' Flagrant Deceit**")[57], which misdirected the | | |

---

[54] as in ¶3, Nathaniel Polish's declaration of February 28, 2006, "Polish 1st Decl", Ex.QQ, ¶49, Fan Decl.

[55] as in ¶2-3, Branislav Radak's declaration of September 1, 2007, Ex. O, ¶47, Fan Decl.

[56] Russell Munves's letter to Magistrate Judge Pitman of July 5, 2012, after Mr. Collins delayed and then produced a letter draft of two (2) pages, and refused to present the material issues of Defendants' violation of liability discovery to the Court.

[57] Defendants' Flagrant Deceit deceived the Court about Plaintiff's allegations: "The specific allegations are detailed in my Report and Recommendation dated August 5, 2009 (Docket Item 112)," The Court's order of May 31, 2017 at 1, Dkt.275.  "There appears to be no dispute concerning the following generalized description of the process utilized in the Yield Book. (1) numbers called 'seeds' are fed into a [YB Monte Carlo] number generator, [FN6]…" at 1 Report and Recommendation (R&R). Clearly "[t]he process" excluded Plaintiff's ACE Verbatim Use Claim. "Teytel's 200-path mixed-seed sequence or 1000-path single-seed sequence, the only sequences used by defendants within the limitations period." at 24, R&R. Clearly "Teytel's 200-path mixed-seed sequence" should be LDS 200-path sequence in **Seq III**, but Defendants Flagrant Deceit misdirected to phony **Seq I** and **Seq II**, ¶44. The 1st "1000-paths" used starting 1999 was again not generated by "the process", i.e. YB Monte Carlo code. According to the

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | discovery **away** from **all** the Sequences Used by TYB, *i.e.,* away from **both** ACE sequences (ACE **Seq IV**) **and** ACE Derivative Sequences (LDS **Seq III**), but to phony Radak **Seq I** and Decoy **Seq II**. | | |
| | | | |

| The Court rulings | | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Collins framed Plaintiff for the March 26, 2014 Order of MJ Pitman (Contempt Order) | | For a summary of the documentary evidence as to how Defendants and Collins procured the Contempt Order, see Appendix B, p.12-18, Row F The Collusion as shown by the undisputed testimony and documentary evidence.<br><br>See Wang 6th Decl. IV,  ¶¶95-211. | |
| July 15, 2014  Order of District Court | | See above. | |
| | | | |

| MJ Pitman's ruling on Rule 56(d) Motion | | | Status: |
|---|---|---|---|
| Did not reject any of Plaintiff's allegations of Defendants' misconduct. The Court observed the evidence of collusion, Wang 6th Decl. and Wang 7th Decl. are voluminous: "But, you know, quite honestly -- I mean, I'm looking  at -- just to take one example, or two examples, the Seventh Fan Declaration is approximately 20 pages single spaced. MR. LI: Sevenths -- what declaration? | Denied Rule 56(d) Motion purely on procedural ground:<br><br>See "[O]RDER denying 292 Motion to Strike [Rule 56(d) Motion]" (ECF 312).  The MJ ruled that "1. Plaintiff's motion to defer consideration of defendants' motion for summary judgment is denied." ECF312, purely on procedural and technical bases, because (i) he still mistook Plaintiff's claims were Defendants' False Claims, the issue of what were "Defendants' sequences" were litigated in 2012; (this is the 1st Prong of Defendants' Scheme, Rule 56(h) Motion); and (ii) 56(d) "should be made prior to | | under AAI's R&R and 56(d) Objection, filed on October 28, 2019, before Hon. Judge Swain |

---

admissible undisputed physical evidence, it is Defendants' programmers' code name of Super ACE sequence, §III,C.

| | | | |
|---|---|---|---|
| THE COURT: The -- excuse me. Seventh Wang Declaration. Excuse me. You're correct. The Sixth Wang Declaration is I think even longer if I recall correctly."  Hr Tr. 52:6-12. | the close of discovery" (contrary to law); and (3) "a party cannot submit new factual material on -- in support of a motion for reconsideration." (contrary to FRCP54(b))[58]. | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| **MJ Pitman's ruling on Rule 56(h) Motion** <br> Did not reject Plaintiff's allegations of Defendants' 3 Prong Scheme or Collusion | MJ Pitman did not consider 3 Prong Scheme and collusion, because he thought these allegations were irrelevant to the requirement of FRCP 56(h).  MJ focused only on the inquiry if Radak, Polish and Russell committed perjury at Defendants' direction.  MJ does not dispute Fan 4th is admissible in support 56(h) but failed to consider it at all. It did not mention the evidence contained in Wang 6th Decl. MJ did not know that the Theft Code evidence has been analyzed in 4th Fan Decl, §E, and is the evidence demonstrating Russell committed perjury. | Status: under AAI's Objection filed on October 28, 2019, before Hon. Judge Swain | |
| | | | |
| | | | |

---

[58] 53:23-55:8, May 28, 2019, Hr Tr.