## CLEARY GOTTLIEB STEEN & HAMILTON LLP

| | | |
|---|---|---|
| WASHINGTON, DC | ONE LIBERTY PLAZA | FRANKFURT |
| PARIS | NEW YORK, NY 10006-1470 | COLOGNE |
| | (212) 225-2000 | ROME |
| BRUSSELS | FACSIMILE (212) 225-3999 | MILAN |
| LONDON | WWW.CLEARYGOTTLIEB.COM | HONG KONG |
| MOSCOW | Writer's Direct Dial (212) 225-2868<br>E-Mail: cmoore@cgsh.com | BEIJING |

August 17, 2007

**CONFIDENTIAL**

BY FACSIMILE

Honorable Henry Pitman
United States Magistrate Judge
United States District Court
Southern District of New York
New York, New York 10007

Re: Advanced Analytics, Inc. v. Citigroup Global Markets Inc., et al.,
No. 04 Civ. 3531 (LTS) (HBP)

Dear Magistrate Judge Pitman:

We represent defendants Citigroup Global Markets Inc. and The Yield Book Inc. in the above-referenced matter. I write in response to the August 3 letter from plaintiff's most recent counsel, Todd S. Collins, and the accompanying declaration of Sen Hu, by which plaintiff baselessly accuses defendants of failing to comply with the Court's July 3 production order, which requires defendants to produce the "Yield Book sequences for the period of April 1999 through the present."

In addition, I am writing to ask the Court to grant defendants relief against plaintiff's most recent, and frankly its most stunning abuse of the discovery process, by serving last Friday through its most recent counsel, with just over one month remaining in a period for non-expert discovery that has endured for more than three years, a raft of overly broad and highly burdensome discovery requests that are largely duplicative of requests that plaintiff has previously served in this case, when it was represented by prior counsel who has since withdrawn. Apparently plaintiff harbors the view that each time its counsel withdraws and new counsel appears, it is entitled to a "do over," and may pursue anew discovery that has already been completed pursuant to its prior discovery requests. This attempt by plaintiff to repeat discovery that has already been completed is highly wasteful and highly unfair to defendants. If

permitted, it will require defendants to incur considerable additional management time and expense, and substantial additional legal expense, to deal with matters that plaintiff has already addressed. The Court cannot allow this to occur.

Specifically, plaintiff's most recent discovery abuse has arisen in the form of its service last Friday of a second request for a deposition under Rule 30(b)(6), demanding the production of representatives of defendants on September 7 to testify as to no fewer than 14 enumerated topics, and a sixth set of document requests, most of which is entirely duplicative of requests served by plaintiff's prior counsel. Further, plaintiff has demanded that defendants agree to increase the number of depositions plaintiff may take in this matter from 10 to 25, without any explanation as to the names of the additional witnesses beyond the 12 to which defendants have already agreed, or why such an extraordinary number of depositions is necessary in this case, especially in the final month of discovery.

The Court should reject each of these duplicative and otherwise improper discovery requests, which are in fact nothing more than an attempt by plaintiff's newly appointed counsel – its third set in this litigation – to impose unreasonable burdens upon defendants and attempt to prolong a discovery process that has been ongoing for more than three years.

**I.      Defendants Have Complied with the Court's July 3 Order**

Pursuant to the July 3 Order, defendants produced electronic information on July 16 in the form of sequences used by defendants on specific dates, providing plaintiff with all versions of these sequences that differ materially from one another and were used by defendants during the relevant period. The week before defendants produced these materials to plaintiff, defendants informed plaintiff in writing of each of the dates for which sequences would be produced, and explained that they would also produce sequences used as of such other dates as plaintiff might request, within reason. Defendants reiterated that offer on July 16, at the time that they produced the sequences.

Instead of responding to this good faith offer, plaintiff instead prematurely and unnecessarily complained to the Court about subjects defendants would have fully addressed if only plaintiff had informed defendants of plaintiff's purported concerns, whether in a telephone call, an email or a letter to defendants' counsel. Undoubtedly, the Court should infer that plaintiff has burdened the Court with these matters, rather than attempting to resolve them directly with defendants' counsel, in a further effort to foment ancillary litigation about discovery compliance, because plaintiff knows that litigation on the merits is increasingly confirming that plaintiff's trade secret misappropriation claims are utterly baseless.

Nevertheless, in an effort to avoid further burdening the Court with plaintiff's baseless accusations regarding defendants' production of sequences, defendants have provided to plaintiff two additional CDs, which should satisfy the concerns expressed in plaintiff's August 3 letter to the Court and the accompanying declaration of Dr. Hu. We are of course available to address any of these issues in further detail at the July 21 conference.

It bears emphasis that, while defendants have made this additional production in an effort to avoid the sideshow plaintiff is attempting to stage to avoid focus on the absence of evidence supporting its claims, plaintiff's complaints in its August 3 letter about defendants' compliance with the July 3 Order are baseless. Tellingly, the only support plaintiff provided to the Court in support of its attack on defendants' July 16 production comes in the form on a declaration from Dr. Hu, who according to his prior declaration, has no formal training in computer science. As the Court may recall, as to matters concerning the analysis of defendants' production code, plaintiff had previously relied upon the testimony of Christian Hicks, who held himself out to be an expert in the field of computer science. See also July 3, 2007 Tr. at 118 (Court noting that Dr. Hu's previous affidavit contained "a lot of things . . . which really are not admissible.")

First, plaintiff's claim that the absence of materials relating to the 1,000 path sequence is evidence that "defendants have failed to produce the Yield Book sequences for the period from April, 1999 through the present" is meritless, because it rests on the premise that the 1,000 path sequence has some relevance to this matter, when in fact it does not. Nor is there any basis for plaintiff's contention that it only learned of the existence of the 1,000 path sequence through Dr. Teytel's deposition on July 30. To the contrary, defendants previously advised plaintiff's counsel both orally on July 10 and by letter on July 11 that the sequence used in connection with the 1,000 path model would not be among the sequences included in the July 16 production to plaintiff because (a) that sequence was generated from a single-seed system unrelated to Dr. Teytel's development of the Yield Book's mixed-seed method, and (b) the indisputable purpose of defendants' testing of ACE was in an effort to reduce, not increase, the number of paths utilized by the Yield Book, thereby rendering the 1,000 path system irrelevant to plaintiff's assertion that defendants misappropriated ACE.

Second, plaintiff's claim that "[d]efendants have . . . apparently failed 'to produce any documents in Teytel's files or work papers that contain the word[ ] 'ACE,'" and, thus have failed to comply with paragraph 3 of the July 3 Order is also baseless. Remarkably, plaintiff entirely ignores defendants' July 16 letter, in which they expressly explained that, as required by the July 3 Order, they searched all of Dr. Teytel's unproduced files (those that relate to the development of the mixed-seed system, and are the subject of the Court's March 2, 2006 Order denying plaintiff's request for that information) and found no references to "'ACE,' 'Wang,' or 'Accelerated Convergence Expert,'" as directed by paragraph 3 of the July 3 Order. Instead, plaintiff has focused entirely on references in Dr. Teytel's notebook that were previously raised by plaintiff's third and fourth set of lawyers, and which defendants have previously addressed, including with the Court, and repeatedly. See March 1, 2006 Court Tr. at 26-28 (plaintiff's counsel presenting Court with copy of Dr. Teytel's notebook, with same terms highlighted as those raised in August 3 letter of plaintiff's new counsel). Plaintiff's prior counsel in fact made the exact same argument during the July 2 conference as its current counsel makes now, see July 2 Tr. at 88-89, in response to which the Court directed defendants to search Dr. Teytel's files or work papers for information referencing "ACE," "Wang," or "'Accelerated Convergence

Expert." Defendants did just that, found no such information, and plaintiff offers no basis for its suggestion that the Court now revisit this issue for a third time.

Third, each of plaintiff's suggestions that "defendants' production in response to the Order was fragmentary and frankly misleading" is without merit.

a. While plaintiff did not support its complaint about supposed required "debugging" with any specific information, defendants have mooted any concern in this respect – as they would have done earlier had plaintiff raised this issue directly – by producing new versions of the folders "2000-09-01" and "1999-11-01."

b. Plaintiff's claim that "[t]he correct number of dimensions for the Sequences is [Redacted]," is patently false, and appears to be part of an intentional effort to mislead the Court. This assertion is based solely upon the disingenuous analysis set forth in paragraphs 4-6 of Dr. Hu's August 2 declaration. Specifically, Dr. Hu asserts that the line "[Redacted]" requires that [Redacted] time intervals be used at all times. See Hu Decl. ¶ 5 (asserting that [Redacted] is the proper number of dimensions because "[o]ne memory allocation is needed by the program to store the [Redacted] dimensions"); id. ¶ 6 (claiming that "as best [Dr.] Teytel could recollect, the dimension number is [Redacted] with respect to all Sequences"). Stunningly, Dr. Hu inexplicably omits a critical portion of the sole line upon which he relies, which provides that "[Redacted]" (emphasis added). As the text omitted by Dr. Hu notes, the number [Redacted] simply defines the maximum number of time intervals that may be used by a particular sequence. And contrary to Dr. Hu's declaration, Dr. Teytel did not testify that all sequences use [Redacted] dimensions. Although plaintiff's counsel insisted that Dr. Teytel assume for the purpose of various questions that the number of time intervals used by the sequences was [Redacted], Dr. Teytel repeatedly explained that he did not remember the exact number of time intervals used. See Teytel Tr. at 111:2-3 (Q: "And that one [the 200 path mixed-seed sequence] had [Redacted] [time intervals], didn't it?" A. "I don't remember the exact number."); id. at 154:11-17 (Dr. Teytel: "Again, I'm not sure [what number of time intervals were used]— [interrupted by plaintiff's counsel] Q. Whatever the time period. I'm just using . . . [Redacted] because that's what I [plaintiff's counsel] think that the two hundred path single seed sequence used . . . So let's just use [Redacted] for time periods.") (emphasis added).

Moreover, neither plaintiff nor Dr. Hu mentions Dr. Chan's testimony, in which he explained that the single line of code relied upon by Dr. Hu for his theory that the number of time intervals is necessarily [Redacted] at all times in fact simply provides that [Redacted] "is only the maximum allowable" number of time intervals. See Chan Tr. 96:6-7; id at 101-02 (Dr. Chan: "the ntg_max is the maximum [number of time periods] allowed and the little ntg is the actual number of periods used, . . . [and] it's set to . . . grid ->ntg, which means the ntg was actually defined in a different place and passed in as part of the structure called grid. . . . Q. [W]hat does that mean? A. That means in that structure called grid, contains a fi[le] also called ntg, for obvious reasons, . . . so for Monte, it just takes that value of ntg from the grid structure and use it as the local ntg. Q. So grid is a whole [']nother file? It would be in a different function. . . .

But, yeah, could be in a different file. . . . Q. The number in the other file could be <u>any number up to the</u> Redacted <u>max</u>? A. Yes.") (emphasis added).

In fact, defendants used [Redacted] time intervals until approximately 2000, after which they used [Redacted] time intervals. Each of the sequences produced on July 16 therefore reflected either [Redacted] or [Redacted] time intervals, as determined by the file "paths.c" and the function "time_grid" in the file "time_grid.c". Accordingly, in order to moot any need to address this issue further, defendants have produced to plaintiff versions of the sequences for each of the previously identified dates in the year 2000 using both [Redacted] and [Redacted] time intervals.

c. Plaintiff's assertion that "[t]he 200 path Sequence contained in one particular folder ["2000-09-01"] was generated by the wrong set of seed [sic] – the seeds for the 100 path Sequence" is also incorrect. The September 1, 2000 sequence was generated using the proper seeds. However, upon review of the version of this sequence produced on July 16, defendants discovered that they inadvertently generated a 200 rather than 100 path sequence, and therefore they have produced a corrected version of the sequence used by defendants on September 1, 2000 (<u>i.e.</u>, a 100 path mixed seed sequence, using the same seeds as the version previously produced).

d. Plaintiff's assertion that it was somehow "misled" by defendants' production of certain sequences that are identical to sequences used on other dates is nonsensical. Plaintiff simply cannot be heard to say it has suffered any prejudice as a result of defendants' production of this additional information, which simply confirms that the sequences produced during relevant time period did not contain ACE, the only relevant issue in this case.

e. Finally, plaintiff's assertion that the only possible purpose for the use of a mixed-seed system would be to "approximate the distribution of a known sequence" is flatly contradicted by Dr. Chan's testimony. <u>See</u> Tr. at 131 ("You couldn't think how mixed seeds could be used to approximate a known sequence?" A: "No."); <u>id.</u> at 166-167 ("Do you have any reason to believe that Salomon or Citigroup ever attempted to approximate the distribution of a known sequence using multiple seeds?" A: Approximate the distribution of a known sequence? No."). Dr. Chan's testimony confirms there is no basis for plaintiff's claim that the mixed-seed system was used to approximate ACE.

In sum, all of the complaints plaintiff has raised in its August 3 letter to the Court are now moot in light of defendants' additional production – one they would have made earlier had plaintiff raised these matters with defendants directly – or demonstrably baseless. There is no merit to plaintiff's renewed demands for the production of additional information relating to defendants' sequences.

## II. The Court Should Reject Plaintiff's Most Recent Abuse Of The Discovery Process

Discovery in this matter began more than three years ago, yet last week, with little more than one month remaining in discovery, and a schedule already crowded with previously-scheduled depositions – and ironically on the same day that the Court entered an Order stating that it would not tolerate such discovery abuses again – plaintiff's latest counsel has essentially attempted to start the discovery process anew by serving a raft of overbroad, duplicative and onerous discovery requests. The Court should not permit this latest abuse to succeed.

The full extent of plaintiff's gross abuse of discovery with its most recent discovery requests can best be understood after a brief review of this matter's history. After defendants tested plaintiff's ACE product in 1998, defendants simply chose not to license it, concluding it would not serve defendants' needs, especially at the exorbitant price plaintiff demanded. Having failed to sell its product to defendants – or, for that matter, to anyone else – in September 1999 plaintiff hired counsel to threaten to sue defendants, based upon false allegations that defendants stole ACE. In response, defendants offered to have an independent expert compare their production software code and ACE to determine whether defendants' code improperly incorporated or was based upon ACE. Tellingly, plaintiff refused, and defendants heard nothing from it again for more than two years.

In February 2002, plaintiff renewed its accusations, with a new set of lawyers, who delivered a draft complaint. Defendants renewed their earlier proposal to resolve this matter with the aid of an expert, but plaintiff again refused, and did not appear again for another two years. In May 2004, aided by yet a third set of lawyers, plaintiff filed this lawsuit, the day before the sixth anniversary of the third and final testing of ACE by defendants.

Plaintiff served its first round of discovery requests <u>over 30 months ago</u>, consisting of 21 separate requests for documents, some dating back to 1996. Even then it was difficult for defendants to gather and produce responsive information, given plaintiff's substantial delay in filing suit.

As the Court knows, the close of non-expert discovery in this case was originally scheduled for July 1, 2005, more than one year after plaintiff filed its complaint. That deadline was subsequently adjourned, twice, to January 31, 2006, thereby providing plaintiff with approximately 19 additional months in which to conclude fact discovery. However, weeks before that deadline plaintiff served a second wave of discovery requests, demanded that defendants agree to schedule seven depositions during the last ten days of January 2006, and demanded that defendants produce witnesses pursuant to Rule 30(b)(6) to testify on four separate topics. As a result of plaintiff's delay in seeking that discovery (in addition to its failure to fully respond to defendants' discovery requests), the non-expert discovery period was extended through May 1, 2006.

In March 2006, the Court held a hearing regarding various discovery disputes, ultimately ordering, among other things, that plaintiff produce documents responsive to

defendants' previous discovery requests for information relating to plaintiff's purported development of the ACE numbers by March 15, 2005. In bold violation of that order, plaintiff refused to produce the required documents by the Court's deadline, arguing that its decision to seek reconsideration of the Court's order rendered it ineffective. That motion for reconsideration was ultimately denied, but plaintiff's efforts to avoid this Court's production order resulted in yet another extension of the period of non-expert discovery, this time through August 1, 2006.

Next, on May 17, 2006, the Court informed defendants that plaintiff's third set of counsel had filed an ex parte motion to withdraw. In July 2006, the Court entered an order adjourning the deadline for conducting non-expert discovery until approximately five months after the resolution of this withdrawal motion. In order to provide plaintiff's new set of attorneys with sufficient time to conclude fact discovery, the parties negotiated, and the Court approved, a further extension of the non-expert discovery deadline to August 20, 2007. Thus, as a result of plaintiff's impasse with its third set of lawyers, the period for conducting non-expert discovery was extended a total of an additional 12 months.

Once they appeared only a few short months ago, plaintiff's fourth set of lawyers in this matter – Loewinsohn, Deary & Flegle and Whatley Drake & Kallas, LLC – brought the discovery process back to square one, serving a third document request containing **18** separate requests, a fourth document request, containing **six** separate requests, a fifth document request, containing **nine** separate requests, a third set of interrogatories, containing **four** separate interrogatories, a fourth set of interrogatories, containing **three** separate interrogatories, and noticing **eight** depositions. Similar to the discovery served by plaintiff's third set of counsel, these requests came less than two months before the scheduled close of non-expert discovery, forcing yet a fourth delay of the discovery deadline, to September 28, 2007. In light of the September 28 deadline, defendants bent over backwards and agreed to accommodate plaintiff's demand that the parties schedule many depositions over the course of several weeks, despite the fact that defendants had identified each of the witnesses more than two years earlier. Nevertheless, as the Court well knows, merely three business days before those depositions were to begin, plaintiff's fourth set of attorneys announced that they too would withdraw, thereby becoming the fifth and sixth law firms to abandon plaintiff's cause.

Apparently in anticipation of this most recent withdrawal motion, plaintiff had already retained the law firm of Storch, Amini & Munves, P.C., to continue prosecuting its claims, as Mr. Munves of that firm acted as lead counsel in a hearing before the Court on July 3, a few weeks before that motion was filed. Plaintiff nevertheless refused to proceed with depositions scheduled for July 24-26, on the ground that Mr. Munves' firm, and yet another newly retained firm based in Philadelphia, Berger & Montague, P.C., required additional time to prepare for those depositions.

Although the Court ultimately permitted plaintiff to reschedule those depositions, it ruled only last Friday that "[d]iscovery will not . . . be further adjourned as a result of any delay occasioned by plaintiff's changing counsel, nor will defendants or witnesses be compelled

to comply with unreasonable requests concerning the re-scheduling of their depositions. A party or witness does not lose that right, nor is the right diminished, as a result of the unilateral action of the adverse party." Order, dated August 10, 2007. Yet on the very same day that the Court entered this Order, confirming that plaintiff cannot rely upon its most recent change of counsel to burden defendants with unreasonable discovery requests, plaintiff's newest counsel had the temerity to attempt essentially to restart discovery from square one once again, serving defendants with plaintiffs' sixth document requests, containing **33** separate requests, and a notice of deposition under Rule 30(b)(6), listing no fewer than **14** topics for defendants' designees to address, all this with slightly more than one month remaining in the non-expert discovery period, one that is already dominated by previously scheduled depositions that have not yet been completed.

Still worse, these eleventh-hour "start from scratch" discovery requests are stunningly overbroad and almost entirely duplicative of requests served by the four law firms that previously represented plaintiff in this matter. The Court need not trust my descriptions to see that this is true – it can verify this fact in the few illustrative examples set forth in the following chart:

| **Plaintiff's Recent Requests** | **Plaintiff's Previous Requests** |
|---|---|
| "Documents sufficient to identify any and all customers of The Yield Book." Request No. 1. | "Documents sufficient to identify customers of The Yield Book for each year during the Relevant Time Period. . ." Pl's First Set of Interr's, Req's for Prod. and Req's for Admission to Def's ("First Requests") at 9. |
| "Contracts between The Yield Book and its customers and licensees, and documents summarizing or describing any or all such contracts." Request No. 3. | "...[A]ll licensing agreements." Id. at 9. |
| "All marketing materials, documents and communications used to promote The Yield Book . . ." Request No. 5. | "All marketing materials used by you to promote, market or sell all versions of The Yield Book." Id. at 7. |
| "Documents showing all sequences used for the purpose of assisting in valuing Securities ("Sequence") that were used or made available to: a.) defendants' employees or anyone else buying or selling Securities for or on behalf of defendant; and/or b.) customers of The Yield Book, including responsive documents that show the time periods when such Sequences were available or used and to or by whom." Request No. 7. | "All documents evidencing any and all changes made to any and all sequences used in simulation in The Yield Book (including but not limited to The Production Sequence), including but not limited to backups and copies of all revision control systems that were utilized." Id. at 8.<br><br>"All documents referenced in providing the response[]" to interrogatory requesting defendants to "identify each sequence used in simulation by your traders in mortgage-backed and asset-backed securities, the time period for which each sequence was used and the principal author(s) of the sequence."). Plaintiff's Second Set of Interrogatories, Requests for Production, and Requests for Admission to Defendants ("Second Requests") at 7-8. |

| Plaintiff's Recent Requests | Plaintiff's Previous Requests |
|---|---|
| "Documents showing all computer code for valuing Securities that was made available to: a.) defendants' employees or anyone else buying or selling Securities for or on behalf of defendants; and/or b.) customers of The Yield Book since January 1, 1997." Request No. 9. | "All documents referenced in providing the response[]" to interrogatories requesting defendants to "identify the code used to generate each sequence used in simulation by The Yield Book and made available to your clients, the time period for which such code was used and the principal author(s) of the code" and to "identify the code used to generate each sequence used [by] your traders in mortgage-backed and asset-backed securities, the time period for which such code was used and the principal author(s) of the code." Second Requests at 7-8. |
| "All documents relating to the creation, testing and evaluation of Sequences." Request No. 14. | "All documents referenced in providing the response[]" to interrogatories requesting defendants to "… identify (i) the systems that have been used to test [the sequences'] performance, including but not limited to source code, the compilation and linking 'makefile' or equivalent shell scripts that produced the executable code, (ii) the executable code, (iii) the environmental variables sufficient to run the tests, (iv) the instruments, input data and performance benchmarks against which the sequences were tested or compared, (v) all of the output and results produced by the test systems, (vi) all of the output and results produced by the test systems, (vi) the complete analysis of the results, and (vii) all other documents relating to such testing."). Second Requests at 7, 9. |
| "All reports generated quarterly by defendants concerning the revenues generated by market making, trading, or acting as a dealer or in proprietary trading, which mention or related to Securities." Request No. 21. | "…all quarterly and annual statements, reports, summaries, abstracts, and other summary documents that reflect the gross revenues, profits and/or losses of CGM, Yield Book, and/or any other affiliated or related entities of Citigroup that trade(d) one or more of the following instruments: a. asset-backed securities, b. mortgage-backed securities; c. fixed-income securities; and/or d. derivatives." Plaintiff's Third Request for Production of Documents to Defendants at 16. |
| "All documents and communications sufficient to summarize, for each quarter during the relevant time period, revenues and pre-tax profits derived from licensing of the Yield Book." Request No. 32. | "Documents sufficient to summarize, for each quarter during the Relevant Time Period, the gross revenues and net profits generated by The Yield Book." First Requests at 10. |
| "All documents and communications concerning changes in The Yield Book software from The Yield Book's inception to the present." Request No. 33. | "All documents evidencing any and all changes made to the source code of the Yield Book, including but not limited to backups and copies of all revision control systems that were utilized." First Requests at 8. |

In addition, in a further example of plaintiff's apparent stance that its engagement of new counsel entitles it to a "do over" in conducting discovery of defendants, plaintiff recently advised defendants that it wishes to increase the number of depositions it will take in this matter from the ten permitted under Rule 30(a)(2)(A) to 25, despite defendants' agreement to permit plaintiff to proceed with 12 depositions and plaintiff's refusal to identify any other witnesses who could possibly warrant such an extraordinary departure from the customary limit

Finally, earlier this week, plaintiff repeated its misconduct of a few short weeks ago when it unilaterally adjourned the deposition of James Goddard, which for weeks had been scheduled for August 16. Consistent with the Court's August 10 Order ("Discovery will not, however, be further adjourned as a result of any delay occasioned by plaintiff's changing counsel, nor will defendants or witnesses be compelled to comply with unreasonable requests concerning the re-scheduling of their depositions."), the Court should now preclude plaintiff from rescheduling this deposition.

Obviously, plaintiff's inability to maintain its counsel does not entitle it to re-launch discovery each time new counsel appears. To hold otherwise would permit plaintiff to require defendants to bear the substantial management time and expense, and the substantial management and legal expense, of repetitive (now three times over) searches for documents, repetitive preparations for and appearances at additional depositions on subjects that have been or are already being fully addressed with the existing deposition schedule, and other additional journeys through subjects that have already been explored by plaintiff's prior counsel, again and again. Plaintiff's most recent suggestion that it should now also be permitted to conduct up to 13 additional depositions – over and above the 12 to which defendants have already agreed – between now and September 28 is outrageous, as is its demand that several witnesses be made available on September 7 to testify on behalf of defendants to address 14 remarkably overbroad topics, including "[r]evenues and profits generated by any and all trading desks or other groups, departments or units of any or all defendants that dealt in, bought, or sold Securities." See Plaintiff's Notice of Videotaped Rule 30(B)(6) Deposition, item 2.

Enough is enough. In total, plaintiff's six different sets of lawyers have, over the course of the past three years, served **87** document requests, **22** interrogatories, and two requests for Rule 30(b)(6) depositions covering in total **18** separate topics. Against this background of delay and abuse, plaintiff should not be permitted to engage in even further abuse by making additional extraordinarily burdensome, overbroad and duplicative demands, a mere six weeks prior to the close of non-expert discovery, during which the parties have already scheduled eight days of depositions.

Plaintiff has had ample opportunity to conduct, and has in fact already obtained, substantial discovery in this matter over the course of the past three years. The effort by plaintiff's newest attorneys to abuse defendants further by starting the discovery process anew just as non-expert discovery is about to conclude cannot be permitted to succeed.

Honorable Henry Pitman, p. 11

In light of the foregoing, the Court should strike plaintiff's most recent requests for documents and its Rule 30(b)(6) notice, and it should permit plaintiff to take no more than the 12 depositions to which the parties have agreed. If the Court prefers, defendants will file a formal motion seeking this relief.

Respectfully submitted,

Christopher Moore

cc:   Russell D. Munves, Esq. (by facsimile)
      Todd S. Collins, Esq. (by facsimile)