Ex. 1 Comparison of Plaintiff's claims and
Defendants False Claims Considered by R&R and Sep 30 Order

| 1. Plaintiff's Claims of Misappropriation of Trade Secret | 2. Purported "Plaintiff's claims" in MJ Pitman's 2009 and 2019 R&Rs, **were copied** from Defendants MSJ's, and are all Defendants False Claims. | 3. <u>Judge Swain November 22, 2010 Order</u> **denied** MJ Pitman's R&R 2009 regarding Misappropriation Claim and Breach of Contract, questioned Defendants' False Claims. | 4. Plaintiff's 2014-2015 MSJ 56.1 Response, Meet and Confer Joint Report. And 56(d) 56(h) and 54(b) Motions and Objections | 3. Purported "Plaintiff's claims" in <u>Judge Swain Sep. 30, 2021 Order</u> **are all adopted** from MJ Pitman's two R&R's **in their entirety**, and overturned the correct 2010 November 22, 2010 Order. |
|---|---|---|---|---|
| (a) Defendants stole Plaintiff's numerical sequences (the "ACE Sequences"), using their Theft Code surreptitiously installed in the system for the system for the last and 4th ACE test.<br><br>(b)Immediately after 4th ACE test, Defendants installed their code suite ("ACE Use Code") in Yield Book systems designed to secretly use stolen ACE sequence for all of their traders | Then the "Yield Book sequences" 100, 200 paths, and 1000 paths (which are either fake Radak Sequences or Decoy Sequences.) incorporated ACE Sequences.<br><br>Defendants misled MJ Pitman to mistake the fake "Yield Book sequences" as products sold to Yield Book licensees, and that "AAI claims" are these fake sequences "(copyright) infringed" ACE sequences.<br>+++ | Although misled by the 1st Prong of Defs 3 Prong Scheme, misdirected to infringement by "Defs sequences", "The Court concludes that the Teytel notebook and the expert evidence proffered by Plaintiff in this connection, which is described at some length in section III.C.2.b. of the Report, would be sufficient to support a reasonable jury's determination in Plaintiff's favor on this aspect of the breach of contract claim, | Note 1: MSJ "Opp" Brief of May 28, 2014 was prepared by Collins in collusion with Defs. It flipped from Plaintiff's 2009-2009 MSJ Opp and Objection papers, and fully embraced Defendants False Claims as "Plaintiff's claims.", and – and even went further to state that ACE sequences were generated by Defs' Monte Carlo code (which AAI somehow appropriated | "Plaintiff's claims" are the same Defs False Claims as MJ Pitman's R&Rs.<br><br>The September 30, 2021 Order adopted MJ Pitman's 2019 RR in its entirety, covering the same Defs False Claims ("Defendants' sequences" *a.k.a* "Yield Book sequences" of 100, 200 (a.k.a Teytel sequence), 1000 paths "infringed" ACE), and adopted in its |

| | | | | |
|---|---|---|---|---|
| (**ACE Verbatim Use Claim**).<br><br>(c ) Defendants used Targeting Algorithm to select ACE *Derivative* Sequences (which are not the fake "Yield Book sequences") generated by YB Monte Carlo code, and used them for all Yield Book licensees.<br>(**ACE Derivative Use Claim**).<br><br>Note: The evidence and the testimony by Prof Fan do not rely on the phony Defendants sequences, none of Defs' sequences can be verified because Defs resistance to producing the sequence development files and testing files that allow a test system to be compiled, and no TYB-RCS or CMO- | Note 1:<br>MJ Pitman held "Limited breach" is material breach and (R&R 2009 ) misappropriation of Confidential Software Information owned by AAI.<br><br>Note 2.<br>2019 R&R at 27 cited the Feb 2013 Order as the basis for his granting MSJ.<br><br>So Plaintiff is required to show copyright infringement, "similarity or derivation" of these garbage sequences to ACE sequences.<br><br>Note 3.<br>2019 R&R erroneously changed the cite of Plaintiff' 56.1 And changed all Plaintiff's Claims to Defendants False Claims.<br><br>See  Pl's Obj to Mot 54(b), June 23, 2020, p.8, ECF442 | The recommended grant of summary judgment in Defendants' favor is, accordingly, premature ==as well as unwarranted== on the current record because there is a genuine issue of material fact as to whether Defendants' sequences were derived from the ACE sequence, and ==the outstanding testing and development discovery may be relevant to whether Plaintiff can frame a genuine issue of material fact as to whether Defendants' disclosed practices were a front for actual use of the ACE sequence in generating Yield Book outputs.=="<br><br>"Because there are genuine issues of material fact as to whether Defendants' sequences were derived from, or ==disguised the use of, the ACE sequence and related information==, Defendants' | from Defs.) Thus ACE is "no trade secret" to Defs.<br><br>(R&R 2019 quoted Collins' Brief as one basis for granting MSJ.)<br><br>Plaintiff presented a mountain of, many times more factual hard evidence of:<br>(a)      Defs' Theft of ACE, Theft Code "save_seq" and "get_seq" etc.<br>(b) ACE Verbatim Use Claim, ACE Use Code: to read ACE sequences to generate ACE interest rate paths "store_paths" into "Xfiles"; "write_paths" "Read_paths" "store_paths" "retrieve paths"<br><br>Numerous Admission of Defs' programmers in English, confirming the Yield Book exclusive use of ACE verbatim for their traders | entirety the disposition of the same claims (regarding the infringement of ACE by the 100, 200, 1000 paths of "Defendants' sequences").<br><br>The Defendants False Claims are unrelated to Plaintiff's claims.<br><br>+++++<br>Sep 30 Order Cited the Feb 8, 2013 Order as the basis for adopting R&R.<br><br>The Feb 8, 2013 Order is based on the 3 Prong Scheme. |

| | | | | |
|---|---|---|---|---|
| RCS. Still, Prof. Fan was able to identify from the two dozens redundant copies of partial MR-RCS in the 2010 production, the Theft Code and ACE Use Code | | motion as to these aspects of the breach of contract claim, which alleges misuse of Confidential Information protected by the NDA, is denied." | | |
| | | | | |

# Glossary[1]

**RCS, a public domain software tool**[2] to archive a software product such as The Yield Book.

**RCS, the RCS archives of code files** created by the RCS tool. Each RCS archive is separately maintained by the separate department which created the archive:

    **TYB-RCS,** the RCS archive from The Yield Book, Inc. Defendants have misrepresented the partial MR-RCS as TYB-RCS from the beginning of the litigation. During September 5, 2012 Hearing, Defendants intentionally made 14 misrepresentations to the Court that the Radak Code produced in 2007 was "the RCS" code generating interest rate paths, the TYB-RCS code or MR-RCS withheld by Defendants sought by Plaintiff. Defendants L.R.56.1 Reply of January 15, 2015, ¶61, conceded that *they have withheld the entire TYB-RCS relating to sequences, i.e., relating to interest rate paths*. Wang 6th Decl. ¶¶85-87, 93-94, fn.63, 111, 219-220.

    **MR-RCS,** the RCS archive from the Mortgage Research Department of CGMI, produced by Defendants in 2005 and 23 identical copies in 2011, but none of them contained the many missing critical files which made them incompilable.

    **CMO-RCS,** the RCS archive from the CMO Analytics Group of CGMI. Defendants have withheld it in its entirety. Defendants did not even reveal its existence, until July 13, 2012 by Teytel Declaration. Fan 4th Decl, ¶¶ 274, 104. The CMO-RCS "is an integral part of The Yield Book code and purportedly was used by Dr. Teytel with the Mortgage Research RCS code to obtain a complete set of source code to price securities during his development of his LDS sequences." *Id.* ¶ 51.

**Radak Code,** in response to this Court's orders in 2007 compelling production of the sequences used by TYB, Robert Russell, the mastermind of the ACE theft, instructed Branislav Radak in 2007 to concoct a set of *new* Monte Carlo codes consisted of three C-code files ("Radak Code") to generate sequences for production ("Radak Sequences") to purportedly comply with the Court orders, Fan 4th Decl. ¶¶ 34, 56.

**Radak Seq I**[3]**, i.e., Radak Sequences** The sequences generated by Radak Code, with the two sets of decoy mixed seeds in MR-RCS code. Defendants produced the Radak Decl in 2007, which only stated that Radak created the Monte Carlo code ("Radak Code") that in turn generated "what are known as the Yield Book sequences" which he produced with his Declaration (which Plaintiff denoted as "Radak Sequences" or "Radak Seq II"). Defendants misrepresented the "Yield Book Sequences Production" in the Radak Declaration as "Yield Book Production Sequences" to claim Defendants have produced the sequences used by Yield Book as ordered by the Court. §B, *Id.*

---

[1] For ease of understanding, the terms are listed in the order of their appearance instead of alphabetically, and are grouped and organized for readability.

[2] https://www.gnu.org/software/rcs/tichy-paper.pdf, at 7, "Every node in a revision tree consists of the following attributes: a revision number, a check-in date and time, the author's identification [log id], a log entry, a state and the actual text [revision of the code]". Wang 6th Decl, ¶160.

[3] Wang 6th Decl, Annex A-C.

**Decoy Seq II,** *i.e.,* **Decoy Sequences** The 1st Polish Decl defined the "so-called Yield Book sequences" as the sequences generated by the YB Monte Carlo code from the two sets of decoy seeds in MR-RCS code. (Plaintiff referred to the two phony sequences as the *Decoy Sequences* or *Decoy Seq II* in order to distinguish them from "so-called Yield Book sequences" of Radak, consisting of approximately fifteen (15) Radak Sequences manufactured by the Radak Code.) Through the use of the semantic trick, Defendants then misrepresented to the Court that Polish's "so-called Yield Book sequences" (i.e., *Decoy Seq II* ) are the only sequences used by TYB. However, (1) in August 2007 after the Court granted Plaintiff's motion to compel sequences used by Defendants, Defendants informed Plaintiff that other than the two Decoy Seq, of 100, 200 paths disclosed by Defendants' Answers to Pl's Interrogotories, TYB used two "1000 paths sequences", "Russell 1000 paths" from 1999 to April 2006, and Radak 1000 paths from April 2006 until today. Defendants filed motion to oppose production of 1000 paths, and to limit production to ONLY sequences generated by Defendants' Monte Carlo code, which exclude ACE sequences used by TYB. (2) Defendants programmers made comments in the ACE Use Code in RCS code that the Russell "1000 paths" is combination of sequences not generated by Monte Carlo code, i.e., ACE sequences;

The 2nd Polish Decl defines "so-called Yield Book sequences" as *Decoy Seq II* as described above, but *also* referred to the the Radak Sequences as the "Yield Book sequences" despite the fact that the Radak Sequences are all totally different from the Decoy Sequences. In the 3rd, 4th, and 5th Polish Decls, the definitions of the "Yield Book sequences" have been switched from that of Decoy Seq II to that of Radak Seq I. §B, *Id.*

**LDS Seq III, i.e. LDS sequences are** the three sequences, LDS64, LDS100 and LDS200 generated by the TYB Monte Carlo code using hidden seeds read in through XXXXX variable. By mathematical analysis, Fan showed that with a **99.95%** certainty[4] that the one and only real algorithm used by Teytel to select all LDS sequence was targeting ACE. *Id.* ¶¶ 268, 269; Ex. E & G.

**Defendants' Theft Code** the secret downloading code Dr. Fan discovered from MR-RCS. Fan Decl., ¶ 121. As shown by RCS[5] of the Theft Code, Robert Russell,wrote and installed the first version of the Theft Code on August 1, 1996, the very day before Russell's boss called Dr. Wang to arrange the first test. *Id.* ¶ 139. During the two-year feigned "testing" period from 1996 to 1998, Russell made at least 13 revisions to the Theft Code (*id.* ¶¶ 127, 150) in "lock step" with the progression of ACE tests" (*id.* ¶ 157). Theft Code was installed in the last ACE test system and saved the ACE paths from the hidden files to back out the *multiple* ACE sequences. *Id.* ¶ 17, Tab. A The Theft Code was designed to be easily converted to the Use Code after they stole ACE to generate ACE interest rate paths. For example, as shown by Dr. Fan, module a2 of the Theft Code became b2 of the Use Code, again for saving the ACE rate paths in hidden files; module a3 in the Theft Code became b3 in the Use Code, again for retrieving the ACE rate paths from the files. Fan 4th Decl.,

---

[4] 99.5% if 8 times steps are used. The Yield Book code indicated it is 10 times steps, and based on 10 times for the best seed, Fan calculated 99.95% certainty that LDS64 targeted stolen ACE64.
[5] The revision history of the RCS code contains the dates and authors of all revisions made to the code, including comments.

5

Table B, ¶17, Fig.2-3; ¶175, §E. See the 4th Fan Decl, ¶¶ 125-176, and See Pl' 56(d) Mot. pp 4-8, the Compendium of evidence attached.

**Defendants' ACE Use Code** Right after Defendants stole the ACE sequences using the Theft Code, they started using the stolen ACE sequences for production by converting the Theft Code to ACE Use Code (or the "Use Code"). *Id.* ¶¶ 178, 181; Summary (b), p. 6. Defendants installed the Use Code on June 16, 1998, immediately after they backed out the ACE sequences from the ACE Interest Rate Paths misappropriated on June 3, 1998. *Id.* ¶ 174. Using all of the stolen ACE sequences, the Use Code generates ACE Interest Rate Paths for the exclusive use of Defendants' internal users including their own traders for arbitrage operation. *Id.* §C and F, ¶¶ 174-5, 194-5, 215-6. For ACE Use Code, see the 4th Fan Decl, ¶¶ 178-259, cited in Pl' 56(d) Mot. pp 9-14.

TYB code for "nts" (*i.e.* "new term structure") model and its attending commentary showed that TYB used exclusively by their internal users does *not* use Monte Carlo code. Fan 4th Decl. ¶¶ 245-247, F9, *Ex.T*.[6] The internal Trading Sequences are *not* generated by Monte Carlo code, but are characteristically ACE sequences. Def.' 56.1 Statement, ¶¶ 7-8, 11-2, 19, and 6th Wang Decl. ¶ 27.

Defs claimed that from the year 2000 onward they have used only two sequences: "a single 200 path mixed seed sequence and a 1000 path single seed sequence." Fan 4th Decl. ¶ 240. See Fig. 4, Ex. SSS. However, Defs' code for their internal users require "the use of multiple sequences of fewer than 200 paths," which can only be ACE sequences. *Id.* F8, ¶¶ 241-244. Further these pricing sequences are subsets of the sequence of "1000 paths" used for calibration, as Russell explained in English in nts_monte_calibration.c., ¶¶73-76.

Robert Russell testified that other than ACE sequences, Defs had never used or tested any other sequences in their own computers, nor found any other sequences interesting.[7] It is also undisputed that other than ACE sequences, the only sequences TYB has ever used since 1994 are all ***generated*** by its Monte Carlo code (*i.e.*, guass_random.c or gauss_random_mixed.c). *See* Fan 4th Dec. Ex. W, pp. 4-7 (Def. Resp. to Interrog. No.2-4). In other words, **when TYB uses any sequence not generated by its Monte Carlo code _or_ any sequence not generated by its code but retrieved from data files, the sequence is necessarily ACE.**

It is indisputable that the internal Trading Sequences are not generated by Monte Carlo code but retrieved daily from offline data files, as revealed by the relevant codes and attending comments, *Id.* ¶¶ 72, 58-65; 174-5, 194-5, 215-6. Thus, the internal Trading Sequences are indeed ACE.

The MR-RCS code produced by Defs contains a codename of "1000 paths" referring to the sequence used for calibration (the "Calibration Sequence"), shortly after the installation of ACE Use Code. Fan 4th Decl. ¶¶ 68-72. The Calibration Sequence is the Super ACE sequence based on Defs' comments in the produced code, their answers to interrogatories and Robert Russell's testimony. *Id.* ¶¶ 72, 58-65. In "nts" model, their programmers admitted that **their Monte Carlo code was not used to generate sequences**. *Id.* ¶¶ 245-

---

[6] See also Fan 4th Decl. ¶13, ¶74 Ex. W (Response 1-4 to Plaintiff's Second Interrogatory), Ex. Z (P.1, Defendants "1000 paths" transmittal letter), and Ex.O (p.3 of the attached Radak Decl. of 2007).

[7] Fan 4th Decl, ¶148, **Russell Dep.** 9/17/07 **198:10-14**.

247, *Ex. T*. That leaves only ACE sequence. *Id.* ¶¶ 60. Defs' programmers further admitted that the multiple pricing sequences exclusively used by their internal users were ***all*** "**subsequences**" of the Calibration Sequence (i.e., "1000 paths"). *Id.* ¶¶ 68-73. This admission directly contradicts Defs' misrepresentation that the "1000 paths" is a single seed sequence, because a mixed-seed sequence such as Teytel sequence of 200 paths can never be a subsequence of a single-seed sequence. *Id.* ¶ 72. A single-race state cannot contain a mixed-race city. In contrast, as its constituent sequences, all the multiple ACE sequences are naturally subsequences of the Super ACE Sequence. Fan 4th Decl. ¶60. This fact is reflected by Defs' admissions in their code and attending comments that all the internal Trading Sequences are subsequences of the Calibration Sequence (*i.e.,* Super ACE sequence). *Id.* ¶ 73. In other words, **all internal Trading Sequences are ACE sequences and the Calibration Sequence is the Super ACE Sequence**. Fan 4th Decl, ¶13[8]. This is a "smoking gun" evidence for the ACE Verbatim Use. See Pl's 56(d) Motion,

**Plaintiff's ACE Verbatim Use Claim** Defendants' ACE Use Code installed immediately after Defendants stole ACE sequences (using Theft Code in the last ACE test) reveals that The Yield Book ("TYB", "YB") offline systems surreptitiously read verbatim ACE sequences to generate ACE interest rate scenarios, which are then installed into the Yield Book online systems for the exclusive use of Defendants' own traders' for pricing, trading and arbitrage. (Appendix A, Objection)

**Plaintiff's ACE Derivative Use Claim** the sequences used by all TYB licensees, the LDS sequences, are selected by the algorithm targeting the stolen ACE sequences, and are all ACE derivative sequences. LDS Seq III are distinct from Radak Seq I and Decoy Seq II. *See* Fan 4th Decl., §§ C, D, F, G.

**"Yield Book sequences",** *a.k.a,* **"YB sequences", "TYB sequences", "Defendants sequences", "YB Numbers," "Yield Book Numbers".** Defendants have used all these terms interchangeably. Using a semantic trick, Defendants misrepresented to the Court that the "Yield Book sequences", the phony sequences generated by YB Monte Carlo code (which Plaintiff called Decoy Sequences) or the sequences generated by Radak Code (which Plaintiff called Radak Sequences) are the sequences used by TYB.

**Defendants False Claim** Defendants have mischaracterized ***Plaintiff***'s claims as the "Yield Book sequences incorporating ACE," where the "Yield Book sequences" are defined in either Radak's Decl or Polish's Decls. This implies that "Defendants' Monte Carlo code generated ACE sequences"[9] (***Defendants* False Claim" or "DFC"**), which further implies that "ACE is *not* AAI's trade secret" and that "AAI stole ACE from Defendants.

**Defendants' 2nd False Claim, and Defendants' 3rd False Claim (**together with Defendants False Claim**, "Defendants False Claims" or "DFCs")** Defendants willfully

---

[8] See also, Fan 4th Decl. ¶73-75, and #48, Parties' Meet-and-Confer Joint Report, Ex. A attached to R.D. Munves' Letter to Magistrate Judge Pitman of January 16, 2015, Ex.4 of A. Pierz Decl.
[9] Wang Decl, ¶46.  See 56(h) Motion at 2, A1-1, 1-3, 1-4.

mischaracterized the ACE Derivative Use Claim as the phony "YB numbers were derived from ACE sequences." (A1-2, Appendix. A, Objection) When the "YB numbers" are Radak Seq I, this will be referred to as **Defendants' 2nd False Claim.** When "YB numbers" are Decoy Seq II, this will be referred to as **Defendants' 3rd False Claim**.[10] Defendants' mischaracterizations deceived the Court into believing that Plaintiff must show "actionable similarity" between the phony "YB sequences" with ACE.

**Semantic game or semantic trick of Defendants:** Defendants' game and trick of confusing the "TYB sequences" defined in Radak and Polish Declarations, i.e. Radak Sequences and Decoy Sequences, with the sequences used by TYB.

**Defendants' defense is based <u>the 3 Prong Scheme</u>**[11]

***<u>First Prong</u>*** **(Mischaracterizations of Plaintiff's Claims as Defendants' False Claims).** Defendants' willfully mischaracterized Plaintiff's misappropriation claim that TYB used verbatim stolen ACE sequences as "YB Monte Carlo code generated ACE sequences"[12] (**"Defendants False Claim"**). This implies that "ACE is *not* AAI's trade secret" and that "AAI stole ACE from Defendants."[13]

Defendants willfully mischaracterized the ACE Derivative Use Claim as the phony "YB numbers were derived from ACE sequences." (A1-2) When the "YB numbers" are Radak Seq I, this will be referred to as **Defendants' 2nd False Claim.** When "YB numbers" are Decoy Seq II, this will be referred to as **Defendants' 3rd False Claim**.[14] Defendants' mischaracterizations deceived the Court into believing that Plaintiff must show "actionable similarity" between the various patently garbage "YB sequences" with ACE.

**Defendants' Three Mischaracterizations** turned Plaintiff's trade secret misappropriation claim into Defendants' three False Claims of "copyright" infringement of ACE sequences by the phony "Yield Book sequences"[15]. By Defendants' own definition, these phony sequences are not even "defendants' product", but are product of Defendants' deceit[16]. A2-2. App.A

Defendants MSJ concealed all of the material facts, and instead relied on their Mischaracterizations, which means that Plaintiff cannot prevail unless Plaintiff can prove *Defendants*' three False Claims to be true. To prove *Defendants*' False Claim is to prove "YB Monte Carlo code generated ACE", *i.e.*, to prove *Plaintiff* stole ACE from *Defendants*. Defendants mischaracterized Plaintiff 's claims to their exact opposite.

---

[10] 56(h) Memo at p. 3: "1st Polish Decl defined the phony sequences generated from the decoy seeds in MR-RCS ("Decoy Sequences II" or "Decoy Seq II") as "YB sequences." The definitions also in (B2-1) and Annex C, ¶42, Wang 6th Decl, several times before FMJ. Defendants semantic trick confused all the phony sequences with the sequences used by TYB. It is necessary to distinguish them and give them different names.

[11] Plaintiff's Objection to Rule 56(h) Ruling, ECF361, at 4-5

[12] Defendants' deceptively phrased their False Claim as "Yield Book sequences incorporated ACE" which implies "YB Monte Carlo code" generated ACE sequences, Wang Decl, ¶46. See 56(h) Motion at 2, A1-1, 1-3, 1-4.

[13] 56(h) Motion, §IV(C) at 20.

[14] 56(h) Memo at p. 3: "1st Polish Decl defined the phony sequences generated from the decoy seeds in MR-RCS ("Decoy Sequences II" or "Decoy Seq II") as "YB sequences." The definitions also in (B2-1) and Annex C, ¶42, Wang 6th Decl, several times before FMJ. Defendants semantic trick confused all the phony sequences with the sequences used by TYB. It is necessary to distinguish them and give them different names.

[15] R&R2009 at 19, and R&R 2019 at 2.

[16] Appendix, A2-2.

***Second Prong*** (**Misrepresentations of Defendants' discovery production**) Defendants' misrepresented their discovery production,  in order to conceal the direct evidence of misappropriation including by withholding the sequences used by TYB and the entire TYB production code relating to sequences (TYB-RCS), which reads ACE to generate interest rate paths.[17] Defendants  misrepresented "YB sequences" as the sequences used by TYB.[18] Defendants further misrepresented the partial code achieve from their Mortgage Research Dept. ("MR-RCS") as the entire TYB production code, TYB-RCS. When Dr. Fan noted that the MR-RCS cannot even be compiled, because of many missing files, Defendants misrepresented to the Court that the Radak Code, comprising only 3 code files, as the concealed TYB-RCS, which by comparison has over 1000 code files, and asserted that Dr. Fan was mistaken because the Radak Code can be compiled. Their conspiracy with Collins procured and sustained the MJ' orders of September 5, 2012 and March 26, 2014.[19]

1. The purported development files for "Teytel sequence of 200 paths in Defendants' production of sequence development files and testing files ("Development Production") in 2011 were all fabricated. Deposition of Teytel on August 26, 2012 and Radak on August 29, 2012, confirmed Defendants spoliated and destroyed all the code and files that might reveal the algorithm used in selecting the seeds was targeting ACE. They destroyed all the original development files and testing files for LDS200 and the Radak 1000 Path Sequence of April 2006, and all the sequence selection files with name "ACE" in the titles. Teytel changed all the "last modification date" of all files to July 2005, even he purportedly developed LDS200 from later 1999 to April 2000. His modification of the dates covered up the fact that he fabricated the Development Production. The 2nd Polish Report relied on the fabricated Development Production. See the factual material in 4th Fan Decl, ¶¶ 91-124.

***Third Prong*** (**the False or Misleading Declarations***)* The 3rd Prong consists of Defendants submissions of seven false/misleading declarations of Radak, Polish and Russell in order to support their first two Prongs: Mischaracterizations and Misrepresentations. Radak Decl did not state that his declaration was based on first-hand knowledge as required by Rule 56(c)(4) and the Court Order ECF81, indeed he testified that he had no personal knowledge regarding the sequences used by TYB. Further, Defendants did not hire Rakak until 2004, Exh.14, and therefore he could not have had first-hand knowledge of the sequences used before this date, no matter to which code he had access. Polish relied on the phony Radak Decl in his 2nd-5th declarations and as the basis for his expert reports. The subject in 1st Polish Decl is Decoy Seq II. Yet in all their submissions, Defendants misrepresented these phony "Yield Book sequences" in the Radak and Polish declarations *(i.e.,* the Radak Seq I or the Decoy Seq II), as all the sequences used by the Yield Book, misrepresented the circular definitions of the phony "Yield Book sequences" in these declarations as Radak and Polish' personal identification of the sequences used by the Yield Book. (B and C in App.A).

---

[17] Fan Decl. §H.
[18] Fan Decl. §B, p.15. Wang Decl. ¶¶45-54.
[19] 56(h) Motion, §III(D); Fan Decl. §B, and September 5, 2012 Hr Trs cited in Wang 6th Decl, ¶93, n63.

In addition, Defendants also submitted the declaration by Robert A. Russell[20] which falsely claimed that he did not "either save ACE nor interest rate paths generated by ACE." This is directly contradicted by his Theft Code which was designed with functions like "save_seq" and "get_seq" to steal ACE. The Theft Code was installed by Russell during the final ACE test system that stole ACE.  Defendants' first two Prongs and their semantic trick of "YB sequences" is evidence of Defendants' bad faith in submitting the False Decls in support of MSJ's for their corrupt purpose of changing Plaintiff's claims from misappropriation of ACE to copy-right infringement by the patently phony Radak Seq I or Decoy Seq II.

## Evidential Documents Withheld by Defendants

Defs withheld 5 categories of direct key evidential documents in violation of 5 discovery orders (See Pl's 56(d) Mot at 2-3, ECF289; the 6th Wang Decl. ¶212) including

**(a) Trading Sequences**, which by Defs' programmers' admission include "multiple" sequences _not_ generated by Monte Carlo code, but are ACE sequences. **The Calibration Sequence** (the "Super ACE Sequence"). II, *Supra*.

**(b) The Development and Testing Files** that Defs withheld in violation of court orders,

(i) The Complete MR-RCS. (ii) TYB-RCS; (iii) The CMO-RCS code files. (iv) Other Testing Files and Development Files.

Defs' spoliation and fabrication of sequence records.


## Defendants' Three Level Fraud.

**First Level Fraud**. Defendants misappropriated Plaintiff's trade secrets: ACE Sequences, e.g., clandestinely relied on the purloined ACE sequences for lucrative riskless arbitrage operations to dominate the markets.

2.  Unbeknownst to AAI, Defendants completed the first version of the Theft Code to steal ACE on August 1, 1996. Then on the very next day, August 2, 1996 Defendants called Dr. Wang to invite him to "test" his new sequences using Defendants' computers. During a period of one and one-half years, Defendants revised the Theft Code eight times in lockstep with the progress of testing ACE. Finally, prior to the fourth ACE test on June 3, 1998, Defendants installed the ACE Theft Code into the ACE Test System.

3.  Defendants' notes from the fourth ACE test confirm that the Theft Code was installed in the ACE test system, which saved all the interest rate paths generated by the ACE™ sequences and stored them in a hidden directory. After the last ACE test Defendants retrieved the "saved" ACE interest rate paths to back out all ACE sequences. See the *factual* material in the 4th Fan Decl, ¶¶ 125-176.

4.  Immediately after the theft of ACE, Defendants clandestinely replaced the ACE Theft Code by the other massive code files in The Yield Book systems used exclusively by their traders to

---

[20] The Op referred to Robert Russell as "Dr.".  This is inaccurate. Russell has a law degree but no advanced degrees beyond a bachelor.  Although he lacked expertise in math relating to sequences development or interest rate modeling, his expertise in programming made him the ideal chief architect of Defendants' Theft Code and ACE Use Code. Wang 6th Decl, ¶13.

use the stolen ACE, as shown by MR-RCS code files.

5.  After they backed out the ACE sequences from the secretly stolen ACE interest rate paths on June 3, 1998, Defendants immediately began frantic efforts to install the large suites of code to use ACE ("ACE Use Code") for the *exclusive use* of the stolen ACE by their internal users, especially for their traders for trading and arbitrage ("**ACE Verbatim Use Claim or ACE Use Claim**"). For their traders, the ACE Use Code surreptitiously dumped the interest rate paths generated by Defendants' Production Sequence of 200 paths and switched to the interest rate paths generated by ACE,  playing daily ball-cup trick undercover.  Similar to the ACE test system, the *Offline* ACE Use Code read in ACE sequences, generated ACE interest rate paths, which Defendants appropriately named as "Xfiles" (*a.k.a*, "Xiaolu's Files" which Defendants referred to as ACE during the ACE testing), and saved them in a hidden directory, using code files appropriately named as "pathogen_cover.c" and "Xfiles.c". Then the *Online* ACE Use Code used exclusively by Defendants traders surreptitiously read in the ACE interest rate paths retrieved from the hidden directory under cover, again using "pathogen_cover.c" and "Xfiles.c", for accurate pricing, trading and risk-free arbitrage operation in global fixed income markets.

6.  Defendants in their internal memos admitted that ACE has a high market value, and Defendants main goal would have high security to prevent its theft by their own employees either while testing, or thereafter when they were using the [stolen] ACE™ in production, pulling off the same theft from Defendants as Defendants contemplated theft of ACE from AAI. This goal was accomplished by the ACE Use Code. The Yield Book *online* systems running in their internal servers for their internal users could only read in ACE interest rate paths stored in a hidden directory, without the need to access ACE sequences. This is their default mode. <u>See</u> the *factual* material cited in the 4th Fan Decl, ¶¶ 178-259.

7.  The Yield Book online systems running in their external servers for *The Yield Book external licensees*, the institutional investors, and other dealers, could not find the stored ACE interest rate paths. As their Yield Book code showed, they then would fall back to the interest rate paths generated by the sequence generated by TYB Monte Carlo generator, which was the Production Sequence in 1998-1999, LDS100 sequence in 1999-2000, and LDS200 sequence post-2000. Defendants' employee, Mihail Teytel selected all the LDS sequences by targeting the stolen ACE™ sequences using the same targeting algorithm (**ACE Derivative Use Claim**). Therefore, these sequences are all ACE derivative sequences. See the 1st Fan Report, and the 2nd Fan Declaration. <u>See</u> the 4th Fan Decl, ¶¶ 261-278.

<u>**Second Level Fraud**</u>. Defendants designed and implemented the *Three-Prong Scheme* to conceal their First Level Fraud: misappropriation of Plaintiff's trade secret and to derail the litigation.

<u>**Third Level Fraud**</u>.  In 2012, when their First Level Fraud and Second Level Fraud were about to be exposed, Defendants recruited Plaintiff's former lead counsel, Mr. Todd S. Collins ("Collins"), to clandestinely work for Defendants. Then Collins faithfully executed Defendants' game plan to mislead the Court step by step to dismiss Plaintiff's case. He sabotaged all of Plaintiff's attempts to expose Defendants' fraud but embraced Defendants' Three Prong Scheme to cover-up Defendants' fraud. In collusion with Defendants, Collins blocked all of Plaintiff's sanctions supported by admissible evidence against Defendants, prevented virtually all of the evidence of Defendants' fraud from being properly considered by the Court, and set up Plaintiff to be held in contempt of court. The Sixth Wang Declaration of

November 12, 2018, presented over 100 pieces of mostly documentary undisputed evidence of Collins' collusion with Defendants. See some excerpts in Appendix. These overt acts by Collins and Defendants include but not limited to:

1. In collusion with Defendants, Collins maneuvered to abruptly suspend discovery and to launch Defendants' summary judgment proceedings in order to have the case dismissed while withholding direct key evidence of misappropriation. First Defendants' obstructed liability and damage discovery, and made it impossible for the schedule outlined in the hearing of January 17, 2012, to be completed on time, while at the time Collins refused in filing a proper motion to compel. After Plaintiff moved to compel through another counsel, and the Court had denied/ disregarded Defendants' repeated requests to bifurcate liability and damage discovery, and extended the discovery schedule past September 2012, Collins called MJ Pitman on August 17, 2012, in collusion with Defendants, without Plaintiff's prior knowledge and approval, to seek reconsideration of Defendants' requests, to prevent both of the key witnesses Russell and Stuart Herman from being deposed, and to sought to move forward the Radak and Teytel depositions to the end of August 2012, which would allow Defendants to declare completion of the depositions at the September 5, 2012, Hearing to launch SJ while concealing direct key evidence. The expedited schedule also deprived Plaintiff's experts of receiving the transcripts in time to prepare their testimony to support Plaintiff's motion to compel in the Hearing.

2. In fact, Collins prevented the July 18, 2012, Declaration of Dr. Jianqing Fan and other declarations from being presented to the Court. Consequently, MJ Pitman's decision on September 5, 2012, was based on "very little if any evidence of Defendants' fraud." Instead, Collins made all of Plaintiff's expert declarations as targets *per se* for Defendants to strike.

3. During the hearing of September 5, 2012 before MJ Pittman, Defendants relied on their *Mischaracterizations* of Plaintiff's claims as "Defendants' sequences (Radak Sequences I or Decoy Sequences II) incorporated or derived from ACE sequences." The Court apparently was misled by Defendants' Mischaracterization that Plaintiff's misappropriation claim is a claim of [copyright] infringement by the bogus "Defendants sequences."

4. During the September 5, 2012 Hearing, Defense counsel made numerous misrepresentations to the Court with impunity, including fourteen misrepresentations that the Radak Code is the RCS production code (which was sought by Plaintiff but was withheld by Defendants) "modified only on two places", and that this code was "capable of generating interest rate paths." Defense counsel knew that these misrepresentations were false because at the hearing Defendants possessed and misrepresented the misleading *Radak Decl* which listed the entirety of the Radak Code of 2007 consisting of a total of three C-code files. They knew the Radak Code can only generate the phony Radak Sequences, and nothing else. They also knew that the uncompilable partial RCS code files actually contains more than 1000 code files. Defendants successfully concealed the direct evidence of their misappropriation in violation of the multiple court orders through the Second and Third Prong of their Scheme.

5. Defendants procured September 5, 2012 Order and which was sustained in the February 8, 2013 Order both through their Three Prong Scheme and conspiracy with Collins. Defendants and Collins in collusion again prevented both MJ Pitman and Judge Swain from considering the Fan July 2012 Declaration and other evidence of Defendants' fraud, such as the Fan 3rd Decl. and the Wang 3rd Decl. of September 28, 2012.

6. From Judge Swain's February 8, 2013 Order, it confirms that the Court has been misled by Defendants' fraud including, *inter alia,* (1) mischaracterization of all of AAI's claims as Defendants' False Claims; (2) misrepresentation of the "Yield Book sequences" *a.k.a* "Defendants' sequences" defined by Radak and Polish Declarations (i.e., the Radak Sequences and Decoy Sequences) as all the sequences used by TYB, by Defendants' semantic trick; (3) misrepresentation that the statements in the Radak and Polish's Declarations about only the Radak Sequences and Decoy Sequences were about the sequences used by TYB; and (4) Collins and Defendants in collusion prevented both Judge Swain and MJ Pitman from consideration of any evidence of Defendants fraud, including the Fan July 2012 Declaration, Third Declaration of Jianqin Fan PhD of September 27, 2012 and Third Declaration of Xiaolu Wang PhD of September 27, 2012, and the Fourth Fan Dec. that contained devastating evidence of Defendants' culpability.

7. Conspired with Defendants, since early 2012, Collins blocked Plaintiff from filing any sanction motions seeking relief from Defendants' fraud, e.g., under FRCP 37(a)/(b) and 56(d)/(h) that Plaintiff had repeatedly instructed him to file. Instead of submitting Plaintiff's experts' declarations in support of these motions as admissible evidence, Collins misrepresented that all of these declarations were "untimely expert reports" that to set them up to be stricken by Defendants and to frame Plaintiff for violation of the scheduling order and contempt of court.

8. In collusion with Defendants, Collins misrepresented that the Fourth Declaration of Dr. Jianjinq Fan ("Fourth Fan Decl.") of June 3rd, 2013 was prepared in support of the opposition to the summary judgment motion without justification, over the express and explicit objections of Plaintiff. Despite Plaintiff's urging, Collins delayed the filing of *Plaintiff's letter-motion to sanction Defendants for their spoliation and violations of existing court's discovery orders pursuant to FRCP 37(b) and the court's inherent powers* ("Rule 37(b) Sanction Motion") for as long as possible so that it would be filed after the filing of AAI's opposition to Defendants' summary judgment motion. Through another lawyer, Plaintiff eventually filed a Rule 37(b) Sanction Motion supported by the admissible Fourth Fan Declaration that would be devastating to Defendants' fraud, during the night of June 17, 2013.

9. The very next morning on June 18, 2013, behind Plaintiff's back, Collins secretly withdrew Plaintiff's Rule 37(b) Sanction Motion and Opposition to Defendants' 37(c) Motion from the Court's consideration, in a joint call with Defendants' counsel, including their lead counsel, Ms. Jennifer Park ("June 18 Call"). The withdrawal was premediated, in collusion with Defendants and without Plaintiff's authorization and knowledge. Collins intentionally and totally concealed both his secret withdrawal of the 37(b)

Sanction Motion and his June 18 Call from Plaintiff. This direct evidence of collusion was revealed and admitted by the Defendants' lead counsel, Ms. Jennifer Park, first in October 2019 and reconfirmed in 2020, in an attempt to block Plaintiff's renewed Rule 37(b) Sanction Motion.

10. Collins' secret withdrawal of the Rule 37(b) Sanction Motion behind Plaintiff's back not only sabotaged Plaintiff's 37(b) Sanction Motion against Defendants, but also set up Plaintiff for Defendants' sanction motion under Rule 37(c), in collusion with Defendants. Subsequently, Collins repeatedly and intentionally concealed from both Judge Swain and MJ Pitman AAI's Rule 37(b) spoliation motion, in all of the six sets of papers "Opposing" Defendants Rule 37(c) Motion.

11. Plaintiff commissioned the Fourth Fan Declaration in support of motions under FRCP37(b), 56(d)(h).  Yet over Plaintiff's express objection, in all of the six sets of briefs purportedly "opposing" Defendants' Rule 37(c) motion. In all of his six briefs, Collins rejected Dr. Wang's suggestion to include controlling facts and precedents establishing that Plaintiff's submission of Fourth Fan Declaration. was substantially justified, and therefore the Court's sanctioning the Plaintiff was not warranted. Instead of presenting any of the law and facts that the Fourth Fan Decl is actually admissible in support of MSJ, Collins included in the briefs his "duplicitous behavior" that among other things concealed the admissibility of the the Fan July 2012 Decl, and his "plainly misleading argument" *e.g.,* misrepresenting that the the facts in the Fourth Fan Decl were "Opinions," and that the "Fan 4th has the same opinions within the 4 corners of Fan 2007 Report." As a result, MJ Pitman cited Collins' deliberate "duplicitous behavior" and "plainly misleading argument" as the basis for his finding of contempt of court. In collusion with Defendants, Collins framed Plaintiff for violating the scheduling order of January 17, 2012, procured and sustained the MJ Pitman's order of March 26, 2014 (the "Contempt Order").

12. Even seven years later, Defendants still must rely on their conspiracy with Collins to prevent their fraud from being exposed. When Plaintiff requested to file Rule 37(b) full motion in October 2019, Defendants had no choice but revealed and admitted Collins' secret join call to MJ Pitman with Defense counsel, that included Jennifer Park, to clandestinely withdraw Plaintiff's Rule 37(b) Motion filed hours before behind Plaintiff's back. Today seven years later Defendants' defense completely relies on Collins' collusion and conspiracy with Defendants, by citing Collins' "withdrawal" of the 37(b) Spoliation Motion behind Plaintiff's back to dodge the sanctions, and by citing Collins' "duplicitous behavior" to further mislead the Court.

# Appendix

**Defendants' 3 Prong Scheme and collusion Misled the Court to Prior Determinations**
(They have been presented in Plaintiff's Rule 56(h) Objection, under Review by District Court)

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| **Background.**<br><br>104. While steadfastly withholding the Evidential Documents, §VI, Defendants anxiously requested the Court ***to foreclose*** liability discovery "very quickly" ***before the start of*** damage discovery, during the **January 17, 2012 Court Hearing,** 74:11-13, Dkt. 146.. Magistrate Judge Pitman correctly denied Defendants' request and ruled that "I'm not going to bifurcate and set one period for testing and development discovery and another period for profits discovery."[21].<br><br>(Here the unspecified Paragraph numbers were from **Wang 6th Decl.,** where the | Defendants stonewalled both liability and damage discovery.<br><br>Defendants steadfastly refused to produce Robert Russell and Stephen Herman to Plaintiff for depositions regarding their Theft Code and ACE Use Code, that would expose the false Russell Declaration.<br><br>106. On July 13, 2012, Mr. Moore submitted a letter to the Court to resist the liability discovery ordered by both Judges. It masqueraded "YB sequences" as the Sequences Used by TYB, misrepresenting that Defendants have "agreed with AAI" regarding Defendants' semantic game, at 7. See ¶45-46. Relying on Defendants Flagrant Deceit, citing a misleading new declaration by Teytel of July 13, 2012. *Id.* Ex. ZZZZ, Moore claimed that Defendants could withhold Sequence Development Files and Testing Files, because "Teytel explained" the withheld code are "unrelated to the code relating to generation of sequences", and the withheld MR-RCS code, such as the 11 head files identified by Fan that are required for compiling | Collins delayed motion to compel, which AAI filed through another attorney on April 30, 2012.<br><br>Wang 6th Decl, ¶¶107-113,§ IV.<br>**Court order ECF 163, 168**.<br><br>107. In July 2012, to support Plaintiff's forthcoming motion to compel, Plaintiff's expert, Prof. Fan submitted a **declaration**, which Collins improperly **renamed** as "Notice of Expert Testimony of Jianqing Fan In Response to Notice of Expert Testimony of Michael Johannes, Ph.D. Anthony B. Sanders, Ph.D. and Nathaniel Polish, Ph.D." ("Fan July 2012 Decl."), Ex, A, Fan 4th Decl. Fan July 2012 Decl was sent to Defendants *before* the Court Hr of July 18, 2012, following Defendants' submission of Teytel's Decl of July 13, 2012. Fan July 2012 Decl. totally reaffirmed that Plaintiff needs the Evidential Documents withheld by Defendants as listed in Plaintiff's letter of July 5, 2012. After carefully analyzing the test data focused by Johannes' Report of June 17, | |

---

[21] *Id.* 77:12-15 "[the Court:] Just not going -- I think it's going to wind up generating more problems than it's going to solve.".

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| ECF numbers of the Court rulings and other documentary evidence are provided.)<br><br>**In July 18, 2012 hearing** ECF, the Court ordered Defendants to produce the damage documents they withheld, within two weeks.<br><br>Damage discovery certainly cannot be completed and has been extended. Discovery was to be extended | MR-RCS code, are maintained by CMO Analytics group. | 2012, Fan July 2012 Decl mathematically proved all these test data had been massively tampered with by Defendants, and discovered how Defendants did it, §II.D.<br><br>108. In the afternoon of August 17, 2012, Defendants **and Mr. Collins** behind my back **jointly** rushed the Court to change the course of Litigation to abruptly close discovery. Behind my back, Mr. Collins purportedly representing Plaintiff and Defendants **jointly**[22] called Hon. Pitman's Chambers to grant Defendants' request to rush the discovery be completed before September 5, 2012, so Defendants could launch SJ while concealing Evidential Documents. Defendants and Collins kept both Plaintiff and the Court in the dark. Their sneaky maneuver succeeded, Dkts. 163, 168. | |
| **September 5, 2012, Court Hearing.** | 93. In the Court hearing of September. 5, 2012, relying on Defendants' Flagrant Deceit, Defendants argued Evidential Documents are irrelevant to the purported "Plaintiff's allegations" which are really Defendants False Claims, ¶¶46-8. Further Defendants misrepresented that they had produced all The Yield Book production code "that generate sequences" and "that | 111. Disregarding my instruction, Collins **refused** to present Fan July 2012 Decl to the Court as an expert's declaration in support of Plaintiff's motion for relief from Defendants' violation of existing orders and obstruction of discovery. Collins' refusal misled the Court to believe that there was "very little if any | |

[22] "The Court: I believe there was a joined call [to the Chambers]… Ms Park: That's correct, Your Honor." Telephone Conference Hr Tr 2:9-14, of August 17, 2012, filed September 17, 2012, Dkt 168.

16

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | generate interest rate [path] scenarios", and asked "why defendant should have to produce code that generates an interface for interacting with a computer-based web program. It doesn't make any sense."[23]. | evidence of Defendants' fraud", in **September 5, 2012 Hearing,** ¶143, ¶155, *infra*. Defendants relied on Defendants' Flagrant Deceit, and also relentlessly misrepresented the 3 files of Radak Code as the thousands of TYB-RCS code they withheld, §III.E.c. Defendants and Mr. Collins' scheme succeeded. | |
| | 94. Defendants further misrepresented to the Court approximately fourteen (14) times, that Radak Code *are* The Yield Book production code files sought by Plaintiff "modified only on two lines", and **can** generate interest rate scenarios, in response to Magistrate Judge Pitman's repeated questioning[24], intentionally misled the Court to believe that Fan's finding that none of Defendants' RCS code files are compilable was due to lack of "modification", rather than Defendants' withholding of files. | | |
| | 95.Defense counsel, Ms. Jennifer Kennedy Park, misquoted Radak 30(b)(6) Depo of September 28, 2007 and its exhibit "Raddick-3[*sic*]" to deceive the Court, 70:10-13, *Id.*, while concealing from the Court that the exhibit Radak-1 holding in her hands, and in Defendants' computers brought into the Courtroom, is Radak Decl, Ex. O, *id.* which listed the inventory of the grand total three (3) code files consisting of **all** | | |

---

[23] September 5, 2012, Court Hr Tr. 44: 20-24, and 34:4-11, Dkt. 170.

[24] From **only redacted** Sep. 5 2012 Hr. Tr., Judge Pitman asked the point-blank questions at least fourteen (14) times *e.g.*, 13:3-7, 15:7-19, 54:25-55:11, 55-63:5, 56:24-57:1, 59:4-6, 60:17-22, 61:9-10, 61:22-62:8, 62:10-63:5, 63:17-20, 64:21-65:1, 65:15-17, 67:18-21, 68:3-4, and Defendants misleadingly answered the Court fourteen (14) times,15:7-19, 33:3-7, 41:8- 43:15, 44:13-25, 45-60 especially 58:7-11, 61:11-21, 63:21-64:1, 65:11-14, 65:19-23, 67:18-21, 70:10-13, 70:15:22, 74:11-21, 77:19-22, 78:22-79:6, *id.*

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | Radak Code. "Raddik-3" was one of the three files. Ms. Park also concealed from the Court that contrary to her misrepresentation, Radak **testified** specifically that Radak Code could generate **no interest rate scenarios** but only the sequences (phony Radak Seq I). Defendants' relentless deceits succeeded to mislead the Court, 93:21-94:12, *id.* Plaintiff's request for Evidential Documents was denied.  Dkts. 174; Court Hr. Tr. 170, 175.   Defendants knew very well that whether compilable or not, Radak Code has no evidential value, is irrelevant to the uncompilable cleansed MR-RCS code of several hundred files from Mortgage Research Dept. (CGM0176), and irrelevant to the partial TYB code (CGM0177). | | |
| **February 15, 2013, Ruling by District Court, ECF  214.**<br><br>Defendants' **mischaracterization** of AAI claims, in J. Swain' order of Feb 8, 2014 at 1 "[Defendants] incorporated [ACE data] into a software product called the Yield Book"; as "copy-right infringement claim" by "Defendants' sequences" (Decoy Sequences): "Plaintiff has everything it needs to compare | Judge Swain's Order of February 8, 2013 (based on Defendants' 3 Prong Scheme, presented to the Court in collusion with Collins)<br><br>45."For substantially the reasons stated by Judge Pitman at the September 5, 2012, hearing, and in light of the evidence proffered by Defendants [misrepresentation of 3 files of Radak Code as thousands of concealed TYB-RCS code] that Plaintiff has everything it needs to compare Defendants' sequences [Decoy Seq II], analyze the code that Defendants use [Radak Code or YB Monte Carlo Code ] to generate their sequences [Radak Seq I or Decoy Seq II] to determine whether this process [Not ACE Use Verbatim Claim, Fig. 3 of Ex. SSS] could have | Judge Swain's Order of February 8, 2013, at 4, Dkt. 214 ("The Court also finds, from review of the evidence in front of Judge Pitman and in light of the briefings submitted…")<br><br>115.    In opposition of Plaintiff's objection, Defendants moved to exclude *Fan 3rd Decl.* and Wang 3rd Decl.  on the base that these documents have not been presented to Magistrate Judge Pitman. I instructed Collins to oppose Defendants' move to exclude, and I provided numerous controlling precedents. Further I pointed out to Collins that closing liability discovery on September 5, 2012 *before* Plaintiff's experts could have received deposition transcripts | |

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Defendants' sequences, analyze the code that Defendants use to generate their sequences to determine whether this process could have been derived from Defendants' alleged exposure to the Plaintiff's product and determine whether the Plaintiff's product played any role in the development of Defendants' sequences"; Judge Swain did not know Defendants **misrepresented** Radak Code as their withheld TYB-RCS. The Order was based on "The Court also finds, from review of the evidence in front of Judge Pitman and in light of the briefings submitted in connection with this objection". Judge Swain had no access to the new evidence of Fan 3rd Decl and Wang 3rd Decl, because both of them had been stricken by Defendants and Collins in collusion. | been derived from Defendants' alleged exposure to the Plaintiff's product and determine whether the Plaintiff's product played any role in the development of Defendants' sequences", *Id.*<br><br>46.The direct evidence to Plaintiff's ACE Verbatim Use Claim and ACE Derivative Use Claim, ¶39-41, is the sequences used by Defendants in TYB in the relevant period of time ("Sequences Used by TYB", Category 1, §VI) and Defendants' Sequences Development Files and Testing Files, which Defendants massively spoliated[25] , and still withheld ("Withheld Sequence Development Files and Testing Files" Categories 2, §VI); Categories 1-2 together will be referred as "Evidential Documents". Throughout this Litigation, Defendants withheld Evidential Documents (i) by **mischaracterizing** Plaintiff's allegations to misdirect, and (ii) by **misrepresenting** what Defendants have produced and what are Plaintiff sought, to mislead.<br><br>47.**(i)** Defendants **mischaracterized** Plaintiff's allegations as **Defendants' False Claim**: "YB sequences incorporated ACE", where their semantic game misleadingly **defined** "YB sequences" as certain phony sequences **generated** by TYB Monte Carlo code, not Sequences **Used** by | of Radak and Teytel to report to the Court in support of Plaintiff's sanction motion in September 5, by itself, should be a base for the Court to reconsider the new evidence, if not by Judge Swain, then through Her Honor, by Hon. Pitman.<br><br>116.    Collins rejected all of my inputs and instructions. Over my objection, **Mr. Collins concurred with Defendants' motion to strike both Fan 3rd Decl and Wang 3rd Decl**. Defendants and Collins let Hon. Swain no choice but to disregard both Declarations. Collins (at Defendants' direction) rushed a correction for an alleged error in Plaintiff's briefs to Judge Swain, and refused to retract the correction after the records demonstrated that there was no error the next day.   Further over my express objection, Mr. Collins briefs withheld controlling laws and key facts that would have overturned September 5 Order, but embraced Defendants Flagrant Deceit and Defendants' Deceit, ¶46-7, and Defendants' numerous misrepresentations in September 5 Hearings. Consequently, Judge Swain sustained September 5 Order, Dkt. 214 | |

[25] §D of Fan Decl.

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Her Honor could only see their briefings which are based on the 3-Prong Scheme. | TYB. So this mischaracterization is the same as "YB code generated ACE sequences" and will be referred as **Defendants' Deceit**. Defendants argued that "YB sequences incorporated ACE" is false because YB Monte Carlo code cannot generate ACE, so their purported "Plaintiff's misappropriation claim"—which is the strawman set up by Defendants----should be dismissed, See Annex A and Annex B.<br><br>48.Defendants further misleadingly named the Decoy **Seq II**[26], or later the Radak **Seq I**[27], as "Yield Book numbers", "Yield Book sequences", and later "Defendants' sequences" after Plaintiff exposed their semantic game[28]. Defendants masqueraded these phony "Yield Book <u>sequences" as the only sequences _used by_</u> The Yield Book, and then misrepresented **Defendants**'s masquerade as **Plaintiff**'s allegations to the Court ("**Defendants' Flagrant Deceit**")[29], which misdirected the | | |

---

[26] as in ¶3, Nathaniel Polish's declaration of February 28, 2006, "Polish 1st Decl", Ex.QQ, ¶49, Fan Decl.

[27] as in ¶2-3, Branislav Radak's declaration of September 1, 2007, Ex. O, ¶47, Fan Decl.

[28] Russell Munves's letter to Magistrate Judge Pitman of July 5, 2012, after Mr. Collins delayed and then produced a letter draft of two (2) pages, and refused to present the material issues of Defendants' violation of liability discovery to the Court.

[29] Defendants' Flagrant Deceit deceived the Court about Plaintiff's allegations: "The specific allegations are detailed in my Report and Recommendation dated August 5, 2009 (Docket Item 112)," The Court's order of May 31, 2017 at 1, Dkt.275.  "There appears to be no dispute concerning the following generalized description of the process utilized in the Yield Book. (1) numbers called 'seeds' are fed into a [YB Monte Carlo] number generator, [FN6]..." at 1 Report and Recommendation (R&R). Clearly "[t]he process" excluded Plaintiff's ACE Verbatim Use Claim. "Teytel's 200-path mixed-seed sequence or 1000-path single-seed sequence, the only sequences used by defendants within the limitations period." at 24, R&R. Clearly "Teytel's 200-path mixed-seed sequence" should be LDS 200-path sequence in **Seq III**, but Defendants Flagrant Deceit misdirected to phony **Seq I** and **Seq II**, ¶44. The 1st "1000-paths" used starting 1999 was again not generated by "the process", i.e. YB Monte Carlo code. According to the

| The Court rulings | Defendants' 3 Prong Scheme at work | Collins' collusion with Defendants at work | |
|---|---|---|---|
| | discovery **away** from **all** the Sequences Used by TYB, *i.e.,* away from **both** ACE sequences (ACE **Seq IV**) **and** ACE Derivative Sequences (LDS **Seq III**), but to phony Radak **Seq I** and Decoy **Seq II**. | | |
| | | | |

| The Court rulings | | Collins' collusion with Defendants at work | |
|---|---|---|---|
| Collins framed Plaintiff for the March 26, 2014 Order of MJ Pitman (Contempt Order) | | For a summary of the documentary evidence as to how Defendants and Collins procured the Contempt Order, see Appendix B, p.12-18, Row F The Collusion as shown by the undisputed testimony and documentary evidence.<br><br>See Wang 6th Decl. IV, ¶¶95-211. | |
| July 15, 2014  Order of District Court | | See above. | |
| | | | |

| MJ Pitman's ruling on Rule 56(d) Motion | | | Status: |
|---|---|---|---|
| Did not reject any of Plaintiff's allegations of Defendants' misconduct. The Court observed the evidence of collusion, Wang 6th Decl. and Wang 7th Decl. are voluminous: "But, you know, quite honestly -- I mean, I'm looking  at -- just to take one example, or two examples, the Seventh Fan Declaration is approximately 20 pages single spaced. MR. LI: Sevenths -- what declaration? | | Denied Rule 56(d) Motion purely on procedural ground:<br><br>See "[O]RDER denying 292 Motion to Strike [Rule 56(d) Motion]" (ECF 312).  The MJ ruled that "1. Plaintiff's motion to defer consideration of defendants' motion for summary judgment is denied." ECF312, purely on procedural and technical bases, because (i) he still mistook Plaintiff's claims were Defendants' False Claims, the issue of what were "Defendants' sequences" were litigated in 2012; (this is the 1st Prong of Defendants' Scheme, Rule 56(h) Motion); and (ii) 56(d) "should be made prior to | under AAI's R&R and 56(d) Objection, filed on October 28, 2019, before Hon. Judge Swain |

---

admissible undisputed physical evidence, it is Defendants' programmers' code name of Super ACE sequence, §III,C.

| | | | |
|---|---|---|---|
| THE COURT: The -- excuse me. Seventh Wang Declaration. Excuse me. You're correct. The Sixth Wang Declaration is I think even longer if I recall correctly."  Hr Tr. 52:6-12. | the close of discovery" (contrary to law); and (3) "a party cannot submit new factual material on -- in support of a motion for reconsideration." (contrary to FRCP54(b))[30]. | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| **MJ Pitman's ruling on Rule 56(h) Motion**<br>Did not reject Plaintiff's allegations of Defendants' 3 Prong Scheme or Collusion | MJ Pitman did not consider 3 Prong Scheme and collusion, because he thought these allegations were irrelevant to the requirement of FRCP 56(h).  MJ focused only on the inquiry if Radak, Polish and Russell committed perjury at Defendants' direction.  MJ does not dispute Fan 4th is admissible in support 56(h) but failed to consider it at all. It did not mention the evidence contained in Wang 6th Decl. MJ did not know that the Theft Code evidence has been analyzed in 4th Fan Decl, §E, and is the evidence demonstrating Russell committed perjury. | Status: under AAI's Objection filed on October 28, 2019, before Hon. Judge Swain | |

---

[30] 53:23-55:8, May 28, 2019, Hr Tr.